**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**ROBBIE KEETON GEIGER, as Administratrix**
**of the Estate of Ricky Keith Keeton, Deceased;**
**DELISHA KEETON MOONEY, and**
**MEGAN ARCHER**                                                                      **PLAINTIFFS**

**VERSUS**                                                            **CAUSE NO. 1:16cv95-SA-DAS**

**MONROE COUNTY, MISSISSIPPI**
**and ERIC SLOAN**                                                                      **DEFENDANTS**

<u>**MEMORANDUM IN SUPPORT OF QUALIFIED IMMUNITY**</u>

  **COMES NOW, DEFENDANT ERIC SLOAN,** in his individual capacity, and by counsel of record, and respectfully submits this Memorandum of Authorities in Support of Qualified Immunity and Summary Judgment as required by Uniform District Court Rule 7.2.

**I.  PREMISE**

  There is no genuine issue of disputed material fact.  The fundamental issue before the Court in this motion is the primary legal question of Qualified Immunity.

  1.  An objective law enforcement officer could believe it lawful for Eric Sloan to participate in a raid on the residence of suspected drug dealer Ricky Keeton wherein officers simultaneously announced themselves, cut the sewer line, and attempted to gain entry based upon a) authorization of a judge *via* a search warrant and b) a reasonable suspicion that knocking and announcing their presence before attempting entry would be dangerous, futile, or that it would inhibit the effective investigation of the crime.

  2.  It was objectively reasonable for Eric Sloan to participate in a raid on the residence of suspected drug dealer Ricky Keeton wherein officers simultaneously announced themselves, cut

1

the sewer line, and attempted to gain entry based upon a) authorization of a judge *via* a search warrant, and, b) a reasonable suspicion that knocking and announcing their presence before attempting entry would be dangerous, futile, or that it would inhibit the effective investigation of the crime.

3.     An objective law enforcement officer could believe it lawful for Eric Sloan to join other officers similarly situated in returning fire when the subject of a search warrant opened the door to his trailer and discharged a weapon at officers.

4.     It was objectively reasonable for Eric Sloan to join other officers similarly situated in returning fire when the subject of a search warrant opened the door to his trailer and discharged a weapon at officers.

5.     Eric Sloan is entitled to qualified immunity, summary judgment, and certification of final judgment.

6.     Eric Sloan respectfully invokes the arguments of the remaining Defendant herein, particularly that there is no cognizable issue of an underlying violation of the Fourth Amendment of the United States Constitution.

## II.  BACKGROUND

At all relevant times, Eric Sloan was a certified law enforcement officer employed by Monroe County, Mississippi.  The Plaintiffs herein have sued him in his individual capacity pursuant to 42 U.S.C. §1983 and the Fourth Amendment of the United States Constitution.  The Plaintiffs' claim arises from the death of Ricky Keith Keeton in Monroe County, Mississippi.  In the early morning hours of October 28, 2015, a confidential informant of the Monroe County Sheriff's Department was stopped in possession of a minor amount of illegal substances (commonly known as "meth" and/or

2

"ice"), after just having left the residence of Ricky Keeton[1]. The informant informed the Monroe County Sheriff's Department that Keeton still had a substantial amount of the illegal substances/drugs, as well as cash made from the sale of said drugs.

Based on this information, Deputy Tony Coxey, on his own affidavit and sworn testimony, obtained a "no-knock" search warrant from Judge Robert Fowlkes[2]. After a brief meeting with other deputies of the Monroe County Sheriff's Department, the search warrant was executed on the residence of Ricky Keeton, in Amory, Monroe County, MS[3].

After arriving at the Keeton residence and preparing to enter, multiple officers announced their presence and identity and proceeded to forcefully enter the Keeton premises[4]. Keeton had security and surveillance cameras set up around the perimeter of his house, knew of the officers' presence, and was already waiting for the officers with a pistol in his hand.[5] Upon breach of the doorway to the Keeton residence, Keeton, who was standing in the doorway, cursed at the officers and fired his pistol directly at the entering officers[6]. At that time, multiple officers with the Monroe

---

[1] Exhibit "B" - Parker deposition, P19, L2-24;   Exhibit "A" - Sloan deposition (from search warrant affidavit), P57, L7-16.

[2] [Doc. 1-1], Complaint Exhibit "A" - Search Warrant.

[3] Exhibit "C" - Smith deposition, P21, L1-9.

[4] Exhibit "D" - Lay deposition, P11, L11-25; P12, L1-3; Exhibit 7 to Lay deposition.

[5] The pistol used by Keeton was later determined to be an airsoft/BB pistol;  Exhibit "E" - Stegall deposition, P29, L4-25; P29, L1;  Exhibit "A" - Sloan deposition, P74, L1-3; P75, L1-22; P76, L1-6; Exhibit 2 to Sloan deposition;   Exhibit "E" - Stegall deposition (Entire deposition as Stegall's lawyer, Jim Waide, invoked Stegall's 5th Amendment rights at the very beginning of the deposition; P28; P29); Exhibit "F" - Coxey deposition, P19, L5-25; P20, L1-15.

[6] Exhibit "D" - Lay deposition, P12, L22-25; P13, L1-14;   Exhibit "A" - Sloan deposition, Exhibit 2.

County Sheriff's Department discharged their firearm at Keeton, who passed away as a result of the shooting. During the execution of the search, a substantial amount of illegal substances (drugs) was found[7]. A separate official capacity claim is filed against Co-Defendant Monroe County, Mississippi [**Doc. 1**, Complaint].

Much of Plaintiffs' Complaint here [**Doc. 1**] and in a companion case naming this officer [See Case: 1:16-cv-00014-NBB-DAS Doc #: 55 Filed: 03/28/17, and, Doc #: 57 Filed: 03/28/17] were devoted to accusations of personal and improper conduct. Nothing less than the same mud-slinging is expected here. Respectfully, however, this is a Fourth Amendment Claim. <u>Davenpeck v. Alford,</u> 543 U.S. 146 (2004) (Holding that an arresting officer's state of mind is irrelevant to the Fourth Amendment analysis).

### III. FACTS

The facts herein are presented in a light most favorable to the Plaintiffs and are re-stated from the separate brief of Monroe County, Mississippi.

### IV. SUMMARY JUDGMENT STANDARD

As a foundational matter, this individual Defendant seeks summary judgment pursuant to *Fed. R. Civ. P*. 56 and invoke the controlling standard for consideration of summary judgment under *Fed. R. Civ. P. 56*; (*See* also: <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Impossible Elec. Tech. v. Wackenhut Protection Systems</u>, 669 F.2d 1026, 1031 (5th Cir.

---

[7] Exhibit "A" - Sloan deposition, Exhibit 2;   Exhibit "E" - Stegall deposition (Entire deposition as Stegall's lawyer, Jim Waide, invoked Stegall's 5th Amendment rights at the very beginning of the deposition; P28; P29);   Exhibit "F" - Coxey deposition, P19, L5-25; P20, L1-15.

1982); Environmental Defense Fund v. Marsh, 651 F.2d 983, 991 (5th Cir. 1981); and, Southern

Distributing Co. v. Southdown, Inc., 574 F.2d 824, 826 (5th Cir. 1978)).

## V.  USE OF FORCE IN CONTEXT OF THIS INDIVIDUAL DEFENDANT

"Allegations of excessive force by police officers during arrest are analyzed for 'objective

reasonableness,' viewed from the on-scene perspective of a reasonable officer 'often forced to make

split second judgments . . . about the amount of force that is necessary in a particular situation'

without the benefit of hindsight."  Galvan v. City of San Antonio, No. 08-51235, 2010 U.S. App.

LEXIS 11114, at *4 (5th Cir. June 1, 2010)  (quoting Graham v. Connor, 490 U.S. 386, 396-97, 109

S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  "The objective-reasonableness inquiry is fact-intensive,

requiring consideration of circumstances such as 'the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight.'"  Id. at **4-5.

However, the use of force inquiry remains distinct from qualified immunity.  "The inquiries

for qualified immunity and excessive force remain distinct, even after Graham v. Connor, 490 U.S.

386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)]."  Saucier v. Katz, 533 U.S. 194, 204, 121 S.Ct. 2151,

150 L.Ed.2d 272 (2001).  Thus, the relevant immunity issue is whether "it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 202.  Further,

the purpose of immunity is to protect "all but the plainly incompetent or those who knowingly violate

the law,"  Id. (citations omitted).  Thus, in any § 1983 case alleging a police officer's use of

excessive or lethal force, the objective reasonableness of the force used is a separate question from

the immunity question of whether no reasonable officer could have believed that he was not using

excessive force.  See Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir. 1997).

Qualified immunity applies unless, under the plaintiffs' version of events, the use of force was "clearly excessive or clearly unreasonable." Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008). The Fifth Circuit has recognized that at least one of three factors have been present in each of the historical precedents in this jurisdiction finding qualified immunity for an alleged use of excessive force. These are: (1) that a subject posed an objective threat to the officers, (2) that a subject physically resisted arrest, or (3) a major crime was involved. Autin v. City of Baytown, 174 Fed. Appx. 183, 2005 U.S. App. LEXIS 29098 (5th Cir. Tex. 2005) (Qualified immunity did not apply when, without warning, an officer repeatedly stunned a non-threatening 5'2" 59 year-old female who was engaged in a minor prank.).

In the case at hand, Keeton was prepared with dogs and live feed surveillance equipment that showed the officers approaching, and he armed himself with a very real looking weapon as he protected a stash of approximately 9 ounces (more than 200 grams) of methamphetamine[8]. It is pretty obvious that Keeton was going back to jail if he were arrested. In this context, Plaintiffs' individual claim as to Defendant Eric Sloan does not state a claim for a seizure which violates the Fourth Amendment.

## VI. QUALIFIED IMMUNITY

The doctrine of qualified immunity shields a government official from civil liability for damages based upon the performance of discretionary functions, if the official's acts did not violate clearly established constitutional or statutory law of which a reasonable person would have known.

---

[8] Exhibit "A" - Sloan deposition, Exhibit 2;   Exhibit "E" - Stegall deposition (Entire deposition as Stegall's lawyer, Jim Waide, invoked Stegall's 5th Amendment rights at the very beginning of the deposition; P28; P29);   Exhibit "F" - Coxey deposition, P19, L5-25; P20, L1-15.

Easter v. Powell, 467 F.3d 459, 462 (5th Cir. 2006). "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002). "To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident." Waltman v. Payne, 535 F.3d 342, 346 (5th Cir. 2008) (footnote omitted). The court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Each government-official Defendant, through the official's own individual actions, must be shown to have violated the Constitution. See: Ashcroft v. Iqbal, 2009 U.S. LEXIS 3472 (May 18, 2009). When this analysis is applied to the individual officer named in this case, it becomes apparent that the Plaintiffs cannot meet the burden necessary to survive qualified immunity.

To demonstrate that an alleged constitutional violation was clearly established, Plaintiffs have two options. See Smith v. Darlin, 1999 WL 498586, *3-6 (N.D. Ill. 1999) (providing in depth discussion of the two options). They may point to a closely analogous case where a constitutional violation has been found. See Idoux v. Lamar U. Sys., 37 F.3d 632 (5th Cir. 1994). Alternatively, they may demonstrate that "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Plaintiffs cannot demonstrate a constitutional violation under the undisputed facts of this case, much less an "'existing precedent [that] place[s] the . . . constitutional question[s] beyond

7

debate.'" See Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (emphasis in original) (en banc).

As recently as January 9, 2017, the United States Supreme Court again reiterated:

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Id., at 639.

The panel majority misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment. Instead, the majority relied on Graham, Garner, and their Court of Appeals progeny, which—as noted above—lay out excessive-force principles at only a general level. Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers, United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L. Ed.2d 432 (1997), but "in the light of pre-existing law the unlawfulness must be apparent," Anderson v. Creighton, supra, at 640. For that reason, we have held that Garner and Graham do not by themselves create clearly established law outside "an obvious case." Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam ); see also Plumhoff v. Rickard, 572 U.S. ——, —— (2014) (slip op., at 13) (emphasizing that Garner and Graham "are 'cast at a high level of generality'"). White v. Pauly, 137 S. Ct. 548, 552 (2017) (emphasis added).

Respectfully, we ask that the Court consider the specific questions presented:

1.      Could an objective law enforcement officer believe it lawful for Eric Sloan to participate in a raid on the residence of suspected drug dealer Ricky Keeton wherein officers simultaneously announced themselves, cut the sewer line, and attempted to gain entry based upon a) authorization of a judge *via* a search warrant and b) a reasonable suspicion that knocking and announcing their presence before attempting entry would be dangerous, futile, or that it would inhibit the effective investigation of the crime.

8

2.     Was it objectively reasonable for Eric Sloan to participate in a raid on the residence of suspected drug dealer Ricky Keeton wherein officers simultaneously announced themselves, cut the sewer line, and attempted to gain entry based upon a) authorization of a judge *via* a search warrant and b) a reasonable suspicion that knocking and announcing their presence before attempting entry would be dangerous, futile, or that it would inhibit the effective investigation of the crime.

3.     Could an objective law enforcement officer believe it lawful for Eric Sloan to join other officers similarly situated in returning fire when the subject of a search warrant opened the door to his trailer and discharged a weapon at officers.

4.     Was it objectively reasonable for Eric Sloan to join other officers similarly situated in returning fire when the subject of a search warrant opened the door to his trailer and discharged a weapon at officers.

### *[Attempted Entry]*

We know generally from <u>Richards v. Wisconsin,</u> 520 U.S. 385, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997) that "in order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." <u>Id</u>. at 394, 117 S.Ct. 1416.  The reasonableness of an officer's decision "must be evaluated as of the time [he] entered the [dwelling]." <u>Id</u>. at 395, 117 S.Ct. 1416.  Moreover, we know that an announcement is not required, however, where "the police ... have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime[.]" Id. at 394, 117 S. Ct. 1416.  The showing of reasonableness necessary to overcome the

9

"knock-and-announce" requirement "is not high." <u>U.S. v. Washington</u>, 340 F.3d 222, 226 (5th Cir.2003) (quoting Richards, 520 U.S. at 394, 117 S.Ct. 1416.). Ultimately, we know that "this showing is not high." <u>Id</u>. 520 U.S. at 394.

Specifically, we know from <u>United States v. Rodriguez</u>, 548 F. App'x 230, 232 (5th Cir. 2013) that advanced consideration of these factors independent of what was authorized by warrant is significant to the constitutional inquiry before the Court. There, Deputy U.S. Marshal Austin Phillips ("Phillips") testified that Preston Browning ("Browning"), a supervisor with the Marshal Service, decided that the officers would execute the warrant without knocking and announcing their presence. In reaching that decision, Browning **considered "the safety of the personnel"** and the **possibility of "people flushing the narcotics down the toilet."** According to Phillips, there was **information from the undercover officer that Rodriguez had a firearm** in his waistband when the undercover officer initially purchased cocaine from Rodriguez. Similarly, Deputy U.S. Marshal Hector Arreola, also part of the arresting team, testified that **Browning informed officers that "there had been guns present during a previous purchase of narcotics at the residence."** Newman also testified that, prior to the October 11 entry, he had reviewed Rodriguez's **criminal history and discovered that Rodriguez had previously been charged with possession of narcotics and unlawful possession of a weapon."** In short, the entry was consistent with the mandates of the Fourth Amendment.

Considering <u>Rodriguez</u> here, we see the hours of training of a tactical unit (which Eric Sloan led), the assembly of officers for a pre-raid briefing, protective clothing, assigned positions and preparation to cut the sewer line to prevent flushing of evidence. The objective threat of a known drug dealer believed to be armed and protected by dogs, the potential for resistance, and the fact that

the raid was the subject of a major crime were actual things considered. Here again, the attempted entry of the Ricky Keeton residence was consistent with the mandates of the Fourth Amendment.

### *[Return Fire]*

"A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." Tennessee v. Garner, 471 U.S. 1, 7, 85 L. Ed. 2d 1, 105 S. Ct. 1694 (1985). "The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter." Estate of Phillips v. City of Milwaukee, 123 F.3d 586, 592 (7th Cir. 1997)).

The Supreme Court held in Graham v. Connor that the use of force during an arrest, an investigatory stop, or any other "seizure" of a person at liberty is to be judged by Fourth Amendment standards. Graham broadened the application of Tennessee v. Garner, where the Court held that the apprehension of a person by the use of deadly force constitutes a seizure of that person subject to the reasonableness requirement of the Fourth Amendment. "The issue of whether an intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry." Graham v. Connor, 490 U.S. 386, 399, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)). "The particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Again, this inquiry must go beyond generalities to the specifics - here, a known drug dealer responding to a significant show of force by brandishing and firing a pellet pistol, which in all respects looks just like a large caliber handgun.[9] No doubt, Plaintiffs will attempt to characterize

---

[9] Mullenix v. Luna, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)(The dispositive question is "whether the violative nature of particular conduct is clearly established." Ibid. (emphasis added). This inquiry " 'must be undertaken in light of the specific context of the case,

11

Keeton (the deceased drug dealer with approximately 9 ounces of meth) as defending his home, but this is to no avail in the context of qualified immunity.

In White v. Pauly, 137 S. Ct. 548, 550, 196 L. Ed. 2d 463 (2017), three officers were investigating a minor crime. When the suspect was located, Officer White, who had been waiting behind, moved to join the other two officers on the scene. As White was walking towards the scene, he heard someone other than his two fellow officers shout, 'We have guns.' White took cover behind a stone wall some 50 feet from the front of the house. One of the suspects fired a shotgun out the back door of the residence. Another pointed a gun generally in the direction of White's position. At this point, another officer fired at the suspect and missed. Several seconds later, White fired and killed the subject.[10]

In the White case, both the District Court and the 10th Circuit denied qualified immunity, hanging up on the fact that White was late to the scene, that the plaintiffs claimed a right to self defense based on a dispute over whether the other officers issued warnings, and the fact that White was safe behind a stone wall. Id. The reversal of the SCOTUS was clear, while the District Court denied summary judgment viewing the facts in a light most favorable to plaintiffs, only the facts that were known to the defendant officers should be considered. Id., 137 S. Ct. 548, 550 (2017). The conclusion – that White had reason to believe that the suspect was aware he was pointing a gun at law enforcement – illustrates that when Eric Sloan joined others in returning fire after the discharge of a very real looking pellet pistol, his actions were within the very broad scope of qualified immunity.

---

not as a broad general proposition.'").

[10] Facts summarized from the lower court opinion. Id. (Citing 814 F.3d, at 1066–1067).

Consider officer perception under the extreme facts posed in <u>Mason v. Lafayette City-Parish</u>

<u>Consol. Gov't</u>, 806 F.3d 268 (5th Cir. La. 2015):

> Quamaine stood still with his hands up and empty, complying with all police
> instructions. But holding his dog by its collar, Officer Faul and the dog charged
> Quamaine—the two were separated by less than the length of the dog's thirty-six-inch
> tether. Officer Faul shouted "Gun!," and launched the dog onto Quamaine. When the
> dog hit Quamaine, he began falling to the ground reflexively trying to fend off the
> attack with his hands. As Quamaine fell, Officer Faul began shooting him. Indeed,
> Officer Faul began firing nearly simultaneously with his deployment of the dog,
> which continued attacking throughout the shooting. This means that Officer Faul was
> firing at point-blank range and that the assault was of man and dog, not dog then
> man. Neither of the other two officers on the scene fired a single shot. <u>Id</u>.

A total of 7 shots were fired, 5 and then a pause, followed by 2 more which were essentially fired

into the back of an unresponsive suspect with whom a K9 was still actively engaged. <u>Id</u>. The result

was an extreme demonstration of the plain meaning of ***"beyond debate"*** in the context of deadly

force. The determination of qualified immunity as to the first 5 shots was not disturbed. Instead,

summary judgment was reversed as to the final 2 shots (in the back of the prone and unresponsive

suspect) because a reasonable jury could conclude that a reasonable officer in Officer Faul's position

would not have "probable cause to believe that [Mr. Mason] pose[d] a threat of serious physical

harm" at the time the final two shots were fired. In Mason, we see an officer use both nonlethal force

(dog) and lethal force almost simultaneously. Faced with a circumstance where many officers would

think it prudent to wait a few seconds longer, qualified immunity still applied to the simultaneous

use of a K9 and discharge of 5 rounds because an objectively reasonable officer could still believe

the suspect to have posed a sufficient threat to authorize the initial force employed.

In the instant case, multiple officers believed it reasonable to return fire. An outside agency

investigated and concurred. Defendant's liability expert, a qualified and real police officer, also

13

reviewed these facts and concurred.   Respectfully, this is a proper qualified immunity case.

**RESPECTFULLY,** we submit that Defendant Eric Sloan is entitled to qualified immunity

in his individual capacity, summary judgment, and certification of final judgment.

**RESPECTFULLY SUBMITTED** this the 1st day of November, 2017.

**JACKS  GRIFFITH LUCIANO, P.A.**

By:     /s/ ***Daniel J. Griffith***
        Daniel J. Griffith, MS Bar No. 8366
        Arnold U. Luciano, MS Bar No. 99198
        Attorneys for Defendants, Eric Sloan, in his
        Individual Capacity, and Monroe County,
        Mississippi

Of Counsel:

**JACKS GRIFFITH LUCIANO, P.A.**
150 North Sharpe Ave.
P. O. Drawer 1209
Cleveland, MS 38732
Phone No. 662-843-6171
FAX No. 662-843-6176
Email: dgriffith@jlpalaw.com
       aluciano@jlpalaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel J. Griffith, attorney of record for Defendants Eric Sloan, in his Individual Capacity, and Monroe County, Mississippi, do hereby certify that I have this day caused a true and correct copy of the above and foregoing *Defendant Eric Sloan's Memorandum Brief in Support of Qualified Immunity and Summary Judgment* to be delivered by the ECF Filing System which gave notice to the following Counsel of Record:

> Jim D. Waide, III, Esq.
> WAIDE & ASSOCIATES, PA
> P. O. Box 1357
> Tupelo, MS 38802-1357
> Phone: 662-842-7324
> Fax: 662-842-8056
> Email: waide@waidelaw.com

**DATED** this 1st day of November, 2017.

> /s/ *Daniel J. Griffith*
> Daniel J. Griffith