**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**ROBBIE KEETON GEIGER, as Administratrix
of the Estate of Ricky Keith Keeton, Deceased;
DELISHA KEETON MOONEY; and
MEGAN ARCHER**                                                        **PLAINTIFFS**

**VS.**                                             **CAUSE NO. 1:16-CV-00095-SA-DAS**

**MONROE COUNTY, MISSISSIPPI;
and ERIC SLOAN**                                                   **DEFENDANTS**

---

**PLAINTIFFS' MEMORANDUM BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

COME NOW Plaintiffs Robbie Keeton Geiger, Delisha Keeton Mooney, and Megan Archer, by and through counsel in the above-styled and numbered cause of action, and file this Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment [Docket 97], and in support thereof would respectfully show unto the Court as follows:

## I.     INTRODUCTION

This case involves the tragic shooting of Ricky Keeton in his trailer home on October 28, 2015.  At approximately 1:00 A.M., Monroe County Sheriff's Deputies were attempting to break into Ricky's home when Ricky confronted their break-in with a pellet gun.  The deputies fired multiple rounds through the walls and door at Ricky from the exterior of the home.   Ricky died from numerous gunshot wounds.

There are simple reasons why this complex case must be tried to a jury.   In many respects, this case boils down to a swearing match on material facts and conflicting inferences.   Some of the witnesses are necessarily untruthful; it is for the jury to determine which are telling the truth. For instance, the Sheriff's Deputies give differing versions of the forcible entry, but all claim they

yelled, "Sheriff's department," after they began trying to break into the door. On the other hand, the sole surviving occupant of the home testified that the Deputies made entry <u>without</u> knocking or announcing their presence. There is a clear-cut issue of fact as to whether there were "particular circumstances" that would have rendered knocking and announcing "dangerous or futile." Should a reasonable jury find that the Deputies did not knock and announce, there is equally clear constitutional liability.

Similarly, there are sharp issues of material fact as to whether the Deputies' firing multiple rounds at Ricky through the exterior of his home amounted to excessive force.   There are intricate factual issues as to whether Ricky posed an "immediate threat" to the officers such that the resort to deadly force was justified. Again here, the sole surviving occupant of the home testified that Ricky was shot through a closed door when he posed no such threat to the officers outside the home.   A jury must hear this disputed evidence and determine the truth.

Finally, there is a generally undisputed claim that the seizure of personal property was unconstitutional.   Defendants did not move for summary judgment as to this claim, presumably because there is no basis for such a request.   Plaintiffs' claims for unconstitutional seizure under the Fourth and Fourteenth Amendments must likewise be tried to the jury.

While this case is facially complex, the reasons to deny Defendant's Motion for Summary Judgment are not.   This case requires a trial.   There is no basis for summary adjudication. Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

Stating the facts in the light most favorable to the non-movants, and with all reasonable inferences drawn in their favor, as required by *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S.

133 (2000); and *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1863 (2014), the relevant facts are as follows:

### A.    Ricky Keeton's Background

Ricky Keeton was a fifty-seven (57) year old mechanic who lived on Sizemore Road in Smithville, Mississippi, in Monroe County.   (*See* Affidavit of Chuck Chism, Exhibit "A"; Transcript of Statements of Wanda Stegall, Ricky Payne, David Mitchell, Curtis Knight, Timothy Coker, Sheriff Cecil Cantrell, Tony Coxey, and Hunter Knight, Exhibit "B," at p. 5).[1]   Ricky lived in a house trailer with his girlfriend of approximately ten (10) years, Wanda Stegall.   (*See* Transcript of Statements of Wanda Stegall, Ricky Payne, David Mitchell, Curtis Knight, Timothy Coker, Sheriff Cecil Cantrell, Tony Coxey, and Hunter Knight, Exhibit "B," at p. 5.)   Prior to being self-employed as a mechanic, Ricky had worked as a plant manager for a furniture factory. (*See* Deposition of Wanda Stegall, Exhibit "C" at p. 39.)   Ricky's total criminal record consisted of one felony possession of marijuana conviction.   Sheriff Cantrell claims this conviction was for over 100 pounds.   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 42.)   Criminal records from the Circuit Court of Itawamba County, Mississippi, show that Ricky's indictment in 1997 was for sale of less than one kilogram of marijuana.[2]   Ricky pled guilty and was sentenced to twenty years incarceration, all of which were suspended.   (*See* Indictment and Sentencing Order in Itawamba County Cause No. CR97-113, Exhibit "E.")

---

[1]  All referenced exhibits are attached to Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [Docket 108].

[2]  Of course, one kilogram is the equivalent of 2.2 pounds.

**B.     Terry Parker's Relationship with Ricky Keeton**

Terry Parker routinely worked as a confidential informant for the Monroe County Sheriff's Department.  (*See* Deposition of Terry Parker, Exhibit "F," at pp. 6, 10-11, 37-38.)  Parker has an extensive criminal record.  (*See* Criminal records of Terry Parker, Exhibit "G.")  Parker claims that he began purchasing crystal methamphetamine from Ricky sometime in 2015.  (*See* Deposition of Terry Parker, Exhibit "F," at p. 8.)  Parker claimed that he bought crystal methamphetamine from Ricky "every two days."  (*See* Deposition of Terry Parker, Exhibit "F," at p. 9.)

Parker testified that he went to Ricky's trailer to purchase crystal meth on October 27, 2015.  (*See* Deposition of Terry Parker, Exhibit "F," at p. 15.)  He purchased an "[e]ight ball, which was $200 worth," though he did not pay for it.  (*See* Deposition of Terry Parker, Exhibit "F," at p. 17.)  On his way home from buying crystal meth, Parker picked up his friend, William Lynn Brown.  (*See* Deposition of Terry Parker, Exhibit "F," at pp. 17-18.)  Shortly thereafter, Monroe County deputies stopped Parker and Brown.  (*See* Deposition of Terry Parker, Exhibit "F," at pp. 18-19.)  Parker swears that a law enforcement officer found the crystal meth and a glass pipe inside his car and asked where Parker had made the purchase.  (*See* Deposition of Terry Parker, Exhibit "F," at p. 19.)  Parker replied that he had purchased the drugs from Ricky, and that he told the officer that there were other drugs inside Ricky's trailer.  (*See* Deposition of Terry Parker, Exhibit "F," at pp. 19-20.)  Parker was arrested, but released on bond.[3]  (*See* Deposition of Terry Parker, Exhibit "F," at p. 21.) The Deputies never asked Parker about the presence of weapons at Ricky's home.  (*See* Deposition of Terry Parker, Exhibit "F," at p. 22.)

---

[3] Parker was never prosecuted for drug possession.   His criminal charge was retired to the file.   (*See* Deposition of Terry Parker, Exhibit "F," at p. 38.)

Parker gave his information to Narcotics Deputy Tony Coxey, and Coxey relayed the information to his boss, the Head of Narcotics, Defendant Eric Sloan. (*See* Deposition of Tony Coxey, Exhibit "H," at pp. 5-8.)

At the time, Sloan was under investigation by Monroe County Chief Deputy Knight and Mississippi Bureau of Investigations investigator Kenneth Bailey for attempting to arrange the stealing of $10,000.00 from a robbery suspect, for sexual harassment, and for making false statements claiming he had been shot by an informant. (*See* Statement of Kenny Bailey, Exhibit "I"; and Polygraph Examination Report, Exhibit "J.") Sheriff Cantrell knew that Sloan was under investigation about a month before the raid on Ricky's home. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 13-15.)

Knight and Bailey were investigating Sloan, based upon information verified by a lie detector examination provided by a witness, Stephanie Herring. (*See* Statement of Kenny Bailey, Exhibit "I"; and Polygraph Examination Report, Exhibit "J.")

In her deposition, Herring explained how she came to know about Sloan's stealing and attempting to obtain $10,000.00 from a drug dealer, and his stealing from other drug dealers. Herring testified that she met Sloan in August 2015, when he came to question her about a robbery. (*See* Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, in His Individual Capacity; and Monroe County, Mississippi*; U.S.D.C., Northern District of Mississippi, Aberdeen Division; Cause No. 1:16-cv-00014-GHD-DAS, Exhibit "K," at p. 6.) Herring had information about the robbery because she knew one of the robbers, B.J. Williams. Sloan wanted Herring to verify the identity of the robbers and to get them to give her $10,000.00. She was, in turn, to give the $10,000.00 to Sloan, in exchange for which he would drop all potential

-5-

charges against her. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 10.) Herring related that if she could get Sloan the $10,000.00, he could use the money to take his kids to Disney World. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 10.) Herring testified that she verified that Williams was one of the robbers, but could not get the money from him since he had claimed that he had himself been robbed of the money. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 12.) Williams did, however, provide the name and address of a co-robber, Michael Patterson, and Herring gave Patterson's physical location to Sloan and told him that the money was at Patterson's place. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 13.) Herring told Sloan where the money was, but she wanted nothing to do with attempting to get it. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 14.)

Subsequently, Herring learned Sloan had been shot, and asked him whether he got shot trying to get the money, to which Sloan responded that he would "take the Fifth Amendment." (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 15.)[4]

Also, Herring described how she became an informant for Sloan and observed Sloan when he stole narcotics money that had been seized by a Natchez Trace Park Ranger by removing it from the bag in which it had been placed after the park ranger left the Sheriff's Department. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 18.) Sloan also related to Herring that he had dropped a felony charge in exchange for money. (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 19.)

---

[4] Sloan subsequently left the Sheriff's Department. Sheriff Cantrell testified that Sloan voluntarily quit of his own accord. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 23.) However, Chief Deputy Knight testified that Sloan quit his job as a deputy when Knight and Sheriff Cantrell asked Sloan to take a polygraph examination regarding Herring's allegations. (*See* Deposition of Curtis Knight, Exhibit "L," at p. 30-31.) Sloan admitted he refused a polygraph. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 36.)

-6-

Further, while Herring was working for Sloan as an informant, Sloan had asked her for oral sex and had exhibited his penis to her.[5]  (*See* Deposition of Stephanie Herring, Exhibit "K," at pp. 22-23.)

Herring relayed to Chief Deputy Knight all of the above information about Sloan, including Sloan's attempting to steal the $10,000.00 and his request for sex.  (*See* Deposition of Stephanie Herring, in Exhibit "K," at p. 23.)  Herring notified Kenny Bailey, who arranged for her to take the lie detector test, which she passed.  (*See* Deposition of Stephanie Herring, Exhibit "K," at p. 24; and Polygraph Examination Report, Exhibit "J.")  Based upon all the above information, Chief Deputy Knight gave Herring a digital recording device "to obtain any possible phone call conversations between herself and Deputy Sloan."  (*See* Statement of Kenny Bailey, Exhibit "I.")

Other than giving the recording device to Herring, there is nothing in the record to indicate the Sheriff's Department made any further investigation of Sloan or gave him any limitations on his authority as head of the Monroe County Sheriff's Department Narcotics Unit.  In fact, it appears that at least some deputies from the Sheriff's Department endorsed what Sloan was doing. A few days before Herring's deposition was to be taken in this case, Herring was arrested by the Sheriff's Department and held for twenty-nine (29) days on old traffic offenses, some of it being held in isolation.[6]  (*See* Deposition of Stephanie Herring Exhibit "K," at pp. 1-5, 31-32.)    While in custody, deputies pressured Herring to disavow her claims against Sloan.  (*See* Deposition of Stephanie Herring, Exhibit "K," at pp. 31-32.)

---

[5] Sloan testified that Herring has nothing against him, and he does not know why she would accuse him of criminal conduct.  (*See* Deposition of Eric Sloan, Exhibit "M," at p. 34-35.)
[6] Herring was arrested after she made her claims about Sloan's criminal activities.  (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 25-26.)

Sheriff Cecil Cantrell, the chief law enforcement officer of Monroe County, and the officer who was in charge of the raid that ended Ricky's life on October 28, 2015, and who had made the final decision regarding the search of Ricky's home was called on October 27, 2015, by Sloan, along with Knight and numerous other Monroe County deputies to the Government Complex to plan an entry and search of the Keeton residence.[7]  (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 6, 10-11; and Deposition of Eric Sloan, Exhibit "M," at p. 70.)   Although both Knight and Sloan knew that Sloan was being "investigated" for serious criminal conduct, there is nothing in the record to indicate either Sheriff Cantrell or Chief Deputy Knight raised any questions about the propriety or reliability of any information which Sloan provided, or whether officers should proceed with a "no knock" entry into the home.   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 16-17) (where the Sheriff testifies that Sloan had related that there were drugs and dogs in the house, and he just made an "assumption" that Parker had told him this).

In his Statement of Facts, given several days after the killing of Ricky, Sloan related that confidential informant Parker had told Coxey that a Mexican male, who had delivered drugs to the Keeton residence, "would be coming back the following day to pick up the cash," consisting of $20,000.00.   (*See* Statement of Facts of Eric Sloan, Exhibit "N," at Bates Nos. MBI-000034 - MBI-000035.)   Parker, however, denied he had given this information to deputies, and testified at deposition that his being asked about the $20,000.00 of the Mexican drug dealer was "the first I've heard about any $20,000.00."   (*See* Deposition of Terry Parker, Exhibit "F," at pp. 20-21.) Also, none of the officers' statements indicate that they had any knowledge of the $20,000.00 or any cash being at the Keeton residence.   (*See* Statement of Facts of John Bishop, Exhibit "O," at

---

[7] Sheriff Cantrell testified that he was in charge of the raid and that he made the final decisions with respect to the raid.   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 6, 10-11.)

Bates Nos. MBI-000030 - MBI-000032; Statement of Facts of John Michael Lay, Exhibit "P," at Bates Nos. MBI-000036 - MBI-000037; Statements of Sam Mitchell, Exhibit "Q," at Bates Nos. MBI-000038 - MBI-000039; Statements of Facts of Mike Edgeworth, Exhibit "R," at Bates Nos. MBI-000040 - MBI-000041; Officers Statement of Chris Smith, Exhibit "S," at Bates No. MBI-000042; Statement of Facts of Tim Coker, Exhibit "T," at Bates Nos. MBI-000043 - MBI-000044; Statement of Facts of Tony Coxey, Exhibit "U," at Bates Nos. MBI-000045 - MBI-000046; Deposition of John Bishop, Exhibit "V," at pp. 14, 28; and Deposition of Spencer Woods, Exhibit "W," at p. 11.)   In fact, even Sheriff Cantrell testified that he knew nothing about the $20,000 cash at the time.   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 7.)   Sheriff Cantrell testified that at the time of the search, Sloan did not tell the officers about the $20,000.00, but the sheriff found out about this later.   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 7-8.)   After the briefing was complete, the Deputies departed the "government complex" and followed each other to Ricky's trailer on Sizemore Road.   (*See* Statement of Facts of John Bishop, Exhibit "O," at Bates No. MBI-000030.)

When the Sheriff was asked whether Ricky was considered a dangerous person, the Sheriff responded, "We just assume any person that's dealing in drugs is dangerous," and this assumption is "why we went in with a no-knock warrant."   (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 9-10.)   For reasons never disclosed in the record, the sheriff and Chief Deputy Knight, who knew about the serious charges being investigated against Sloan, apparently did not question his decision to either search the premises or to use a "no knock" entry.   Instead, while the briefing was occurring, Sloan's subordinate in the narcotics division, Coxey, went to the residence of Justice Court Judge Robert Fowlkes to secure a search warrant for Ricky's trailer.   (*See* Affidavit

-9-

for Search Warrant, Exhibit "X"; and Search Warrant, Exhibit "Y.")  The only material facts
contained in the affidavit are:

> That within the past seventy-two (72) hours, a confidential source
> contacted me, Agent Tony Coxey, with the Monroe County
> Sheriff's Department and stated that at 60021 Sizemore Rd Amory,
> MS that Ricky Keeton possessed and he saw a crystal like substance
> that was stated by Mr. Keeton to *Methamphetamine* . . . .

(*See* Affidavit for Search Warrant, Exhibit "X," at ¶ 8, Bates No. GEIGER 31.)  The search
warrant contains in those statements as to how Deputy Coxey knew that the confidential informant
was reliable.  The warrant states that Coxey *requested* a "no knock" warrant.  (*See* Search
Warrant, Exhibit "Y.")  The warrant itself, however, does not authorize a "no knock" entry.
Instead, the printed language on the warrant states that officers should make "known to the person
or persons occupying or controlling said place, if any, your purpose and authority for so doing . .
. ."  (*See* Search Warrant, Exhibit "Y," at ¶ 6, Bates No. GEIGER 27.).[8]   In his deposition, Coxey
testified that almost all the Sheriff's Department searches were "no knock," and cited as
circumstances that "due to dogs" and there being "a good amount of dope there."   (*See* Deposition
of Tony Coxey, Exhibit "H," at pp. 15-16.)

Parker claimed that he had known Ricky for approximately twenty (20) years and had never
seen him do anything violent.   (*See* Deposition of Terry Parker, Exhibit "F," at p. 14.)

Justice Court Judge Robert Fowlkes testified Coxey gave him no specifics as to whether
Ricky had ever performed any violent acts, and Fowlkes explained he had no independent

---

[8] Defendants incorrectly assert that the warrant authorized a no-knock entry based on its recitation of the
officer's request for a no-knock entry.   This is wrong.   The warrant does not, on its face, authorize a no-
knock entry.   However, in any event, as explained below whether the warrant authorizes a no-knock
entry is not dispositive of the constitutional issue.   *See, e.g.* in *Gould v. Davis*, 165 F.3d 265 (4th Cir.
1998).

knowledge that Ricky had ever behaved in a violent manner. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9.) Fowlkes testified that Coxey had told him that the confidential informant had reported that Ricky might have guns in the house, but Parker explained that Coxey, the agent to whom he gave his information, had never asked him whether Ricky had any guns in his house. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9; and Deposition of Terry Parker, Exhibit "F," at p. 22.)

Furthermore, reason to suspect any claim that Ricky was violent comes from the testimony of Robbie Keeton Geiger, who talked to the Sheriff shortly after her father was killed. Geiger testified that the sheriff told her that he and Ricky were "closer than friends," and she recorded this conversation. (*See* Affidavit of Robbie Keeton Geiger, Exhibit "AA.") Evidence that there was some form of relationship between the Sheriff and Ricky also was corroborated by a check, which had been endorsed by Sheriff Cantrell to Ricky's live-in girlfriend, Wanda Stegall. Sheriff Cantrell explained his statement as being friends with Ricky by saying that he was " just an acquaintance" and that he is "friends with everybody." (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 43-44.) Sheriff Cantrell did not remember endorsing a check, which ended up in Ricky's bank account, but said that he believed the check was probably intended for Ronald Minga, who works at the Sheriff's Department and who has a relationship with Ricky's family. (*See* Deposit ticket and check, Exhibit "BB"; and Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 45-47.) Cantrell said the check was probably for either a trailer or for work on a lawnmower or for the sale of a lawnmower. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 47-48.)

-11-

Ronald Minga, an employee of the Monroe County Sheriff's Department, testified that he dated Ricky's sister. (*See* Deposition of Ronald Minga, Exhibit "CC," at p. 11.) Minga further testified that it might be possible that Cecil Cantrell had endorsed a check intended for him, but he does not recall it. (*See* Deposition of Ronald Minga, Exhibit "CC," at pp. 10-11.) Minga said Cantrell once bought a weedeater from him, but the check would not have anything to do with it. (*See* Deposition of Ronald Minga, Exhibit "CC," at pp. 10-11.)

Judge Fowlkes testified that the search warrant he issued appeared to be a blank form of search warrants that the Sheriff's Department has. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at pp. 4-5.) He says the Sheriff's Department "usually has the same form." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 5.) Judge Fowlkes was specifically asked about the language in paragraph 7 of his search warrant, which says:

> Do not interpret this writ as limiting your authority to seize all contraband and things the possession of which in itself is unlawful which you find incident to your search, or as limiting your authority to make otherwise valid arrests at the place described above. **The above affiant respectfully requests a no-knock search due to officer safety and the protection of further evidence.**

(*See* Search Warrant, Exhibit "Y.") (emphasis added). Judge Fowlkes responded that is the same language that he sees on all the forms from the Monroe County Narcotics Department.[9] (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 5.) After having again heard the language read to him, Judge Fowlkes again answered that this is the standard form that

---

[9] After Fowlkes issued the October 27, 2015, warrant, he issued a second warrant on October 29, 2015, after Keeton was killed. Fowlkes testified he does not know why he issued the second warrant. (*See* Deposition of Judge Robert Fowlkes, Volume II, Exhibit "DD," at pp. 4-5, 7-10.) Both warrants have identical language requesting a no-knock warrant. Further, additional warrants obtained during discovery in this case reveal use of the same form language. (*See* Email correspondence of July 5, 2017, and attached search warrants, Exhibit "EE.") It was indisputably ubiquitous practice in Monroe County to request no-knock warrants in all circumstances.

-12-

the Monroe County Narcotics Department submits to the judge for search warrants. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 6.) Judge Fowlkes said it is a standard form which the Sheriff's Department began to use approximately nine (9) or ten (10) years ago. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 6.) The Judge has no notes to indicate Coxey told him anything different than what is in the documents he brought him. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 7.)

Judge Fowlkes related that Coxey had told him that they had stopped a person coming from Ricky's house, and that because of what their informant had told them, they felt like there were cameras, dogs, and "other drugs at the property." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 8.) When asked if he was sure this was all he was told, Judge Fowlkes said he thought that he gave him some "familiar landmarks," and told him that "Ricky was known to deal in drugs." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 8.) Fowlkes related that he had known Ricky since years back when he was young and knew that Ricky had a drug conviction in the 1990s. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9.) When questioned further, he then said he thinks Coxey had told him "there was a possibility weapons might be in the house," and "that [Ricky] could be dangerous." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9.). Coxey did not, however, give any specifics as to whether Ricky had ever committed any dangerous act. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9.)

Judge Fowlkes did not consider that his warrant authorized the seizure of any specific property other than property that was used with drugs. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 11.) Judge Fowlkes testified that he had no knowledge that the

Sheriff's Department was going to seize all of Ricky's personal property. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at pp. 11-12.) However, he did say, "[O]f course, usually they do seize the resident vehicles or whatever that belong to them . . . ." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 12.) Fowlkes testified that when he signed the warrant, it did not occur to him that he was authorizing them to seize vehicles or whatever personal property that might be outside. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 13.)

Asked about the "no knock" search warrant, Judge Fowlkes said that "with the cameras and all," he thought Ricky would already know they were on the premises. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 17.) Regarding the dogs, he did not know what kind of dogs there were, and they "could have been hound dogs." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 17.)

Judge Fowlkes had no knowledge as to whether officers were going out there at 1:00 A.M., and did not know when they were going out there. Although Coxey told him they thought they were going to be able to serve it that night. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 18.)

Fowlkes agreed that it is normal for people in Northeast Mississippi to keep firearms in their house. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at pp. 18-19.) Fowlkes also agreed that it would be "inherently dangerous" for an intruder to crash in the door of a homeowner in Mississippi. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 19.)

-14-

Judge Fowlkes testified that he cannot remember an occasion when he had refused a search warrant requested by a deputy, and that as far as he can remember, he has "always signed these search warrants in the form they present them." (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at pp. 21-22.) Fowlkes further testified that every time they do a search, it is dangerous. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 22.) Judge Fowlkes does not know any way that it would be "less dangerous" to knock on the door and give a person a chance to come to the door before bursting in the door. (*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 23.)

**C.      Raid on Ricky's Trailer**

Shortly before 1:00 A.M. on October 28, 2015, deputies from the Monroe County Sheriff's Department arrived on Sizemore Road. (*See* Statement of Facts of John Bishop, Exhibit "O," at Bates Nos. MBI-000030 - MBI-000032.) SWAT Team Members Eric Sloan, John Michael Lay, Sam Mitchell, John Bishop, Tony Coxey, David Mitchell, Spencer Woods, Hunter Knight, and Tim Coker lined up and walked down the road toward Ricky's driveway. (*See* Statement of Facts of John Bishop, Exhibit "O," at Bates Nos. MBI-000030 - MBI-000032.)

Because the gate to the driveway was locked, the officers climbed over the gate and moved toward the trailer. (*See* Statement of Facts of John Bishop, Exhibit "O," at Bates Nos. MBI-000030 - MBI-000032.) Sam Mitchell and John Bishop were assigned to "breach the back door." (*See* Statement of Facts of John Bishop, Exhibit "O," at Bates Nos. MBI-000030 - MBI-000032.)

In their brief to this Court, Defendants state, "As the door was being pried open, the deputies began announcing their presence by yelling 'Sheriff's Department, Search Warrant.'" (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at p. 5.) This is

a correct statement of what the deputies <u>claimed</u> at their depositions, but is completely contradicted by other evidence. As Defendant Sloan stated:

> Once we were at the back door, Deputy John Bishop took the lead, approached the door and used the ram to attempt to gain entry. The door did not open immediately so Deputy Sam Mitchell took the pry bar and Deputy Bishop struck the pry bar trying to wedge the bar into the locking mechanism. I, along with other team members began yelling "Sheriff's department, search warrant" and Deputy Mitchell then pulled the pry bar and the door opened.

(*See* Statement of Facts of Eric Sloan, Exhibit "N," at Bates No. MBI-000034.).[10]

Defendants correctly state that the deputies all testified that when they broke open the door, they say Ricky with what they believed to be a firearm (which actually turned out to be a pellet gun), and many of the deputies, including Sloan, opened fire, killing Ricky. (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at p. 6.)

Defendants' statements and their deposition testimonies conflict with what Sheriff Cantrell testified that the deputies told him. Cantrell, who was located a few yards away from the actual break-in, when the officers killed Ricky, testified that immediately after the scene, all the officers had told him that Ricky had opened the door and started firing, even wounding a deputy. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 30-33.) This is what Cantrell reported to the news media. (*See* Newspaper articles, Exhibit "FF.")

Most significantly, Wanda Stegall denied getting any audible warning from the deputies before the deputies shot and killed Ricky. According to Wanda, during the night, Ricky woke her up and told her that he heard someone outside. (*See* Deposition of Wanda Stegall, Exhibit "C,"

---

[10] During his deposition, Sloan testified that Deputies yelled to announce their presence after the ram hit the door. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 45.) Sloan testified there was no announcement before the battering ram hit the door. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 45.)

-16-

at p. 6.)   She heard banging on the door and Ricky got up to see who was at the door, taking the pellet gun with him.   (*See* Deposition of Wanda Stegall, Exhibit "C," at p. 6.)   Wanda then heard shots being fired and saw that Ricky had been shot.   (*See* Deposition of Wanda Stegall, Exhibit "C," at pp. 7-8.)   Subsequently, Ricky's daughter, Robbie Keeton Geiger, counted forty-nine bullet holes through the side of the trailer.   (*See* Affidavit of Robbie Keeton Geiger, Exhibit "AA.")[11]

Wanda testified that Ricky had no weapons, other than pellet guns, on his premises. (*See* Deposition of Wanda Stegall, Exhibit "C," at p. 29.)   Despite all of the officers claiming that they yelled, "Sheriff's Department," Wanda testified that the officers did <u>not</u> knock and announce their presence.   (*See* Transcript of Statements of Wanda Stegall, Ricky Payne, David Mitchell, Curtis Knight, Timothy Coker, Sheriff Cecil Cantrell, Tony Coxey, and Hunter Knight, Exhibit "B," at p. 6; and Deposition of Wanda Stegall, Exhibit "C," at p. 23.)

When the shooting ended, deputies took Wanda outside, arrested her, and then took her to jail.   (*See* Deposition of Wanda Stegall, Exhibit "C," at pp. 30-32.)   She was charged with drug trafficking.   (*See* Deposition of Wanda Stegall, Exhibit "C," at p. 34.)

Deputies returned to the scene and took possession of virtually all of the personal property in the home.   (*See* Petition for Forfeiture, Exhibit "GG.")   Accordingly to Sloan, Sheriff Cantrell made the decision to seize Ricky's personal property.   (*See* Deposition of Eric Sloan, Exhibit "M," at p. 99.)[12]   As the exhibit to the Petition for Forfeiture shows, the Deputies' seizure was

---

[11] It is unclear, therefore, whether any of the rounds were shot directly into Ricky's body or whether they were all shot through the wall after Ricky had closed the door.

[12] Tellingly, Sloan testified that the County seizes the personal property of the suspect in all drug cases. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 99.)

shockingly broad, taking property including several vehicles, ATVs, trailers, lawnmowers and tools. (*See* Petition for Forfeiture, Exhibit "GG"). It is undisputed that there was no evidence that the seized property was connected with drug activity. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 27.)

On November 24 2015, the Monroe County Sheriff's Department finally filed a Petition for Forfeiture. (*See* Petition for Forfeiture, Exhibit "GG.") When the Petition was answered, the County finally returned the property. (*See* Estate of Ricky Keith Keeton's Answer and Defenses to Petition for Forfeiture, Exhibit "HH.")

There is no evidence of any judicial order to seize the property, and as previously noted, Judge Fowlkes did not authorize its seizure.

### D. Investigation by Mississippi Bureau of Investigation

Curtis Knight informed the Mississippi Bureau of Investigation ("MBI") of the shooting, and that entity launched an investigation. (*See* Deposition of Captain Kenny Bailey, Exhibit "II," at p. 5.) Captain Kenny Bailey was assigned to investigate. (*See* Deposition of Captain Kenny Bailey, Exhibit "II," at p. 3.) Bailey arrived at Ricky's trailer at approximately 1:30 A.M. on October 28, 2015. (*See* Synopsis of Kenny Bailey, Exhibit "JJ.") Bailey noted that when he arrived, he was informed that the officers who fired at Ricky refused to provide statements to him until they had the opportunity to meet with their attorney, Tony Farese.[13] (*See* Deposition of Captain Kenny Bailey, Exhibit "II," at pp. 7-8; and Deposition of Corey Burrow, Exhibit "KK," at p. 10.) Those officers were John Michael Lay, John Bishop, Eric Sloan, Spencer Woods, and Sam Mitchell. (*See* Synopsis of Kenny Bailey, Exhibit "JJ," at p. 2.) Bailey did conduct audio

---

[13] Farese came to the scene at approximately 2:00 A.M. or 3:00 A.M. on the morning of the shooting. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 34.)

-18-

interviews of the following: Wanda Sue Stegall, Ricky Dale Payne, David Lee Mitchell, Curtis Knight, Timothy Joe Coker, Cecil Van Cantrell, Kenneth Antonio Coxey, and Hunter Nathaniel Knight. (*See* Synopsis of Kenny Bailey, Exhibit "JJ," at p. 3.) Corey Burrow, also an MBI Investigator, collected the firearms of the officers involved in the shooting and retrieved two (2) subscriber identification module (SIM) cards from deer cameras that were installed on Ricky's property. (*See* Deposition of Corey Burrow, Exhibit "KK," at pp. 8, 11.) One (1) of the cameras were pointed at the back of Ricky's trailer, where officers entered. (*See* Deposition of Corey Burrow, Exhibit "KK," at pp. 11-12.) Burrow noted, however, that there were no pictures showing the officers firing or the incident. (*See* Deposition of Corey Burrow, Exhibit "KK," at p. 12.) Burrow explained, "Again, it appears that someone put – put something over the camera, maybe a shirt or hand or something." (*See* Deposition of Corey Burrow, Exhibit "KK," at p. 12.) Burrow noted that the pictures of the incident could also be missing because someone deleted the images from the SIM card, though he could not say for certain anything was deleted. (*See* Deposition of Corey Burrow, Exhibit "KK," at pp. 15-16.) The reason Burrow believes that images of the officers' shooting into the house does not show up is that something was placed over the camera. (*See* Deposition of Corey Burrow, Exhibit "KK," at p. 16.)

## III.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires that a court grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

According to *Hopson v. Quitman County Hosp. and Nursing Home, Inc.*, 119 F.3d 363, 366 (5th Cir. 1997):

> [S]ummary judgment will be affirmed only if we are "convinced, after an independent review of the record, that there is 'no genuine issue as to any material fact' and that the 'movant is entitled to judgment as a matter of law.'"

This Court is to consider the evidence in the light most favorable to the non-movant, draw inferences in her favor, and "disregard all contrary evidence that the jury is not required to believe." *Reeves,* 530 U.S. at 150-51. "Litigants are entitled to have the jury draw those inferences and conclusions that are appropriate grist for juries." *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir. 1978).

## IV.    ARGUMENTS AND AUTHORITIES

**A.    There Are Issues of Material Fact as to Whether the Death of Ricky Keith Keeton Was Caused by Defendants' Entering the Premises Without Knocking and Giving Warning, Thereby Violating the Fourth Amendment of the United States Constitution.**

Defendants correctly cite the "general rule" "that an officer must knock and announce his presence and authority prior to entering a home."   *Trent v. Wade*, 776 F.3d 368, 378 (5th Cir. 2015), cited in Defendants' Brief, p. 21.   *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997), held that "[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."   *Richards* also held that there is no "blanket exception" to the knock and announce rule for drug cases, stating that "[w]e disagree with the court's conclusion that the Fourth Amendment permits a blanket exception to the knock-and-announce requirement for this entire category (felony drugs cases) of criminal activity."   *Richards*, 520 U.S. at 388.   Rather, the question is whether the "case establishes that the decision not to knock and announce was a reasonable one under the circumstances . . . ."   *Richards*, 520 U.S. at 388.

Before examining the case law on this question, it should be emphasized that *Richards*, and many of the cases interpreting *Richards*, have been criminal cases in which the court was called upon to make a decision as to whether a no-knock warrant is justified.    That is not the case here since this is a civil case.    The issue presented here is whether there are issues of material fact as to whether a no-knock warrant was justified.    Without rehashing the details in the statement of facts Plaintiffs have already made, Plaintiffs remind the Court that the evidence before the Court is that:    1) Ricky was a non-violent person (*See* Affidavit of Chuck Chism, Exhibit "A"); 2) Ricky

-21-

was a friend of Sheriff Cecil Cantrell (*See* Affidavit of Robbie Keeton Geiger, Exhibit "AA"); and 3) Ricky had never been known to commit any violent act (*See* Affidavit Chuck Chism, Exhibit "A"; and Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 9).

The opinion testimony of Judge Fowlkes is also important. Regarding the element of danger, not only does the evidence indisputably estop that Ricky was not known as a dangerous person, but Judge Fowlkes even agreed that it would be "inherently dangerous" to execute a warrant under the circumstances of this case. Judge Fowlkes testified at his first deposition:

> Q.   Would you agree with me that if it's – it would be inherently dangerous for an intruder, somebody to come and crash in the door of a homeowner in Mississippi given the fact that they have guns? That would be an inherently dangerous thing to do, wouldn't it?
>
> A.   I would think so.

(*See* Deposition of Judge Robert Fowlkes, Volume I, Exhibit "Z," at p. 19.)

Defendant Sloan has attempted to characterize this as a serious drug operation by claiming that he was told by Coxey, who, in turn, was told by Parker, that there was $20,000.00 in the house, and a member of the Mexican drug cartel was coming to pick that up in the morning. (*See* Deposition of Tony Coxey, Exhibit "H," at pp. 6-8.) On the other hand, Confidential Informant Parker testified that first time he had ever heard about $20,000.00 and a Mexican drug dealer was his deposition. (*See* Deposition of Terry Parker, Exhibit "F," at, p. 20.) Further, Defendant Sloan testified that he always uses no-knock warrants, and he has conducted one hundred (100) searches, all of them which have been no-knock. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 97.) Additionally, all of the warrants which Coxey has obtained in this case (Coxey appears to be invariably the person who obtained the warrants) had the no-knock language. It appears,

therefore, there is an issue of fact as to whether conducting no-knock warrants was not based upon any reasonable suspicion of violence, or drugs being flushed down the toilet, but was based upon routine practice in Monroe County in the Monroe County Drug Unit.

Insofar as the destruction of evidence is concerned, a fact-finder is entitled to find that there was no such danger in this case since a Deputy had disconnected the sewer line so that any drug evidence could not be flushed down the toilet.   (*See* Statement of Facts of Tim Coker, Exhibit "T," at Bates Nos. MBI-000043.)

In short, there was no evidence either of danger from a knock and entry, or of the destruction of evidence.   A jury is entitled to find that there were was no reasonable suspicion that would justify a no-knock warrant.

The case law which has addressed similar issues indicate that the circumstances of this case would not justify a no-knock warrant as a matter of law.   The Fourth Circuit addressed a similar case in *Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998).   In *Gould*, Baltimore police officers requested and obtained a "no-knock" warrant to enter and search the home of a robbery suspect. *Gould*, 165 F.3d at 267.   The officers had information that handguns used in a spree of robberies were present in the home and that other occupants of the home had violent criminal histories. *Gould*, 165 F.3d at 267. Based on this, a State Court Judge permitted a no-knock entry.   *Gould*, 165 F.3d at 267.   When the officers made entry, the suspect believed intruders were invading his home.   *Gould*, 165 F.3d at 267.   The suspect retrieved a handgun and was promptly shot by an entering officer.   *Gould*, 165 F.3d at 267.   The suspect filed a civil action claiming that the officer's unconstitutional no-knock entry caused his injuries.   *Gould*, 165 F.3d at 267.   The District Court denied a Motion for Summary Judgment and the defendants appealed.

-23-

The Fourth Circuit noted that it was clearly established (in 1992, no less) that the Fourth Amendment knock-and-announce principle applied unless certain exigent circumstances are present. *Gould*, 165 F.3d at 270. The Court in *Gould* concluded that the mere presence of weapons in the suspect's home, the seriousness of the crime being investigated and the criminal histories of other occupants of the home did <u>not</u> justify a no-knock entry. *Gould*, 165 F.3d at 273-74. The Court held that more than alleged criminal conduct or firearms is required to justify deviating from the knock-and-announce rule. *Gould*, 165 F.3d at 273-74. The Court held that officers know that "guns do not fire themselves" and there must be more than this, such as violent propensity of the suspect, to justify a no-knock entry. *Gould*, 165 F.3d at 273-74.

The *Gould* Court likewise held that the fact that the State Court Judge authorized a no-knock entry did not shield the officers from liability. *Gould*, 165 F.3d at 272 (stating "although the state court judge clearly neglected his duties in sanctioning a no-knock warrant under these facts, his incompetence does not excuse the officers' default in bringing the no-knock request to the judge in the first place, as well as their execution of the warrant later that morning.")

The *Gould* Court affirmed the denial of summary judgment based on the no-knock entry. *Gould*, 165 F.3d at 273.

The Fifth Circuit has cited *Gould* with approval such that its analysis should apply in this case. *Cass v. City of Abilene*, 814 F.3d 721, 732 (5th Cir. 2016) (relying on *Gould*). *Gould*, where the no-knock entry was unconstitutional, involved facts which would far more readily justify a no-knock entry than the facts of this case. That is to say, if the no-knock entry was unconstitutional in *Gould* (as the Court held it was), the no-knock entry in this case is not a close call.

In this case, in contrast to *Gould*, there was no evidence of firearms in Ricky's home and there was no indication that Ricky or any other occupant was violent. Further, in this case the search warrant did not authorize a no-knock entry, but specifically required the officers to knock-and-announce. Likewise, in this case the officers were allegedly investigating drug possession, rather than the violent crime of armed robbery. The facts of this case do not rise to level of the facts in *Gould* where the Court found the more-compelling facts insufficient to justify the no-knock entry.

*Gould* correctly states the analysis applicable to this case. Following the analysis of *Gould*, it is obvious that the no-knock entry in this case was unconstitutional. Just as in *Gould*, Defendant's Motion for Summary judgment should be denied.

The United States Supreme Court has noted that one of the interests counseling against a no-knock entry is "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006). As Judge Fowlkes noted in this case, the officers coming out at 1:00 in the morning, arising one from a deep sleep by banging on the door with an instrument so heavy that it took two (2) people to carry it might reasonably be expected to provoke the very violence that occurred in this case. It is for the jury to draw inferences from the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A jury may reasonably infer that the most probable result of a no-knock warrant at 1:00 in the morning to a person who is thought to have firearms in the house would be for him to appear at the home with the firearms in necessary self-defense.

*United States v. Scroggins*, 361 F.3d 1075 (8th Cir. 2004), held that when determining whether reasonable suspicion to support a no-knock search warrant for a resident exists, courts

must evaluate the totality of the circumstances to determine whether police officers had a particularized and objective basis for their conclusion, and "[i]n determining whether reasonable suspicion to support a no-knock search warrant for a residence exists, . . . ." In this case, since it is a civil case in which the Court is determining there are issues of material fact, the fact Ricky's record for non-violence, the common-sense opinion of Judge Fowlkes, which a jury may well draw the inference that an attempt to crash in a citizen's door at 1:00 in the morning, would foreseeable cause violence, not prevent it, and the fact that a jury may find that Defendant Sloan's claim that this was a center of large drug activity is fabricated, and the fact that no-knock searches are routine and not based on particularly sufficient facts in Monroe County, all indicates issues of material fact under Rule 56 as to whether a no-knock search warrant was necessary.

Obviously, if a no-knock search was not necessary, a jury may reasonably draw the conclusion that the entry through this no-knock search may reasonably infer that the entry without knocking would cause a reasonable person to come to the door with the only weapon he had available (a pellet gun in this case), which ultimately resulted in his death.

Because there are issues of material fact as to whether there was a "reasonable suspicion" that officers' lives would be endangered, or that drugs were would be destroyed, the Court should deny summary judgment on Plaintiffs' theory that Ricky's death was proximately caused by entry through an unconstitutional no-knock search. Proximate cause requires only a showing that there was "some direct relation between the injury asserted and the injurious conduct alleged,. . . ." *Paroline v. United States*, ___ U.S. ___, 134 S.Ct. 1710, 1719 (2014) (citations omitted).

Should a jury determine that the officers did not have any "reasonable suspicion" that the no-knock entry was necessary, and that the breaking into Ricky's home was directly related to his

death, then a jury could find liability based on Plaintiffs' claim that Ricky's death was the proximate cause of the unconstitutional no-knock entry.

**B.     There Are Issues of Material Fact as to Whether Ricky Keeton's Death Was Caused by Unreasonable Force.**

Quite distinct from Plaintiffs' Fourth Amendment claim that the unconstitutional breaking into the home (the no-knock entry) proximately caused Ricky's death is the Fourth Amendment excessive force claim by Plaintiffs.    This claim is that the officers on the scene used unreasonable force in shooting and killing Ricky.

A similar case, *Graham v. Connor*, 490 U.S. 386 (1989), set the standard to be utilized in claims of unreasonable force.    The Supreme Court held that the due process standard of determining whether officers acted "maliciously and sadistically for the very purpose of causing harm," *Graham*, 490 U.S. 386, is "incompatible with a proper Fourth Amendment analysis." *Graham*, 490 U.S. at 387.    Rather, the Fourth Amendment is the applicable constitutional provision, and it requires a determination of whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."    *Graham*, 490 U.S. at 387.

The specific standard of reasonableness applicable in cases where officers kill a suspect is succinctly set forth in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985): "It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

The issue of whether Ricky posed an "immediate threat to the officer[s]" is a disputed issue of material fact.    To be certain, every officer has signed virtually identical statements to the affect

that officers broke into the home, whereupon they saw Ricky with a pistol, who was shooting it at them. While there are many officers repeating this same version of events, there is a single witness who says otherwise. This witness is Wanda Stegall, a factory worker who had been living with Ricky for ten (10) years and had never known him to commit any act of violence, or even be in a fight. (*See* Deposition of Wanda Stegall, Exhibit "C," at pp. 38-39.) Stegall relayed the follow version of events, which contradicts the version of events of all officers:

> Q.    Okay.    During the night, were you awaked by anything?
>
> A.    Ricky woke me up.
>
> Q.    Okay.   Why did he wake you?
>
> A.    He said he thought he heard something.
>
> Q.    Okay.   What happened then?
>
> A.    He went to the door.   I think they rammed the door.
>
> . . .
>
> Q.    . . . If I understand right, you said he – Mr. Keeton woke you up.   Then you heard some banging on the door.
>
> A.    Yeah.
>
> Q.    Okay.
>
> A.    Yes, sir.
>
> Q.    Did you hear anyone announce their presence?
>
> A.    No.
>
> Q.    Okay.
>
> A.    They just started, like, beating on the door.
>
> Q.    Okay.

A.    And Ricky went to the door, and he opened it, and then he closed it back.

MR. WAIDE: Did you hear what she said?

COURT REPORTER: (Nods head up and down.)

BY MR. LUCIANO:

Q.    Okay.  Did Mr. Keeton have anything in his hands when he went to the door?

A.    He had a pellet pistol.

Q.    Okay.  Do you know if Mr. Keeton had any other firearms or weapons on the premises?

A.    No, sir.

Q.    As in you don't know or there weren't any?

A.    There wasn't – there wasn't anything.

Q.    There was no anything?

A.    No, sir.

. . .

Q.    But he did have it on him at the time that he –

A.    Yes, sir.

Q.    – opened the door.  Okay.  You said he opened the door and closed it.  Okay.

A.    Yes, sir.

Q.    Okay.  During the time did you hear any type of announcement of presence?

A.    No.  When he closed – when he pulled the door to, that's when they started shooting.

Q.    Okay.  Do you know if he shot his pellet pistol before he closed the door?

A.      I don't know.

Q.      Okay.   Did you see any of that – anything else happen after that?

A.      No, sir.

(*See* Deposition of Wanda Stegall, Exhibit "C," at pp. 27-30.)

Stegall then gave the same version of events on cross-examination:

Q.      All right.  I just heard you say that he opened the door and then closed it, and at that point he was shot.  Did I understand that correctly?

A.      Yes, sir.

Q.      Is that the sequence of events as you remember them?

A.      That's what I remember.

Q.      Had you heard the thumping on the door?

A.      When they – I guess when they hit it, and that's when he got up to go see what was going on.

(*See* Deposition of Wanda Stegall, Exhibit "C," at p. 41.)

Q.      Could you tell how much of a delay from the time he closed the door till they started shooting?

A.      As soon as he closed the door.

Q.      As he as he closed the door?

A.      Yeah.

(*See* Deposition of Wanda Stegall, Exhibit "C," at pp. 42-43.)

Q.      But you believe that the door had already shut when the officers fired?

A.      Yeah, I think so.   I think so.

(*See* Deposition of Wanda Stegall, Exhibit "C," at p. 44.)

-30-

In order to grant Defendants summary judgment, it would be necessary for the Court to disregard Stegall's testimony in favor of all of the deputy sheriffs at the scene. The Supreme Court has recently made it plain that a court cannot disregard the non-movant's version of events when ruling upon summary judgment. In *Tolan v. Cotton*, ___ U.S. ___, 134 S.Ct. 1861 (2014), the Fifth Circuit had upheld summary judgment on an issue of qualified immunity in an excessive force case because, according to the Fifth Circuit, "'an objectively-reasonable officer in Sergeant Cotton's position could have ... believed' that Tolan 'presented an 'immediate threat to the safety of the officers.'" *Tolan*, 134 S.Ct. at 1865. The Supreme Court reversed, however, stating "[b]y failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party, *Anderson*, 477 U.S., at 249, 106 S.Ct. 2505." *Tolan*, 134 S.Ct. at 1866.

The Supreme Court further corrected the Fifth Circuit for failing to allow inferences from the evidence to be drawn by the jury. The Fifth Circuit had found that the words of the shooting victim indicated a "clear evidence of an intent to inflict harm," but the Supreme Court held that "a jury could reasonably infer that his words, in context, did not amount to a statement of intent to inflict harm." *Tolan*, 134 S.Ct. at 1867.

In the present case, if the jury chooses to accept the testimony of all of the officers, it may certainly find that the officers reasonably believed that the pellet gun was, in fact, a real firearm, and that Ricky's shooting it at the officers made it objectively reasonable for them to shoot him to kill.

-31-

This testimony, however, does not have to be accepted by a jury because they are entitled to believe the word of Stegall over the word of all of the officers. This Court should not here weigh the credibility of each side. To do so would violate the mandate in *Tolan*.

It is significant, however, that there are many reasons why a jury might choose to believe the testimony of a single witness over all of the testimony of numerous deputies to the contrary. Of course, it is now established fact that Sheriff Cantrell's original version of events does not comply with what we now know to be the known facts. In a statement to the news media, Sheriff Cantrell stated, "When they got to the back door, he opened the door and started shooting, wounded one of my deputies." (*See* Newspaper articles, Exhibit "FF," at Bates No. RK-000169.) The deputies shot back. Those were seasoned deputies who were on that SWAT team, and they had no choice but to shoot back." Cantrell said the wounded deputy was "expected to make a full recovery,. . . ." Thus, in the false version of events Cantrell gave the media, he did not even acknowledge that there was any no-knock entry, and further claimed that Ricky had wounded a deputy.

Sheriff Cantrell, in the last line in the press release, even magnifies events by alluding to the previous shooting of Deputy Sloan, a fifteen (15) year veteran, whom he claims to have been shot on Highway 45 after pulling over a motorcycle. (*See* Newspaper articles, Exhibit "FF," at Bates Nos. RK-000175 – RK-000176.) According to Stephanie Herring, Sloan was, in fact, shot when he was trying to steal the proceeds of a robbery. (*See* Deposition of Stephanie Herring, Exhibit "K," at p.14.)

In short, a jury may choose to find that any version of events coming from Defendant Monroe County is not credible.

For further indicia that the version of events related by Cantrell is not credible is found through the testimony of Mississippi Highway Patrol Investigator Corey Burrow that someone had thrown something over the camera that would have depicted the officers' entry into the home. (*See* Deposition of Corey Burrow, Exhibit "KK," at p. 16.) "Spoliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). The Fifth Circuit will "permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'" *Guzman*, 804 F.3d at 713. In this case, Defendants have offered no explanation for destroying the camera which would have shown precisely the officers' entry, and would have demonstrated whether or not Defendant Sloan killed Ricky only by shooting through the trailer and into his body. We do know from the Stegall deposition that there were forty-eight (48) entry holes into the trailer since she counted them. (*See* Deposition of Wanda Stegall, Exhibit "C," at p. 49.) Defendant Sloan, who was the first person in line after the two (2) deputies who were breaking the door in, and was the person closest to Ricky, would have been the deputy most likely to have shot directly into Ricky's body before the door was closed. (*See* Deposition of Eric Sloan, Exhibit "M," at pp. 72-74). Defendant Sloan claims that the door was closed after he fired, , but, in light of Stegall's testimony, the jury does not have to believe that. Defendant Sloan acknowledged that deputies continued to fire after the door was closed, and there is at least an issue of material fact as to whether there was any necessity for continuing to shoot through the walls of the trailer after the closing of the door. (*See* Deposition of Eric Sloan, Exhibit "M," at pp. 76-76.) Given Stegall's testimony, inconsistent claims by the Sheriff as to how the shooting occurred, and some unknown deputies having covered up the camera so as to keep any record being made of the actual shooting,

a jury may infer that Stegall is the person telling the truth, disregard all of the testimony of the deputies to the contrary, and enter a verdict for Plaintiffs for the use of unreasonable force on the grounds that Ricky was shot and killed by shooting through the door and trailer.[14]

### C. There Are Issues of Material Fact as to Whether Official County Policy or Custom Caused or Contributed to Ricky Keeton's Death.

Defendants argue that "Plaintiffs have not alleged that any official policy, custom or practice of the Monroe County Sheriff's Department violates federal law. . . ." (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at p. 31.) Defendants overlook *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), which holds that since the "County Prosecutor was acting as the final decisionmaker for the county, . . . the county may therefore be held liable under § 1983." *Pembaur*, 475 U.S. at 485. Under Mississippi law, the county sheriff is the official decision-maker of the county, rendering the county liable for his unconstitutional acts. *Brooks v. George Cty.*, Miss., 84 F.3d 157, 165 (5th Cir. 1996); *Huddleston v. Shirley*, 787 F. Supp. 109, 112 (N.D. Miss. 1992); J*auch v. Choctaw Cty.*, 874 F.3d 425, 435 (5th Cir. 2017).

In this case, Sheriff Cantrell has frankly testified that he was the person in charge of the raid on October 27, 2015, and that he made the final decision regarding the search. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at pp. 6, 10-11.) Furthermore, M*onell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692-93 (1978), makes it plain that a municipality

---

[14] Crime Scene Analyst Larry Smith corroborated Stegall about the number of rounds shot through the trailer. Smith counted a total of forty-nine (49) rounds shot into the trailer, with thirty-nine (39) rounds into the side of the trailer and nine (9) into the door. (*See* Deposition of Larry Smith, Exhibit "LL," at p. 11.) With Defendant Sloan being the first person in line behind the two (2) officers who were attempting to break into the trailer and who were not the first shooters, it is logical to believe that the nine (9) rounds through the door were fired by Defendant Sloan. Further, Sloan testified he had his pistol drawn, and ready-to-fire, while other Deputies broke into the house without their weapons drawn. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 32.)

may be held liable when its custom causes the constitutional issue in question. There is evidence from Defendant Sloan that no-knock searches were customary in all narcotics cases. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 45) (stating that breaking in at night is the customary method of executing a warrant in narcotics cases); and Deposition of Eric Sloan, Exhibit "M," at p. 97) (stating that he has conducted hundreds of no-knock searches). Sloan testified that a no-knock entry in a drug case was a "given" in Monroe County. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 49.) Sloan testified that he has <u>never</u> participated in a search in which officers knocked and announced before making entry. (*See* Deposition of Eric Sloan, Exhibit "M," at p. 97; and Deposition of Tony Coxey, Exhibit "H," at p. 15) (noting that almost all search warrants in Monroe County are no-knock warrants and the warrants are always issued by the Justice Court Judge when requested.)

Defendants argue, however, that Plaintiffs have made allegations of a rogue deputy, Defendant Sloan in his alleged acts to steal $20,000.00 from a Mexican cartel supplier (Ricky), was the cause of the search. (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at p. 31.) Defendants' argument in this regard is wrong since Fed. R. Civ. P. 8(d) specifically allows alternative statements of a claim and inconsistent claims.

In any event, claims against Defendants are not necessarily inconsistent. The evidence is that Defendant Sloan knew about the $20,000.00, and that he had been engaged in a practice of stealing from drug suspects. Sheriff Cantrell has testified that he knew about the investigation into Defendant Sloan. It is, therefore, not inconsistent to hold both Defendant Sloan and the County liable for the unconstitutional seizure.

Furthermore, defense counsel should be estopped from raising any defense for the Defendant County which would leave Defendant Sloan as the only party liable. Because any defense based upon the idea that the injury was caused by Defendant Sloan as a "rogue" officer, (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at p. 31), Defendants should withdraw this defense since it would expose Defendant Sloan to individual liability since the defense is made at the expense of Defendant Sloan's individual liability. *See Dunton v. Suffolk Cty., State of N.Y.*, 729 F.2d 903, 909 (2d Cir. 1984) (holding that it is the duty of plaintiff's counsel and the court to alert an individual defendant when the municipality makes a defense which jeopardizes the interest of the individual defendant).

Accordingly, Plaintiffs have viable claims against Monroe County. Summary judgment should be denied.

### D. Defendant County Is Not Entitled to Summary Judgment on Plaintiffs' Claim That Defendants Seized Much of Ricky Keeton's Property Without a Warrant and Without Judicial Hearing.

Defendants have not challenged the factual allegations of Plaintiff's complaint, ¶ 18, that after Ricky's death, without probable cause and without a judicial order so authorizing, Defendant County deputies seized much of Ricky's personal property. (*See* Complaint [Docket 1], at ¶18.) Sheriff Cantrell, at his deposition, admitted that he had no evidence that this personal property was the proceeds of drug sales. (*See* Deposition of Sheriff Cecil Cantrell, Exhibit "D," at p. 27.)

The Complaint alleges that:

> Defendant Monroe County is liable to Plaintiff for violation of the substantive and procedural aspects of the due process clause of the Fourteenth Amendment to the United States Constitution, and violation of the Fourth Amendment by the judicially unauthorized seizing and detaining of some of Plaintiff's property without a

-36-

> hearing, and because of the confiscation of other of Plaintiff's
> property.

(*See* Complaint [Docket 1], at ¶ 21.)

There is nothing in Defendants' brief addressing this claim under the due process clause or the Fourth Amendment. Because Defendants have not addressed the issue, it is not properly before the Court on motion for summary judgment.

With respect to Plaintiffs' claims of the seizure of property and the due process violation, Defendants have not shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a).

Notwithstanding Defendants' failure to brief the issue, out of an abundance of caution, Plaintiffs briefly address the claims under the Fourth and Fourteenth Amendments for the seizure of Ricky's personal property.

The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

A "seizure" of property occurs when there is some "meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992).

Here, there is no evidence of any judicial authorization for the seizure of Ricky's personal property. Sheriff Cantrell admitted there was no probable cause for the seizure of the property, and he admitted that he had no evidence that the property was involved in drug activity.

-37-

Therefore, Plaintiffs' Fourth Amendment rights to be free from a seizure of property without judicial authorization have been violated. The Fourth Amendment applies to seizures of personal effects. *See United States v. Place*, 462 U.S. 696 (1983). Having neither judicial authorization, nor probable cause for the seizure of Ricky's personal property, Defendants are liable for violating the Fourth Amendment and seizing the personal property. *Gennusa v. Canova*, 748 F.3d 1103, 1114-15 (11th Cir. 2014) ("In the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant, issued by a neutral magistrate after finding probable cause").

Here, there was no judicial authorization for the seizure of the personal property, let alone any finding of probable cause. Thus, the seizure violated the Fourth Amendment.

Furthermore, since Sheriff Cantrell admitted that he had no basis for believing that the personal property (Ricky's trailer) was related to the drug trade, the seizure of the property was totally arbitrary in violation of the substantive aspect of the due process clause of the Fourteenth Amendment. "[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'" *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994).

In the case at bar, Defendant County's seizure of all of Ricky's personal property, only to be returned when Plaintiffs filed an answer to the petition in forfeiture, shocks the conscience. When the sheriff admitted that he had no information that the property had anything to do with drugs, he, in effect, admitted that the seizure of all of the property was baseless. There are, therefore, issues of material fact as to whether Defendant County violated Plaintiffs' substantive due process rights in the seizure of all of Ricky's personal property.

-38-

E.     **The Defendant County's Independent Intermediary Defense and its "Good Faith" Defense Are Not Applicable.**

Beginning on page 26, Defendants argue that the issuance of the warrant by the judge "breaks the chain of causation for [claims of] false arrest, insulating the initiating party," citing *Glenn v. City of Tyler*, 242 F.2d 307, 313 (5th Cir. 2001).

Defendants overlook *Malley v. Briggs*, 475 U.S. 335, 345 (1986), which quoted an earlier United States Supreme Court case, in holding that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."

In this case, as previously pointed out, the magistrate judge did not actually authorize a no-knock search, and, even if he did, that would not be a defense "if a reasonably trained officer would have known" that such a search was illegal.   Further, in no sense did the judge authorize any use of force on Ricky.   Defendants' claim that the magistrate judge was an independent intermediary, whose warrant justifies Ricky's death, is not well-taken.

The *Gould* case is again on point here.   In *Gould*, where the State Court Judge did authorize a no-knock search based on insufficient justification, the Court explained:

> In this case, although the state court judge clearly neglected his duties in sanctioning a no-knock warrant under these facts, his incompetence does not excuse the officers' default in bringing the no-knock request to the judge in the first place, as well as their execution of the warrant later that morning.

*Gould*, 165 F.3d at 272 quoting *Malley v. Briggs*, 475 U.S. 335, 345, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). ("If the magistrate issues the warrant in such a case, his action is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty. The officer then cannot excuse his own default by pointing to the greater incompetence of the magistrate.").

Defendants also spend a large amount of their brief arguing that it is entitled to the "good-faith exception to the exclusionary rule announced in *United States v. Leon*. (*See* Defendants' Memorandum in Support of Summary Judgment [Docket 98], at pp. 10-13.) As Defendants' own argument states on its face, the cases which it cites are related to a good-faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897 (1984), established that evidence may not be suppressed when officers execute a search warrant based upon their good-faith belief that the search warrant showed probable cause.

This case has nothing to do with the "exclusionary rule." The two (2) main issues before the Court are whether the Defendant County violated the Fourth Amendment through its use of a no-knock search, and whether it violated the Fourth Amendment by using force that was objectively unreasonable. Neither of these issues have anything to do with the exclusionary rule, which relates to the suppression of evidence in a criminal case. Defendants' argument in this regard is totally irrelevant.

## V.    CONCLUSION

For all the reasons stated herein, Plaintiffs request that Defendants' Motion for Summary Judgment [Docket 97] be denied in all respects.

RESPECTFULLY SUBMITTED, this the 1st day of December, 2017.

ROBBIE KEETON GEIGER, DELISHA KEETON MOONEY, and MEGAN ARCHER, Plaintiffs

By:    */s/ Jim Waide*
Jim Waide, MS Bar No. 6857
waide@waidelaw.com
WAIDE & ASSOCIATES, P.A.

-40-

332 North Spring Street
Tupelo, MS 38804-3955
Post Office Box 1357
Tupelo, MS 38802-1357
(662) 842-7324 / Telephone
(662) 842-8056 / Facsimile

Shane McLaughlin, MS Bar No. 101185
rsm@mclaughlinlawfirm.com
McLAUGHLIN LAW FIRM
338 North Spring Street, Suite 2
Tupelo, MS 38804-3955
Post Office Box 200
Tupelo, MS 38802-0200
(662) 840-5042 / Telephone
(662) 840-5043 / Facsimile

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

This will certify that undersigned counsel for Plaintiffs has this day filed the above and foregoing **Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment** with the Clerk of the Court, utilizing the federal court electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

**Daniel J. Griffith, Esquire**
**Jacks Griffith Luciano, P.A.**
<u>dgriffith@jlpalaw.com</u>
<u>vsmith@jlpalaw.com</u>
<u>nmelton@jlpalaw.com</u>
<u>mpowell@jlpalaw.com</u>
<u>aluciano@jlpalaw.com</u>

**Arnold U. Luciano, Esquire**
**Jacks Griffith Luciano, P.A.**
<u>aluciano@jlpalaw.com</u>
<u>vsmith@jlpalaw.com</u>
<u>mhankins@jlpalaw.com</u>

DATED, this the 1st day of December, 2017.


*/s/ Jim Waide*
Jim Waide

-42-