IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ROBBIE KEETON GEIGER,
DELISHA KEETON MOONEY, and
MEGAN ARCHER                                                                PLAINTIFFS

V.                                               CIVIL ACTION NO.: 1:16-CV-95-SA-DAS

MONROE COUNTY, MISSISSIPPI, and
DEPUTY ERIC SLOAN                                                        DEFENDANTS

MEMORANDUM OPINION

Monroe County, Mississippi Sheriff Deputies killed Ricky Keeton during the service of a search warrant on his home in the early morning hours of October 28, 2015. Keeton's daughters, Robbie Keeton Geiger, Delisha Keeton Mooney, and Megan Archer filed this lawsuit under 42 U.S.C. §1983 against Monroe County, Mississippi and Monroe County Sheriff Deputy Eric Sloan seeking damages for Keeton's death. In their Complaint [1], the Plaintiffs allege that the County and Sloan violated several of Keeton's constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution.

The County filed a Motion for Summary Judgment [97] requesting summary judgment in its favor on most of the Plaintiffs' claims.[1] Defendant Sloan also filed a Motion for Summary Judgment [99] requesting qualified immunity from all of the Plaintiff's claims, or in the alternative, that the Court grant summary judgment in his favor. These Motions are now fully briefed and ripe for review.

---

[1] The County did not move for summary judgment on the Plaintiffs' Due Process claim related to the seizure of Keeton's property

I.     *Factual and Procedural Background*

At all the times relevant to this case, Defendant Sloan was in charge of the narcotics division of the Monroe County Sheriff's Department. Deputy Tony Coxey worked under Sloan in the narcotics division. Sloan and Coxey were investigating Ricky Keeton for about a year prior to his death; the deputies suspected that Keeton was a drug dealer. As part of their investigation, Sloan and Coxey watched Keeton's house trailer from a nearby, concealed location on numerous occasions. On October 27, 2015, Sloan and Coxey were watching Keeton's trailer when they saw a truck that Coxey recognized as belonging to one of his confidential informants leaving Keeton's residence. Sloan and Coxey contacted patrol deputies and asked them to perform a traffic stop on the truck, identify the occupants, and to "see if there was anything illegal in the vehicle." Patrol deputies were able to perform a traffic stop on the truck and confirm that Terry Parker, a confidential informant that Coxey routinely worked with was the driver. Patrol Officers also found a glass pipe and a small amount of methamphetamine inside the vehicle. After the Patrol Officers stopped Parker, he immediately began asking to speak to Coxey.

The Patrol Officers contacted Sloan and Coxey, updated them on the results of the traffic stop, and Sloan and Coxey drove to the scene of the stop to talk to Parker. Parker told Sloan and Coxey that he just bought the methamphetamine from Keeton, and that there was a substantial amount of methamphetamine in Keeton's house trailer. Parker also said that Keeton had $20,000.00 in cash from a large recent drug sale, and that a Hispanic male, Keeton's supplier, would be picking the cash up the following day.

Based on the information obtained from the informant, Coxey, with at least some help from Sloan, immediately prepared an affidavit and search warrant and took them to Justice Court Judge Robert Fowlkes. Fowlkes approved and signed the warrant. Sloan contacted the members of the

SWAT team and asked them to assemble at the Monroe County Government Complex. Once assembled, Sloan and Coxey briefed the other deputies on the layout of Keeton's property, the location of some cameras that they knew Keeton had set up, and the fact that Keeton had several dogs. Around 1:00 A.M. on October 28, 2015 Sloan and Coxey, along with deputies John Michael Lay, Sam Mitchell, John Bishop, David Mitchell, Spencer Woods, Hunter Knight, and Tim Coker drove to the area near Keeton's trailer. The team knew that Keeton had a locked gate blocking the entrance to his driveway so they stopped their vehicles some distance from the gate and lined up to proceed on foot. Sheriff Cecil Cantrell and Deputy Ricky Payne also came to the assembly point near Keeton's trailer, but remained in their vehicle. Chief Deputy Curtis Knight also waited at the assembly point in his own vehicle.

The team first proceeded to Keeton's front door but decided against attempting to enter there because there were no steps, and the door was several feet above the ground. The team then proceeded around the trailer to the back door that had a set of steps with a small porch enclosed with a railing. Noticing that the back door opened outward, the team planned for Bishop to hit and crease the door with a battering ram so that Mitchell could insert a pry bar near the lock and pry the door open. Bishop and Mitchell positioned themselves on either side of the door with the other team members on or near the steps in a single file "stack" with Sloan at the front, weapons drawn and at the ready.

Meanwhile, inside the trailer, Keeton and his girlfriend Wanda Stegall were in bed. Keeton woke Stegall up and told her that he thought he heard something outside. Keeton got out of bed and got his pellet pistol that had a flashlight mounted on it. Bishop hit the back door with the ram, deforming it, and Mitchell inserted a pry bar near the lock and began prying the door open.[2] Keeton

---

[2] According to Sloan, he and the other deputies began shouting "Sheriff's Department, Search Warrant" when Bishop hit the door. According to Stegall, the deputies never announced or identified themselves.

went to the back door. Either opened from inside by Keeton, or pried open by Mitchell, the door opened approximately two feet and then quickly closed. Sloan offers two different reports as to what he saw while the door was open. In his official statement, Sloan states "Immediately [when the door opened] I hear a male yelling 'you son-of-bitches' and then saw a white male [Keeton] with no shirt holding a black hand gun and firing it in the direction of Deputy Mitchell." In his deposition, Sloan stated "He [Keeton] would have had to actually come out on the porch in order for me to see him." According to Stegall, Keeton opened and closed the door himself. Although it is unclear who fired first, and whether the deputies began firing before or after the door closed, Keeton was shot six times. After the incident, there were approximately forty-nine bullet holes in the side of the trailer, including nine in the door itself. It is unclear how many of the bullets that hit Keeton came through the door or side of the trailer first.

One of the Deputies, and then paramedics, administered first aid to Keeton, but he died at the scene. Deputies recovered around nine ounces of methamphetamine from the trailer. Stegall was unharmed and was arrested and charged with a drug offense. According to the Sheriff's Deputies, the $20,000 that Parker stated was in the trailer was not found. The Mississippi Bureau of Investigation was assigned to investigate the incident, and investigators arrived and took control of the scene that same night.

The Plaintiffs filed this suit against Deputy Sloan and Monroe County in June of 2016. The Plaintiffs allege that Sloan violated Keeton's constitutional rights protected by the Fourth Amendment. Specifically, the Plaintiffs claim that the "no-knock" search and entry, at Sloan's direction, violated Keeton's right to be free from unreasonable search and seizure, and that Keeton's death was a result of an unreasonable use of force. Sloan argues that he is entitled to qualified immunity, or in the alternative, that summary judgment is warranted in his favor.

As to Monroe County, the Plaintiffs allege that there was no basis for a "no-knock" warrant in this case, that unconstitutional "no-knock" warrants are the default policy in Monroe County, and that the search, entry, and ultimately Keeton's death, were the result of this allegedly unconstitutional policy and practice. The County disputes these claims, and requests summary judgment in its favor.

## II. Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (punctuation omitted). The nonmovant "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* (punctuation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812.

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated

assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

The Court notes that the summary judgment record in this case is nearly 1300 pages long. The Court also notes that the vast majority of the Parties' lengthy summary judgment briefing is devoted to disputing the facts of this case. After reviewing the entire record of this case, the Court is of the opinion that the based on the record alone, the best and most prudent course is to allow this case to proceed to a full trial. "[E]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986)). There are numerous, important differences between the eyewitness accounts, and differences between the statements and testimony of individual witnesses, some of which the Court highlights below, and other circumstantial evidence that the Court believes are best suited for jury consideration. Out of an abundance of caution, and in an effort to frame the legal issues in preparation for trial, the Court will analyze the case and the Parties' arguments as presented.

### III. *Individual Liability - Deputy Sloan*

As noted above, Sloan asserts that he is entitled to qualified immunity. Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights. *Trent v. Wade,* 776 F.3d 368, 377 (5th Cir.), *reh'g denied,* 801 F.3d 494 (2015). "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof," shifting it to the plaintiff to show that the defense is not available. *Trent*, 776 F.3d at 376 (internal quotation marks omitted); *accord McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).

A plaintiff seeking to overcome qualified immunity must show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). Courts are free to decide which of the two prongs of the qualified immunity analysis to address first. *Id.*; *see also Camreta v. Greene*, 563 U.S. 692, 131 S. Ct. 2020, 179 L. Ed. 2d 1118 (2011). The second prong is satisfied only if "the state of the law at the time of the incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Tolan v. Cotton,* –– U.S. ––, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (internal quotation marks omitted). In this case, the "clearly established" prong is not contested. Therefore, the Court will focus its inquiry on the alleged constitutional violations.

### A. Fourth Amendment

The Plaintiff has asserted two claims based on the Fourth Amendment relative to individual Defendant Sloan. The Plaintiff's first claim is based on the "no knock" entry, and the second is based on the use of deadly force.

### i. Fourth Amendment – "No Knock" Entry

The Parties agree, as does the Court, that the standard articulated by the Supreme Court in *Richards v. Wisconsin* and adopted by the Fifth Circuit in a number of cases, is the appropriate one by which to assess the alleged constitutional violation in this case. *See Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997); *see also Trent*, 776 F.3d at 379; *Bishop v. Arcuri*, 674 F.3d 456, 461 (5th Cir. 2012).

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard –as opposed to a probable-cause requirement– strikes the appropriate

> balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries. This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged.

*Richards*, 520 U.S. at 394–95, 117 S. Ct. 1416 (internal citations omitted). Importantly in this case, the *Richards* Court also rejected any "blanket exception to the knock-and-announce requirement for felony drug investigations." *Id*. at 396, 117 S. Ct. 1416. Nor does the "mere presence of handguns in a house justif[y] forceful entry." *Cass v. City of Abilene*, 814 F.3d 721, 732 (5th Cir. 2016).

Turning first to the search warrant authorized by Judge Fowlkes in this case, the Court finds that there is a question of fact as to whether the warrant authorizes a "no knock" entry. The warrant does not explicitly say that it authorizes a "no knock" entry, nor does it contain any information relevant to the *Richards* standard. The only reference to "no knock" on the face of the warrant is the very last sentence which reads: "The above affiant *requests* a no-knock search due to officer safety and the protection of further evidence." (emphasis added). Turning next to the affidavit provided by Coxey to procure the warrant, the Court finds that there is likewise no information relevant to the standard articulated in *Richards* contained in the affidavit or in the attached "underlying facts and circumstances" document.

With no relevant information regarding the reasonableness of a "no knock" entry provided in the relevant documents, the Court turns to the facts of the case, as presented through witness testimony. First as to dangerousness, the Defendants have failed to bring forth any evidence that announcing their presence, "under the particular circumstances" was dangerous. *See Richards*, 520 U.S. at 394–95, 117 S. Ct. 1416. Although Sloan and Coxey had ample opportunity to question the informant, Parker, about the presence of weapons or other dangerous circumstances in the

residence, they failed to do so.[3] When questioned in their depositions about the dangerousness aspect of serving the warrant, Coxey and Sloan both indicated that Keeton had several dogs and surveillance cameras. In their reply brief, the Defendants argue,

> [. . .] Ricky Keeton was at home, had just used drugs with Terry Parker, had just sold drugs to Terry Parker, and still had a substantial amount of drugs at his home. It is undisputed that Deputy Coxey relayed this information to Judge Fowlkes, who also conducted an independent consideration of the dangers of drug dealers, dogs, video cameras, Keeton's reputation as a drug dealer, the possible destruction of evidence, and the safety of the officers involved.

The Court notes that the Defendants have not brought forth any evidence of "Keeton's reputation as a drug dealer" and that at this summary judgment stage "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver*, 276 F.3d at 744. In addition, these arguments, and the deposition testimonies of Fowlkes, Coxey, and Sloan sound merely in general that all cases involving drugs are dangerous, but as the Court noted above the *Richards* Court rejected any "blanket exception to the knock-and-announce requirement for felony drug investigations." *Richards*, 520 U.S. at 396, 117 S. Ct. 1416.

Moving to the futility aspect, the Court does find that the presence of surveillance cameras could be relevant to the extent that "'[f]utility' therefore justifies a no-knock entry only when the officer has a reasonable suspicion that the *occupants* of the residence to be searched are already aware of the officer's presence." *Trent*, 776 F.3d at 381. Under the facts of this case, however, the Defendants have not provided any evidence that they knew at the time of entry that the cameras were operational, effective at night, or that Keeton actually knew or could have known of the

---

[3] In his deposition, Parker was able to provide a substantial amount of specific information about Keeton's residence the location of specific items inside the residence, the contents of outbuildings on the property, and Keeton's dogs obtained over twenty years of visiting, buying drugs, and using drugs with Keeton in his home.

9

deputies' presence and identity. Further undermining this argument, the Plaintiffs have brought forth evidence that the cameras focused on the back door where entry was made were either disabled or covered with something right before the deputies initiated their entry. Disabling the cameras could of course remove any risk of futility based on alerting the occupants of the trailer to the deputies' presence.

Also relevant to the futility aspect is the potential destruction of evidence. Most of the cases dealing with destruction of drug evidence involve relatively small amounts of drugs that are easily destroyed. *See Bishop*, 674 F.3d at 468. In this case, the deputies knew or anticipated a substantially larger stash of drugs, and they did in fact recover nine ounces of methamphetamine. In addition, the deputies broke open the sewer line of the trailer before they made entry, thus substantially mitigating Keeton's ability to destroy evidence by flushing it down the toilet.

Finally, the Defendant invokes the protection of the independent intermediary doctrine and argues that Judge Fowlkes approval of the warrant insulates him from liability. Under the independent-intermediary doctrine, "'if facts supporting an arrest are placed before an independent intermediary such as a magistrate [. . .], the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Winfrey v. Rogers*, 882 F.3d 187, 200–01 (5th Cir. 2018) (citing *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) (quoting *Cuadra*, 626 F.3d at 813)).

The Court finds a number of issues with the application of the independent intermediary doctrine under the specific circumstances of this case. First, the doctrine is most commonly applied in wrongful arrest cases and in cases where the potential lack of probable cause is an issue. That is not the case here. The Plaintiffs do not argue that the Defendants lacked probable cause for a warrant; they only challenge the "no knock" entry. The Defendants have failed to bring forth any

relevant cases applying the doctrine in a similar factual context. Second, the Defendants' argument is based on the premise that the warrant did in fact authorize a "no knock" entry. As the Court noted above, there is a question of fact on that issue. Third, the Defendants' argument is also based on the premise that Defendant Sloan had no participation in the preparation of the warrant. The Plaintiffs have brought forth some contrary evidence, and Sloan's own statement of facts represents that he did participate, at least to some extent, in the preparation of the warrant. Finally, this argument, even if taken as true, fails to address the connection between the requisite "reasonable suspicion" and an exigency. *See Cass*, 814 F.3d at 732. Indeed, the *Richards* Court rejected a similar argument stating "the reasonableness of the officers' decision, [] must be evaluated as of the time they entered. . . ." *Richards*, 520 U.S. 385 at 395, 117 S. Ct. 1416.[4]

Based on these facts, the Court finds that a reasonable juror could find that Defendant Sloan violated Keeton's Fourth Amendment constitutional rights in this case, because he did not possess a "reasonable suspicion" such that "that knocking and announcing his presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime." *Richards*, 520 U.S. at 394–95, 117 S. Ct. 1416.

### ii. Fourth Amendment – Use of Deadly Force

As to the use of deadly force, the Parties again agree, as does the Court, that the standard articulated by the Supreme Court in *Tennessee v. Garner*, and adopted by the Fifth Circuit, is the appropriate one by which to assess this alleged constitutional violation. *See Tennessee v. Garner*,

---

[4] Interestingly, the Magistrate Judge in *Richards* denied the "no knock" request at the time of application for the warrant, and the officers argued that exigencies that arose at the time of the search justified a "no knock" entry. The Supreme Court agreed and found that the "no knock" entry in that case was justified by the requisite reasonable suspicion based on the actual circumstances at the time of entry. *Id* at 395-96, 117 S. Ct. 1416. In this Court's opinion, this focus on the time of entry only further undermines the application of the independent intermediary doctrine here.

471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985); *see also Romero v. City of Grapevine, Texas*, 888 F.3d 170, 176–77 (5th Cir. 2018); *Cass*, 814 F.3d at 731.

Thus, to succeed on an excessive force claim, the Plaintiff "bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass*, 814 F.3d at 731 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). "The use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero*, 888 F.3d at 176–77 (citing *Garner*, 471 U.S. at 11, 105 S. Ct. 1694; *see also Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) ("An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm.")).

In this case, at least two specific genuine issues of material fact preclude summary judgment. The first issue is the difference between Keeton's girlfriend Stegall's testimony and Deputy Sloan's testimony. According to Stegall, the deputies never announced who they were, and Keeton opened and closed the door himself very quickly. Also according to Stegall, all of the shooting occurred after the door was already closed.

The second issue is the different accounts that Sloan himself has given. In his statement of facts, Sloan reported that he saw Keeton with a gun in his hand firing in Deputy Mitchell's direction. In his deposition testimony, Sloan states that Keeton would have had to come out onto the porch in order for Sloan to see him. In addition to these factual disputes, there are differences between the other Deputies' accounts of the incident, and expert evidence and testimony regarding whether Keeton was shot directly or through the door. The fact finders' credibility assessment of

these witnesses is crucial to the determination of whether a reasonable officer in Sloan's position could have reasonably believed that Keeton posed a threat of serious harm. *See Romero*, 888 F.3d at 176–77 (citing *Garner*, 471 U.S. at 11, 105 S. Ct. 1694).

### iii. Fourth Amendment – Qualified Immunity

Because the Court finds above that several genuine issues of material fact exist as to the Fourth Amendment violations, both the "no knock" entry and the use of deadly force, summary judgment is not warranted on these claims at this time. The Court finds that the Plaintiffs have highlighted genuine issues of material fact as to whether Sloan violated Keeton's Fourth Amendment rights, and whether those rights were clearly established. *See Cuadra*, 626 F.3d at 812. Thus, Sloan is not entitled to the protection of qualified immunity.

### IV. Municipal Liability

In addition to their claims against Sloan individually, the Plaintiffs allege that the Fourth Amendment violations, and ultimately Keeton's death, were caused by the enforcement of an official county policy. Specifically, that Monroe County had an official policy of executing "no knock" warrants in all narcotics cases without regard to reasonable suspicion or exigency, and that this allegedly unconstitutional policy directly caused Keeton's death. The Plaintiffs' additionally allege that the County seized a substantial amount of Keeton's property that was unrelated to the drug case in violation of the Fourteenth Amendment.

#### A. Municipal Liability – Fourth Amendment

It is well-established that a city is not liable under § 1983 on the theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 308 (5th Cir. 2004). A municipality is almost never liable for an isolated unconstitutional

act on the part of an employee; it is liable only for acts directly attributable to it "through some official action or imprimatur." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Id*.

Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id*. at 579 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

In this case, Deputy Sloan, Deputy Coxey, Sheriff Cantrell, and Judge Fowlkes all testified that virtually all warrants in Monroe County, especially those involving narcotics, are "no knock" warrants, and that the warrants are always issued when requested. Sloan testified that he never participated in a search where the deputies knocked and announced despite having performed hundreds of searches. It is undisputed that Sheriff Cantrell was both the person in charge of the search of Keeton's trailer, and that he is the official decision maker for the county on these matters.

Although the County argues, briefly, that there is no evidence that any such policy exists, and that even if it did there is no evidence of a causal link between such a policy and Keeton's death, the County fails to bring forth any evidence or caselaw to support its argument.

As noted above, *Richards* explicitly rejected any "blanket exception to the knock-and-announce requirement for felony drug investigations." *Richards*, 520 U.S. at 394–95, 117 S. Ct. 1416. Based on these facts, a reasonable juror could find that such a widespread practice in Monroe

14

County fairly represents a municipal policy and that such a policy directly resulted in the use of force against Keeton. *See Cass*, 814 F.3d at 732.

For these reasons, the Court finds that summary judgment is not warranted in the County's favor on this claim.

*B. Municipal Liability – Property Seizure*

As noted by both Parties, the County did not move for summary judgment on the Plaintiffs' Due Process claim related to the seizure of Keeton's property. As such, any brief arguments presented by the Parties on this claim are not properly before this Court.

*V. Conclusion*

For all of the reasons fully explained above, the Court finds the following:

Individual Defendant Sloan is not entitled to qualified immunity. Sloan's Motion for Summary Judgment and Qualified Immunity [99] is DENIED.

Defendant Monroe County's Motion for Summary Judgment [97] is DENIED.

All of the Plaintiffs' claims will proceed to trial

It is SO ORDERED, on this the 18th day of June, 2018

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE