IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ROBBIE KEETON GEIGER, as Administratrix Of the Estate of Ricky Keith Keeton, Deceased; DELISHA KEETON MOONEY, and MEGAN ARCHER — PLAINTIFFS

VS. — CAUSE NO. 1:16-CV95-SA-DAS

MONROE COUNTY, MISSISSIPPI and ERIC SLOAN — DEFENDANTS

*************************************************************

VIDEOTAPED DEPOSITION OF FORMER SHERIFF CECIL CANTRELL

*************************************************************

TAKEN AT THE INSTANCE OF THE PLAINTIFFS
AT THE HOME OF FORMER SHERIFF CECIL CANTRELL,
30390 CENTRAL GROVE ROAD, ABERDEEN, MISSISSIPPI
ON JANUARY 18, 2022, BEGINNING AT 9:57 A.M.

GENA MATTISON GLENN, CSR 1568
Glenn-Henry Reporting
Post Office Box 492
Amory, Mississippi 38821-0492
gena.glenn@gmail.com
(662) 315-2613

EXHIBIT
H

APPEARANCES:

WAIDE & ASSOCIATES
P.O. Box 1357
Tupelo, MS 38802-1357
For the Plaintiff
BY: JIM D. WAIDE

JACKS GRIFFITH LUCIANO
P.O. Drawer 1209
Cleveland, MS 38732-1209
BY: JAMIE F. LEE

ALSO PRESENT: MR. EDDIE NABORS, Videographer

Reported by: GENA MATTISON GLENN, CSR 1568
GLENN-HENRY REPORTING

TABLE OF CONTENTS

| WITNESS | PAGE |
|---|---|
| FORMER SHERIFF CECIL CANTRELL | |
| Examination by Mr. Jim D. Waide | 5 |
| Examination by Ms. Jamie F. Lee | 133 |
| Examination by Mr. Jim D. Waide | 138 |

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| *D-1 | Sloan Statement | 23 |
| *D-13 | Petition for Forfeiture | 78 |
| *D-14 | Answer to Petition for Forfeiture | 78 |
| *D-15 | Agreed Order | 78 |

| PLAINTIFF'S EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| *P-34 | Photo | 66 |
| *P-29 | Newspaper Article | 101 |
| *P-16 | Copy of Check | 123 |
| *P-6 | Warrant | 151 |

* Exhibits not provided to reporter to be attached to the transcript

09:58:53

09:59:13

THE VIDEOGRAPHER: This is the deposition of Cecil Cantrell, taken in the matter of Robbie Keeton Geiger, as Administratrix of the Estate of Ricky Keith Keeton, Deceased, Delisha Keeton Mooney, and Megan Archer versus Monroe County, Mississippi, Eric Sloan; United States District Court for the Northern District of Mississippi, Aberdeen Division, Cause Number 1:16CV95-SA-DAS.

Today's date is January 18, 2022. The time on the monitor is 9:57.

Will the attorneys please introduce themselves on audio.

MR. WAIDE: Jim Waide for the plaintiffs.

MS. LEE: Jamie Lee for the defendants.

THE VIDEOGRAPHER: We'd ask the reporter to administer the oath, please.

CECIL CANTRELL,

being first duly sworn, was examined and testified under oath as follows:

EXAMINATION

BY MR. WAIDE:

Q. Would you state your name, please, sir.

A. Cecil Cantrell.

MS. LEE: Mr. Waide, before we get going -- I know this is a video deposition. Are we going to be on the record as this is a trial deposition, and any objections we need to go ahead and make --

09:59:43

MR. WAIDE: That's what I would think.

MS. LEE: -- this morning? Okay. That's --

MR. WAIDE: I believe -- I believe we ought to just go ahead and make objections now so there won't be any question and we'll have a chance to cure any deficient questions, so....

MS. LEE: Very good.

09:59:57

MR. WAIDE: Okay.

BY MR. WAIDE:

Q. Mr. Cantrell, you're a former justice court judge and a former sheriff of Monroe County; is that correct?

A. Yes, sir.

Q. What years were you justice court judge?

A. From '79 to 2004.

Q. What are the educational requirements to be a justice court judge?

A. Well, there used to not be any, but they passed a law that you had to have a high school education.

Q. And you were sheriff of Monroe County for -- from what years?

10:00:26

A. 2012 to 2019.

Q. And so you were -- you were elected for two terms as sheriff?

A. Yes, sir.

Q. All right. Would your first -- first time you were elected to sheriff been in the fall of 2015? That would be the --

A. No, 2012.

Q. I'm sorry, 2012.

10:00:46

A. Would be in the fall of 2011 and took office 1-1 of 2012.

Q. All right. So your first term would have ended -- your first term would have ended when?

A. 2015.

Q. All right. The death of Ricky Keeton occurred on or about October 28th, 2015; is that correct?

A. Yes, sir. I think so, yes, sir.

Q. All right. Would that have been just a few days before the general election?

A. Just a few days, yes, sir.

Q. First -- the -- the general election is in November, the first Tuesday in November?

10:01:23 A. Yes, sir.

Q. Are you the person who appointed Eric Sloan as head of the narcotics unit?

A. Yes, sir. I guess I was, yes, sir.

Q. And Tony Coxey worked under Mr. Sloan as a narcotics officer as of October of 2015?

A. Yes, sir.

Q. As the sheriff would you have been the final policy maker so far as law enforcement is concerned in Monroe County?

10:02:13 MS. LEE: Object to the form of the question.

A. We had a procedural -- you know, we had our -- a procedure manual that we went by.

BY MR. WAIDE:

Q. All right. Were you the top law

enforcement officer for Monroe County?

A. Yes, sir.

Q. And did you have authority over Sloan?

A. Yes, sir.

Q. Did you have authority to make decisions regarding use of force?

MS. LEE: Object to the form of the question.

MR. WAIDE: I'll rephrase the question. I don't -- I think this is an adverse witness and he can be asked leading questions, if that's the nature of your objection; but just so there won't be any question about it, I'll make it non- -- I'll make it nonleading.

BY MR. WAIDE:

Q. Would you tell the jury whether or not you had the authority to make the final law enforcement decisions for Monroe County?

A. Yes, sir, I did.

MS. LEE: Object to the form.

A. Yes, sir. I guess -- yes, sir, I guess I did. Yes, sir.

MS. LEE: My objection is to the vagueness of the question. The final --

MR. WAIDE: All right.

MS. LEE: -- use of force decisions for Monroe County I don't think is clear. It's -- it's vague and ambiguous.

MR. WAIDE: Okay. I'll rephrase it, then.

BY MR. WAIDE:

Q. Who had -- who in Monroe County had the final word as far as law enforcement matters were concerned for Monroe County, Mississippi? Who had that authority?

10:03:26

A. The sheriff.

MS. LEE: Same objection.

A. Me.

BY MR. WAIDE:

Q. Did you have the authority to tell Deputy Sloan whether he could or could not carry out a no-knock search? Would that have been within your authority?

10:03:58

MS. LEE: Object to the form of the question.

A. Well, you know, a warrant like that's left up to the judge. After being a judge for 24 years, the judge would make that decision, not --

BY MR. WAIDE:

Q. I see.

A. Not the -- not the sheriff.

Q. Okay. Does the judge make that decision based on information furnished him by the deputies?

A. Yes, sir. Yes, sir.

Q. What -- what would the judge base it on other than what deputy sheriffs told him?

10:04:28 A. I -- I'm not sure. I don't understand your question. I don't understand what you're trying to say.

Q. Okay. In this particular case, do you know of any information the judge had other than what deputies of Monroe County gave him?

A. I don't know of any, no, sir.

Q. In this particular case -- well, let -- let me ask a little bit different question.

Who were the deputies that actually 10:05:02 went up to the house and confronted Ricky Keeton or ultimately shot Ricky Keeton? Who were the deputies that did that?

MS. LEE: I'm going to object to the form of the question. You can answer if you understand the question.

BY MR. WAIDE:

Q. Do you know -- do you know what deputies actually went up to Ricky Keeton's house?

MS. LEE: Are you talking about on the -- October --

MR. WAIDE: Yeah.

MS. LEE: -- 28, 2015?

A. You talking about on the night that the search warrant was --

10:05:27

BY MR. WAIDE:

Q. Yeah. Right. Who actually went up there and --

A. It would be Eric Sloan, Officer Coxey, Sam Mitchell, John Bishop, David Mitchell, and -- I can't think of the other guy's name. He's -- he -- there's one other -- one other deputy up there.

Q. Would be approximately six deputies?

10:06:01

A. Yes, sir.

Q. That actually went up to the house?

A. Yes, sir. I believe so, yes, sir.

Q. And you -- you were located some distance away at a fence at the time that the shooting occurred. Am I correct?

A. Actually, when we came in I was in my vehicle. I was the third vehicle back. And we was just trying to, you know, see what -- you know, just kindly seeing if anybody was trying to leave or anything and -- but there wasn't, you know.

Q. Yeah. Here's my question: You did not actually go up to the house where the deputies executed the no-knock search. Am I correct?

10:06:37

A. No, sir, I did not.

Q. And you were back at a fence that was some distance away is where you stayed. Am I correct?

A. Yes, sir.

Q. And there were a number of other deputies that stayed back with you. Am I correct?

A. Yes, sir. Well, they were in their vehicles, so we were sitting -- it was very cold that night. We was sitting in a vehicle.

10:06:50

Q. And am I correct in saying that you learned about the shooting when you heard them announce "shots fired" over the radio? Is that how you learned about it?

A. They said, "Shots fired, need an ambulance."

Q. Yeah. Is that how you heard about it?

A. Yes, sir.

Q. Is that the only way you learned about it, you heard it over the radio?

A. Yes, sir. We were inside our vehicles.

Q. So you couldn't actually hear the

10:07:16 shots.

A. No, sir.

Q. Now, Sheriff, was it your practice to go on all of the no-knock searches? Although you may not have gone up to the house, did you go with the deputies on all the no-knock searches?

A. Well, like I say, you know, the no-knock search warrants is left up to the judge. And most of the search warrants were of

10:07:40 narcotic nature. So I don't know what the judge decided about no-knock warrants.

Q. Well, let's -- let's put it this way: On all of the -- on all of the searches -- let's leave off the "no-knock." Did you -- did you accompany -- you may not have gone up to the

house where the break-in would occur or -- or whether -- whatever they did at the house, but did you personally attend, go with them out to the area on all the searches?

MS. LEE: I'd object to the form and move to strike the characterization of the break-in of the house.

MR. WAIDE: All right.

A. I don't understand that.

10:08:11 BY MR. WAIDE:

Q. I don't understand it either, so let -- let me ask you a little different way.

Did -- did you personally accompany the deputies on all narcotics searches? Did you go on all of them?

A. Not all but a lot.

Q. How did you decide whether you went on a search or you did not go?

A. Well, you know, I can be out of town. 10:08:30 I might have -- could be sick. Just a lot -- just a lot of scenarios.

Q. All right. Have you read Mr. Sloan's deposition?

A. No, sir.

Q. Let's assume for the sake of argument

that he said he had conducted hundreds of -- of no-knock searches. Do you have -- you have any way of knowing whether that's correct or not?

MS. LEE: I'm going to object to the form, object to the hearsay within the question.

A. I -- I can't answer it. I don't -- I can't -- I don't -- give an honest answer, I don't under- --

10:08:56 BY MR. WAIDE:

Q. Okay.

A. I don't know how he could say that. I mean, but he's been in law enforcement before he worked at the sheriff's department, so I'm sure he did a lot. I don't think how many. I wouldn't think hundreds, but -- you know, that's a lot of search warrants.

Q. You earlier indicated that it was just up to the judge about whether it was a no-knock search. Have you ever known that a judge -- a judge -- the judge involved in this case was Judge Fowlkes, correct?

10:09:17

A. Yes, sir.

Q. Are you aware of any occasion when a no-knock search has been requested from Judge

Fowlkes and he refused it?

A. I don't -- I -- I couldn't answer that. I don't know. I wasn't there. I don't know. I don't --

Q. Are you -- are you aware -- are you -- are you aware of any case where Judge Fowlkes has refused to issue any search warrant that's been requested of him?

A. I'm not aware of that.

10:09:47

Q. You had earlier indicated a justice court judge has a high school education?

A. Yes, sir.

Q. Have you found that a judge like Judge Fowlkes pretty much does what law enforcement asks him to do?

MS. LEE: Object to the form of the question.

A. I can't answer that. I don't -- I don't know.

10:10:00

BY MR. WAIDE:

Q. Have you ever known of Judge Fowlkes to refuse any law enforcement officer request?

MS. LEE: Object to the form of the --

A. I don't know that.

MS. LEE: -- question. Vague and

open.

BY MR. WAIDE:

Q. You worked with -- you worked as sheriff while Judge Fowlkes was justice court judge for eight years?

A. Yes, sir.

Q. Did you know Judge Fowlkes before that?

A. Yes, sir.

10:10:18 Q. Was he a judge at the same time you were a judge?

A. Yes, sir.

Q. How many years do -- did y'all work together as judge?

A. Actually four years.

Q. All right. So you worked with him either as judge or sheriff for 12 years?

A. Approximately, yes, sir.

Q. Am I correct in saying you have never

10:10:33 -- you cannot recount any occasion where he refused a request made by law enforcement?

A. I can't answer for him. I don't know that.

Q. I know. But from working with him, you're not aware of any.

A. I'm not -- I don't know. I can't answer that and -- I -- you'd have to ask Judge Fowlkes that question.

Q. When you were justice court judge, did you ever refuse a request made by law enforcement?

MS. LEE: I'm going to object to --

MR. WAIDE: Well --

MS. LEE: -- the form, object to the vague nature of the question, but you can answer.

10:11:00

A. You know, when the sheriff comes and, you know, he asks for a search warrant, or a deputy or whatever, I mean, you have to -- you know, you look at the facts and circumstances, whatever. Usually drug dealing, you know, it's -- they usually have weapons. It's a dangerous situation. I mean....

BY MR. WAIDE:

10:11:21

Q. Here was my question: Have -- did you as a judge ever refuse to issue a warrant which law enforcement officer requested?

A. Didn't issue that many, but I don't know for -- to give you an honest answer, I can't answer that because I -- I don't recall.

Q. Okay. The officers that you just named awhile ago as going up to the house, what -- except for the two narcotics officers, Sloan and Coxey, were they all members of the SWAT team?

A. Yes, sir.

Q. Is it the practice among the SWAT team to always use no-knock searches?

A. I can't answer that because I don't -- I wasn't there when they got this warrant. I mean --

Q. Okay. As the sheriff of Monroe County, do you ever -- are you aware of any occasion when the SWAT team has carried out a search but it was not a no-knock search; they just knocked on the door and waited for the homeowner to come? Are you aware of that happening?

A. I'm not aware of that.

Q. So far as you know, all searches carried out by the SWAT team were no-knock searches. Am I correct?

A. I -- I don't -- I -- you'll have to ask the judge that question. I don't know how the judge answered --

Q. All right. Well, the judge is -- we understand the judge is not there when the search goes on, right?

A. Yeah, but he's there -- he -- he makes the decision whether it's a no-knock or not.

Q. Well, here's what I want to -- well, first, the judge is not actually on the scene when the search is carried out, is he?

A. No, sir.

10:13:07 Q. Are you aware, as the sheriff of Monroe County, Mississippi, or former sheriff of Monroe, are you aware of any occasion where the Monroe County SWAT team has ever carried out a search that was not a no-knock search?

MS. LEE: Object to the form of the question. Vague and open-ended.

A. I can't answer that and -- and give you an honest answer because I don't know.

BY MR. WAIDE:

10:13:27 Q. All right. Well, they're your deputies. They work under you, correct?

A. Yes, sir.

Q. And on a lot of the searches, you accompany them, right?

A. Yes, sir.

Q. What is the alternative -- have you ever -- strike that.

It is possible or conceivable for deputies to go to the door and knock on a house and give the homeowner time to come to the door. They could do that, couldn't they?

A. Yes, sir.

MS. LEE: Object to the hypothetical.

BY MR. WAIDE:

10:13:56 Q. You are aware of -- of the ability, if they wanted to do it, of ability of deputies to make a controlled buy when they arrest a drug person, aren't you?

A. Yes, sir.

Q. Describe what that is. What is a controlled buy?

A. Well, basically you use a CI, a confidential informant. You use somebody, and you usually put video on them; and, you know, 10:14:24 they make a hand-to-hand buy, and you have it on video so you can show the -- you know, show the court, when you go to court, the evidence.

Q. So y'all had videos where you were capable of just videoing what went on there? Y'all had cameras that would do that?

MS. LEE: Object to the form of the question.

A. No, sir. We -- no, sir, we did not.

BY MR. WAIDE:

Q. Well, how did -- how did you do that when you made --

A. Well, we had --

Q. -- those controlled buys?

A. -- video cameras like you set up on a 10:14:53 -- a confidential informant or somebody that's going to work for you. You know, they wore cameras. And we -- you know, we -- we did have some deputies that, you know, would make buys from, you know, drug dealers. But we tried to get some video if we could.

Q. Who was the confidential informant involved in the Keeton case?

A. I -- I -- I -- I --

Q. Was it Terry Parker?

10:15:27 A. I have heard his name several times, but I'm not -- I'm not for sure. You'd have to ask -- you'd have to ask the narcotics agents that question.

Q. All right. The narcotics agents -- one of the narcotics agents called you to tell

you they were going on the search, right?

A. Yes, sir.

Q. Have you ever looked at Sloan's statement?

A. Not in depth. I -- I glanced over it one or two times, but not in depth, no, sir.

Q. From looking at the statement, are you aware of whether he actually called for the SWAT team to come at the same time as he stopped Parker? He called right there from the scene?

10:16:03

MS. LEE: Object to the form. Object to the --

A. I --

MS. LEE: -- lay the -- no foundation laid for the statement, and object to the statement generally as hearsay.

BY MR. WAIDE:

Q. All right. I'm going to show you --

A. I'm not -- I'm not aware of that. I --

- - - - -

(Exhibit D-1 premarked for identification.)

BY MR. WAIDE:

Q. All right. Well, let me show you.

I'm going to refer you to -- it's been premarked for identification as Defense Exhibit 1, and ask you -- I made a little mark down in the -- on the side of the page where -- where he called the -- John Michael Lay of the SWAT team?

MS. LEE: Okay. Oh, continuing objection to the statement for all the reasons just stated in my previous objection, but....

10:16:46 BY MR. WAIDE:

Q. You see I made a little mark on the right to where he makes a reference to calling John Michael Lay of the SWAT team?

A. Yes, sir, I see that. Yes, sir. I do see that.

Q. Okay. So you agree that at least assuming what Sloan said in his statement is true, that at the same time he stopped Parker, he called from the scene and called for the head

10:17:10 of the SWAT team to come and do the search. Am I correct?

MS. LEE: Object to the form of the question. Object to the witness testifying about a statement he has not had the opportunity to read, and a marked portion

only. But with that, you can answer.

A. Well, I wasn't aware of that. I was -- I don't know. I can't answer that and give you an honest answer. I don't know.

BY MR. WAIDE:

Q. All right. You -- Well, you don't know whether -- whether Sloan would be telling the truth about that, you mean?

A. I don't know.

10:17:39 Q. Okay. Well, that's -- based on Sloan's statement, based on Exhibit D-1, would you agree that he did, in fact, call the head --

A. That's what it looks like. That's what it --

Q. That's what Sloan said.

A. That's what it --

MS. LEE: Same objection.

A. That's what it says here.

BY MR. WAIDE:

10:17:52 Q. That's what Sloan says.

A. Evidently, because it's written here. I guess -- I guess that's his statement, I guess.

Q. So do you agree with me, then, that so far as Sloan was concerned, by calling the SWAT

team and knowing that the SWAT team only does no knock searches, that at the very time he talked to Parker, or the confidential informant out on the scene, at that very time he made the decision that there was going to be a no-knock search?

MS. LEE: Same objection.

A. I'm not aware of that.

BY MR. WAIDE:

10:18:20 Q. Well, how -- that's what the statement --

A. At that -- at that point there was no search warrant even -- even given at that -- they didn't have a search -- they couldn't have had a search warrant then.

Q. Right.

A. So I -- I mean, and like I say, that goes back to the judge deciding whether it's a no-knock warrant or not.

10:18:37 Q. All right. Does the statement say that he called the head of SWAT team --

A. Yes.

Q. -- from the scene? Is that what the statement says?

A. Well, apparently.

MS. LEE: Same objection.

A. Apparently.

BY MR. WAIDE:

Q. Right?

A. Yeah. I think so. Yeah, that's what it says.

Q. So does the statement say, then, that he was arranging for the SWAT team to make the search from the scene when Parker was stopped? Is that what -- that's what Sloan's statement says?

10:18:59

MS. LEE: Same objection.

A. Evidently.

BY MR. WAIDE:

Q. Do you agree that's true?

MS. LEE: Object to the form of the question.

A. I don't know. I can't -- I -- I -- you would have to ask them them questions because I don't know.

10:19:09

BY MR. WAIDE:

Q. Do you have -- do you have any reason to dispute what's in Sloan's statement?

A. I don't know why I would.

Q. Right. You don't know of anything

contrary to what's in his statement, correct?

A. No, sir.

Q. Okay. Now, so that -- it appears -- if you -- or tell me whether you agree with me or not, that the initial decision, then, to carry out a no-knock search was apparently made by Sloan rather than yourself. Am I correct?

MS. LEE: I'm going to object to this -- this entire line of questioning. There is nothing in the statement that says anything about a no-knock search warrant, and you keep asking the witness about whether this equates to a no-knock search warrant, and that's not what's in the statement.

10:19:38

BY MR. WAIDE:

Q. Yeah, but I -- I thought you earlier -- didn't -- didn't you -- didn't you say earlier that the SWAT team only does no knock searches?

10:19:54

MS. LEE: Object to the -- object to that question. That was not the witness's testimony --

A. If I did I was wrong. If I'm -- you know, a lot of times, these questions, you get

-- you -- a lot of questions it's over and over. And, you know, I'm -- I may -- I don't know.

BY MR. WAIDE:

Q. Okay.

A. I can't answer that. I don't know.

Q. Okay. Well, do you remember which -- was it one of the narcotics officers that called you to tell you about the search?

A. Yes, sir.

10:20:29 Q. Either Sloan or Coxey, one or the other? Is that what you remember?

A. Yes, sir.

Q. Okay. Did you discuss with the no-knock -- I'm sorry. Did you discuss with either Sloan or Coxey your relationship with Ricky Keeton? Did you have any discussion with them about that?

A. I don't understand your question.

Q. Did you talk with them about whether you knew Ricky Keeton? 10:20:59

A. No, sir.

Q. Y'all never had any discussion about it?

A. No, sir.

Q. Could you say from the search warrant

that it was Ricky Keeton that was going to be searched?

A. I -- I didn't -- I didn't know really who they were searching. I didn't know.

Q. So you didn't look at the search warrant?

A. Well, they had the search warrant; and they do it, you know, all the time. No, sir, I -- that -- when they de- -- briefed us, they said it was going to be at Keeton's premises.

10:21:28

Q. At Ricky Keeton's?

A. Yes, sir.

Q. All right. Am I correct in saying that you had a number of family connections with Keeton?

A. No, sir, I didn't have any family connections with Keeton.

Q. Well, you had a number of your deputies that were connected with his family, or several of your deputies, correct?

10:21:48

A. No, sir.

Q. All right. Did you have a deputy named Ronald Minga?

A. Yes, sir.

Q. And was Ronald Minga at the time

living with Ricky's sister?

A. Yes, sir.

Q. And what is her name?

A. I don't know.

Q. Debbie Lollar, correct?

A. Ms. Debbie, yeah.

Q. Ms. Debbie Lollar, yeah.

In fact, after -- after the deputies had killed Mr. Keeton, you went out the first thing the next morning to notify Ms. Lollar, did you not? You went to her house.

MS. LEE: Objection to the form. Move to strike the characterization of deputies killing Mr. Keeton.

MR. WAIDE: Strike --

BY MR. WAIDE:

Q. Do you -- do you deny that the deputies killed Mr. Keeton, Sheriff?

MS. LEE: Object to the form. Move to strike the statement "deputies killed Mr. Keeton."

A. Well, Mr. Keeton came to the door with a gun.

BY MR. WAIDE:

Q. Okay. I understand that.

A. And --

Q. My question is did the deputies --

MS. LEE: And let him finish.

MR. WAIDE: Okay.

MS. LEE: Please.

BY MR. WAIDE:

Q. Oh, go ahead.

A. Mr. Keeton, according to what the deputies say -- and this is hearsay because I wasn't around there. I don't know.

10:22:42

Q. All right.

A. But I do know that he came to the door with a gun, I mean, and was shooting at them; and they shot back.

Q. Well, we'll get into the facts of it in a little bit, but --

A. Okay.

Q. -- what I'm asking you --

A. All right.

10:22:53

Q. -- right now is --

A. Okay.

Q. -- Debbie --

A. Okay.

Q. -- Lollar. Did you go out to Debbie Lollar's house the next morning to express your

condolences?

A. Yes, sir, I did.

Q. And how close of friends -- how -- what was the relationship between you and Mr. Minga, the fellow that she was living with?

A. Well, I went to high school with him. He was, like, a year or two behind me in high school.

Q. Y'all were close friends, weren't you?

10:23:18 A. No, sir, not close friends but -- we were friends but not close friends. No, sir. We were --

Q. All right.

A. We were friends, you know, but not close friends, no, sir.

Q. All right. Well, I'm going to get into that a little bit more, but --

A. Okay.

Q. -- you had -- you related in your

10:23:30 deposition how you had just bought a lawn mower from him?

A. No, sir, I -- wait a minute. Yes, sir, I did buy a used mower from him. Yes, sir.

Q. And you also knew Debbie Lollar's daughter, April Bryant? Do you remember talking

about her when you were talking to the family?

A. April Bryant. I don't recall that.

Q. Okay. Now, you had an -- a retired highway patrolman and a -- a retired Highway Patrolman who worked for you for a time as a -- as an auxiliary deputy named Robert Weaver, did you not?

A. Robert Weaver has never been a Highway Patrolman.

10:24:08 Q. He was not? Was he -- was he your auxiliary deputy?

A. Robert Weaver?

Q. Yes, sir.

A. Yes, sir, he did -- he did work as an auxiliary as a volunteer, yes, sir, sometimes. Yes, sir, he did.

Q. And isn't it true that approximately 11 months or so before Mr. Keeton was killed, you had bought a trailer by talking to Robert Weaver?

10:24:33

A. Yeah. Robert --

MS. LEE: Object to the form. Move to --

THE WITNESS: I'm sorry.

MS. LEE: -- strike the characterization of killing Mr. Keeton.

MR. WAIDE: Strike -- I don't quite understand this. Are -- is somebody denying that the deputies killed Mr. Keeton?

MS. LEE: I'm not denying that Mr. Keeton was shot after shooting at the deputies, but I'm objecting to the characterization of the deputies killing Mr. Keeton.

10:24:49

MR. WAIDE: I see.

THE WITNESS: Okay. All right. Do you want me to answer it about Mr. Weaver?

MS. LEE: Yes, sir.

BY MR. WAIDE:

Q. Yeah. We were trying to talk about Mr. Weaver and the --

A. Okay. Mr. --

Q. -- and the trailer that you bought.

10:24:58

A. Mr. Weaver, the way he made his living -- he didn't have a regular job. And he basically traded a lot. And I saw him one day at the sheriff's office; and I said, If you run across a used trailer, I would like to have it.

A horse trailer, because I had some horses at the time. And he said, I -- I -- I think I've got what you need.

And he brought it over here, and it was just -- it was really rough. And I give him 4- or 500. I don't remember. I wrote him a check. And then I found out later, after those girls, Geigers or whatever -- they found the check and thought me and Mr. Ricky were friends.

10:25:45 But me and Mr. Ricky, we hadn't had any -- any dealings as trading or -- I -- I just -- you know, I didn't really know him. I didn't really -- I don't know -- if he walked up out there, I wouldn't have known him. No, sir.

Q. Well, we'll get into that in just a minute and your --

A. Okay.

Q. -- your talking with the family afterwards. Right now I'm talking to you about Mr. Weaver.

10:26:06

A. Yes, sir.

Q. Initially isn't it true, sir, that you're the one that -- that talked to Mr. Weaver about the trailer; and when you talked to him, you believed it was Ricky Keeton's trailer?

A. No, sir. He didn't tell me that. I thought it was his trailer.

Q. Where did you first see the trailer?

A. When he drove up out here with it.

Q. I see. You didn't see it over at somebody else's house and told it was Mr. Keeton's trailer?

A. No, sir.

Q. Is it not true that for some reason Mr. Keeton did not want to deal with you about the trailer?

10:26:31

A. Well --

MS. LEE: Object to the form. Lack of foundation.

A. -- I don't know about that. I -- I -- I don't know.

BY MR. WAIDE:

Q. Had you and Mr. Keeton had any type of falling out?

A. No, sir. I don't -- I did -- like I say, I don't even -- I didn't -- wouldn't even know Ricky Keeton if he walked up out there.

10:26:40

Q. Well, that's not what you told the family when y'all talked right after --

A. Well --

Q. -- the killing, is it?

A. Well, let me say this to you: Being sheriff of the county, when we were small, small children, like 6 or 7 years old, we went to Trace Road church. And we became friends because we was in the same Sunday school class. And, you know, when you're childhood friends, I just assume you'd be friends for -- for life; but I never saw Mr. Keeton after -- you know, after, probably, I was 8 or 9 years old. But....

Q. So y'all went to church together, and you assumed y'all were friends for life from that?

A. Well, I've got -- I guess. I don't -- I can't -- I don't know -- I don't -- I guess. I -- I mean, we was acquaintances.

Q. All right. After you had gone over to Debbie Lollar's house, and then just a few days later you met with several of Mr. -- or all of Mr. Keeton's daughters, with Debbie Lollar, with -- with -- Ronald Minga --

A. No, Mr. Minga wasn't there.

Q. He wasn't?

A. No, sir. I did meet with his -- his

daughters, yes, sir.

Q. With Debbie Lollar and her daughter April?

A. Okay. I don't know exactly who those daughters were. I knew Mr. and Ms. Geiger. I don't know about the other two ladies, what their names were.

Q. And Alan Gurley, the -- the -- the coroner for the county, was there?

10:28:18 A. No, sir. Not in there where I was at, no.

Q. How many different meetings did y'all --

A. One time.

Q. Just one time?

A. Yes, sir.

Q. Well, I assume everybody was pretty upset because this was just a few days after Mr. Keeton was killed, correct?

10:28:34 A. Yes, sir. They were upset.

Q. And they were wanting to know what happened, basically, correct?

A. Yes, sir, but I -- you know, I just -- I just told them, you know, I -- I'm very sorry of their loss and -- and just --

MS. LEE: Let him finish, please, Mr. Waide.

BY MR. WAIDE:

Q. All right. Go ahead.

A. I just -- I was saying I was very sorry for their loss, that, you know, we hated that this happened, and just was very sympathetic towards them because I think that's the Christian way to be.

10:29:01 BY MR. WAIDE:

Q. Well, do you remember -- I'll ask you about some specific things that happened at the meeting. Do you remember one of them, one of the daughters, objecting to the fact that you had put in the paper that Mr. Keeton was involved in a drug cartel? Do you remember them saying something to you about that, that you'd put that in the paper?

MS. LEE: I'm going to object to the question. 10:29:23 I'm going to object to the hearsay within the question. You can answer.

MR. WAIDE: It's not admitted for the truthfulness of it. It's admitted to show the relationship with him and the family.

MS. LEE: Same objection.

BY MR. WAIDE:

Q. Is -- is -- do you --

THE WITNESS: Do I answer that or -- do I answer --

BY MR. WAIDE:

Q. Yeah. Yeah. Do you remember one of the daughters saying to you, You've put these statements in the paper about my daddy being in a drug cartel with a -- a Mexican drug cartel or something? Do you remember them objecting to --

10:29:40

A. Well --

Q. -- your saying that?

A. -- is it all right for me to tell what I know there?

MS. LEE: Yeah. Same objection, but you can answer --

MR. WAIDE: Well --

MS. LEE: -- Mr. Cantrell.

THE WITNESS: Okay.

10:29:48

MS. LEE: You can answer. You've asked the question. He can answer the question.

MR. WAIDE: I understand.

BY MR. WAIDE:

Q. But you need to respond to the question. I don't need a speech. I just need you to respond to the question.

MS. LEE: He's going to respond to the question.

BY MR. WAIDE:

Q. The question is --

A. Would you --

BY MR. WAIDE:

10:29:59 Q. -- whether or not they objected or expressed to you being upset, the fact that you made statements to the newspaper about their daddy being in a drug cartel. Do you remember that?

A. He was buying drugs from the Mexican cartel.

Q. Did they bring that -- okay. And that's what you had put in the paper, wasn't it, sir?

10:30:15 A. Yes, sir. Yes, sir.

Q. And one of the daughters objected to you and wanted to know, Why are you doing that? Why are you telling the paper that?

Do you remember that?

MS. LEE: Same objection, but you can

answer, Mr. Cantrell.

A. I don't recall that.

BY MR. WAIDE:

Q. They may have, though, correct?

A. I don't know. I can't recall.

Q. Okay. Do you recall whether, in response to that, you told the daughters, quote, I respect him more than you will ever know, referring to Mr. Keeton?

10:30:36 A. Well, I went to -- I went to church with him. I just -- I just -- I -- I had a lot of -- I have a lot of respect for people.

Q. My question is -- or did -- do you deny that you told the family that I respect him, meaning Mr. Keeton, a lot more than you'll ever know?

A. No, sir. I said that.

Q. You did say that.

A. Yes, sir. And I -- and I would say it 10:30:56 today about anybody because all -- all I can tell you is we -- when we were small, and I -- I know I'm going over it again, we went to church together. And as a Christian -- and I am a Christian, and I'm proud I am -- that I just assumed he'd be a brother in Christ.

Q. All right. And then one of the sisters, in response to your making that statement concerning respecting him, one of the sisters said, I knew you were friends.

Do you remember one of the sisters saying that?

MS. LEE: I'm going to object again to the questions involving hearsay statements --

10:31:27 A. I --

MS. LEE: -- made about -- one second, Mr. Cantrell --

A. I don't know how they could say it --

MS. LEE: Mr. Cantrell, let me -- let me object.

THE WITNESS: Okay. I'm sorry.

MS. LEE: -- to the hearsay statements that Mr. Waide is attempting to backdoor through these questions asked of

10:31:40 Mr. Cantrell. These are facts not in evidence, and I -- for those objections I will --

MR. WAIDE: A statement has -- to be hearsay, a statement has to be admitted for its truthfulness. This is not admitted for

its truthfulness but to show how close Mr. -- the sheriff was to Keeton and the Keeton family.

A. I was not --

MS. LEE: Same objection.

A. I was not close to Mr. Keeton.

BY MR. WAIDE:

Q. Did you not -- did you not exactly say these words, Sheriff Cantrell, quote, we were closer than friends?

10:32:06

A. If you had --

Q. Did you say that?

A. If you had been there that day, those -- and which I was the only -- them in there. I'm sure they -- I don't know if they taped that. I don't know. I don't know exactly what I said. But, you know, I was trying to console those people. They'd just lost their father.

Q. All right. Do --

10:32:25

MS. LEE: Let him finish his answer, please.

A. That they -- they had just lost their father, and I was just trying to condole those people and -- the best way I knew how. And I -- and I -- I did it in a Christian manner. Yes,

sir, I did.

BY MR. WAIDE:

Q. So you --

A. And if I said that, if I said that, it would be from a -- a way that -- to try to comfort the family. I mean, I don't know that -- and I evidently didn't do a very good job.

Q. Well, my question was did you make the statement, quote, we were closer than friends.

10:32:57 A. Hold on a second.

Q. Do you need to take a break?

A. Hold on just a second. Hold on a second.

MR. LEE: Let's take a break.

THE WITNESS: No, just -- just give me a minute. I'll be all right. Just give me a minute. I'm used to this, believe me.

Okay, go ahead. Go ahead.

MR. WAIDE: Well, I don't want -- you know, Sheriff, if --

10:33:18

THE WITNESS: No, I'm fine.

MR. WAIDE: -- you need to take a break --

THE WITNESS: I'm fine.

MR. WAIDE: -- we can do it.

THE WITNESS: It's just -- it just -- I won't go into my health issues, but I've got --

MR. WAIDE: Do you want to get some water?

A. No, I'm fine. I'm fine. I'm -- here, I've got something right here. Let me get a little drink.

BY MR. WAIDE:

10:33:32 Q. Sheriff, whatever your rationale was, you did tell the family that y'all were closer than friends?

A. I may have had. I don't know for sure.

Q. Okay. And you told them truthfully that you knew all of the family. You remember that?

A. Well, the only one I knew was Ronald Minga's girlfriend, Ms. Debbie. That's the only one I knew. 10:34:10 But, now, when I was small, his daddy would come to church. I'm -- I just remember his father, you know. That's -- but I haven't seen that man in -- I don't guess he's even living. I don't know. I haven't seen him in years.

Q. You told him that Ricky's mama and daddy were wonderful friends of yours.

A. When I was a little bitty fellow.

Q. You didn't tell them that, did you? You just said, They were wonderful friends of mine.

A. When -- when -- when I was going to church with Ricky when I was small, children, they would -- you know, they were there with their children, and they seemed like nice people. But, now, I was just a little bitty kid. I don't -- that's not like I had an adult relationship with those people.

Q. And you also -- you also made the statement to them that Ricky's sister, Debbie Lollar, was, quote, as good of friend as I've got.

A. She -- she was a -- she was a good -- a good acquaintance. I --

Q. What you told them was she was a good friend.

A. Well -- all right. Now, acquaintance, sometimes you say as a friend. Because of Mr. Minga, yeah, she was -- she was -- I just knew her from around town. She worked at a

restaurant that we ate lunch there, and I would -- you know, she'd wait on our table, and I was -- that's before she got -- through the years.

Q. And then you also told them that Mr. Minga, your deputy, was, quote, one of my very dearest friends.

A. Say that again, sir?

Q. You also said that Mr. Minga, who she was living with, her boyfriend, was, quote, one of my dearest friends.

A. Yes, sir, he was a good friend.

Q. You said you love him to death.

A. Yes, sir. He's a good guy. He's a fine, fine, fine man.

Q. And you said you love him like a brother.

A. Mr. Minga?

Q. Yes, sir.

A. I loved all -- all -- I -- I even -- I'll love you, Mr. Waide, like a brother. Does that -- I mean, y'all -- me and you have been friends for -- for whatever, 40 years.

Q. Well, Sheriff --

A. I mean, I'm just trying to answer it honestly.

Q. I'm just trying to talk about the relationship with the Keeton family that you had when we went out and did the search that ended up in Mr. Keeton's death.

A. Yes, sir. I'm aware of that, sir.

Q. Do you remember one of the sisters asking you -- after you had told them all this about your relationship with family and Mr. Keeton, do you remember -- I guess it was

10:36:57 Mr. Keeton's daughters -- one of the daughters asked you, Why did you have to go out there at 1:00 o'clock in the morning? Why do you have to wake somebody up at 1:00 o'clock in the morning when you know every -- when you know that you could have a gun in your house?

MS. LEE: Object --

BY MR. WAIDE:

Q. Do you remember one of the daughters asking you that?

10:37:14 MS. LEE: Object to the form of the question. Object to the hearsay --

MR. WAIDE: That's -- excuse me for interrupting. That is not hearsay.

MS. LEE: It is --

MR. WAIDE: Hearsay is a statement

admitted for the truthfulness of it.

BY MR. WAIDE:

Q. She asked you the question about why did you have to go out there at 1:00 o'clock in the morning, knowing that people would have -- could have a gun in their house, why would you have to do that. Do you remember them asking --

MS. LEE: Same objection.

BY MR. WAIDE:

10:37:32 Q. -- you that question?

A. No, sir, I don't -- I don't recall that.

Q. Do you recall telling them, I can't answer that?

A. I don't recall.

Q. Well, that's true, isn't it? You can't answer that.

A. I don't -- I don't know. I don't recall that. I'm not saying it's not true. I don't know.

10:37:48

Q. Okay. Well, why would you -- why would you -- you've told us about the relationship with friends of Mr. Keeton or Mr. Keeton's family. You've told us about one of your deputies being -- living with his

sister.

A. Yes, sir.

Q. And we had an earlier deposition, not for trial but just an earlier deposition where you said you didn't know anything about Mr. Keeton ever being violent. Do you remember telling us that?

A. It's been so many years. I don't --

Q. All right.

10:38:15 A. I don't --

Q. Well, I'll ask you.

A. I -- it's just been so many years ago. I mean, we're looking at seven or eight years ago, and -- and I'm going to be very honest with you. I've been -- I've been put to sleep for surgeries during this time and stuff, and it affects your memory.

Q. Okay. Well --

A. I'm not saying --

10:38:35 Q. -- do you know --

A. I'm not saying I did or didn't. I don't know, to give you an honest answer.

Q. Do you know, can you give us any information that you had that Mr. Keeton was violent other than your testimony that he's a

drug dealer? Other than that do you have any -- any evidence that Mr. Keeton was violent?

A. No, sir.

Q. And so you could not answer the question, then, as to why -- what was the necessity of y'all going out there at 1:00 o'clock in the morning and doing a no-knock search.

A. I don't know if it was a no-knock

10:39:07 warrant. I can't answer that. You'll have to ask the narcotics agents. But drug dealers never sleep. They're always -- they're always doing drugs. They stay up for days and weeks at a time.

Q. So is that the reason that you went out at 1:00 o'clock in the morning?

A. No, sir, that's not the reason.

Q. What is the reason?

A. Well, they had just recently, that

10:39:30 night, made a drug buy off Mr. Keeton because, I mean, he sells drugs. He's slinging drugs all over the county.

Q. Wait, excuse me. Just --

MS. LEE: Wait. Let him finish, Mr. Waide.

BY MR. WIDE:

Q. Mr. --

MS. LEE: Thank you. Just let him finish.

MR. WAIDE: All right.

A. He slings drugs all over -- he was slinging drugs all over the county, and we -- we wanted to see if we could, you know -- we -- we don't like drug-dealing in our county.

10:39:51

BY MR. WAIDE:

Q. Just a couple of follow-ups on that.

Other than the confidential informant, Mr. Parker, and your drug agents, Coxey and Sloan, who -- what individual told you he was selling drugs all over the county? Who told you that?

A. During -- during the process of all this, over months and months and months of investigations, not only on him but all investigations, his name always come up that he was selling drugs.

10:40:19

Q. Here -- here's my question: Who? Who? We know Mr. Parker -- apparently Parker, Sloan, and Coxey made that claim, but who? Who told you, I've been buying drugs from

Mr. Keeton?

A. I can tell you this. I --

Q. No, sir, I'd like to know a name.

A. I'm going to give -- you won't let me finish --

Q. Yes, sir. Yes, sir.

MS. LEE: Thank you. He -- he's entitled to finish his question --

MR. WAIDE: Yeah, he is.

10:40:43 MS. LEE: -- his answer. Thank you.

A. I can't answer that quick.

BY MR. WAIDE:

Q. Okay, sir.

A. Would you state that again, sir?

Q. What individual, other than Sloan, Coxey, and the informant, Parker, told you he was selling drugs?

A. There was a confidential informant that I know.

10:40:58 Q. Named who?

A. Dustin Parham.

Q. Dustin Parham.

A. Uh-huh.

Q. Where do we find Mr. Parham?

A. Mr. Parham, he lives in Amory.

Q. Can you spell that?
A. D-U-S-T-I-N P-A-R-H --
Q. And when did he tell?
MS. LEE: Let him finish his -- he hasn't even finished spelling the name.
MR. WAIDE: P-A-R-H-A-M, I believe he said.
MS. LEE: He had not finished spelling the name. Now, if you'll let him finish --
10:41:26 THE WITNESS: That's correct. That's right.
BY MR. WAIDE:
Q. When did Mr. Parham tell you that?
A. Mr. Parham was on meth. Matter of fact, he was going down to Texas and the Mexico border, meeting with a Mexican cartel, buying drugs for Mr. Keeton, bringing them back to Monroe County. He got a thousand dollars per load to bring it back to Monroe County, Mr. 10:41:52 Parham did. Mr. Dustin Parham. Is what he told me.
Q. When did he tell you that?
A. We had him in jail and he told me that.
Q. When?

A. I'd have to go back and -- I don't know. Probably a few months after that had happened.

Q. After what had happened?

A. Mr. Keeton was dead.

Q. Oh, you're talking about something that happened after Mr. Keeton was dead.

A. Well, after he was deceased, yes, sir.

Q. All right. Who told you this before Mr. Keeton was dead?

10:42:19

A. I -- I -- I -- I -- nobody told me that, no, sir, other than street talk.

Q. Well, when you say street talk, somebody has to speak it. Now you're telling us you had a man named Mr. --

A. I --

Q. -- Mr. Parham that told you after the fact --

A. Street -- on the street, different people say things, and it gets back to law enforcement. Whether or not that's being true or not, I don't know.

10:42:38

Q. Are you going to give us a name or not?

A. I did.

Q. Mr. Parham, after he was already dead, told you that.

A. Yes, sir.

Q. And who -- but you couldn't name anybody that told you that before he was dead.

A. No, sir.

Q. Where do we find Mr. Parham?

A. He lives in Monroe County, out -- out above Hatley, out there somewhere.

10:43:04 Q. He's not in jail? He's in Hatley?

A. No, sir. He's reformed. He doesn't do drugs anymore. He's working and going to church.

Q. Where -- where does he -- where does he work?

A. I don't know.

Q. Where does he go to church?

A. Christian Chapel.

Q. How could we get in touch with him?

10:43:21 A. I couldn't answer that, Mr. -- Mr. Waide. I don't know. I -- I take that back. He came by out here. He's -- a few weeks ago, months ago. He's a good guy.

Q. He came by to see you?

A. Yes, sir. Just to say hello. He was

-- he -- he -- he straightened his life up.

Q. All right. Well, good. He'll make us a good witness if you can find him, then. Can you help us with it in how to find him?

A. I -- I will try to.

Q. You don't know where he lives?

A. No, sir, not -- no, sir, I don't.

Q. Do you know any relatives?

A. Oh, I knew his daddy. I used to go to church with his daddy.

10:43:55

Q. What's his daddy's name?

A. Mark Parham.

Q. Where does his daddy live?

A. Out above Hatley.

Q. Do you remember that you went on in the conversation, that the daughters told you that you know that Ricky would never pull a gun on you?

A. No, sir, I never --

10:44:34

MS. LEE: Object to the form.

A. I never said anything --

MS. LEE: Hold on --

A. -- like that.

MS. LEE: -- a second, Mr. Cantrell. Object to the form. I'm again

objecting to the hearsay. And you are trying to offer it for the truth of the matter asserted in a way in which you're -- because of the way in which you're asking the question: Isn't it true that these daughters said that? That's -- that is --

MR. WAIDE: That's not --

MS. LEE: -- hearsay and I'm objecting --

10:44:52 A. I never --

MS. LEE: -- to it because of that.

A. I -- I can answer it --

MR. WAIDE: It's admitted -- it's admitted for the purpose of showing he knew Mr. Keeton wasn't dangerous.

A. I never said anything like that.

BY MR. WAIDE:

Q. Like what?

A. You said something about a gun, pulling a gun. I don't -- I don't recall that. But now -- I don't recall that.

10:45:03

Q. Sheriff, as far -- so far as -- as you know, is the -- and I know you're saying, well, the judge decided for some reason. But so far as you know, is the only reason that a no-knock

search was done is because Mr. Keeton was a drug dealer? Is that the only reason?

A. I don't -- first of all, I don't know if it was a no-knock warrant or not. I can't answer that. You'll have to ask the narcotics agents.

Q. Excuse --

A. Second --

Q. Excuse me for interrupting.

10:45:42

MS. LEE: Let him finish.

MR. WAIDE: He --

MS. LEE: Let him finish.

BY MR. WAIDE:

Q. Okay. Go ahead.

A. Would you ask that question again?

Q. Is the only reason -- is the only reason that -- well, first of all, you say you don't know whether it was a no-knock search. Are you saying that you don't know that the deputies went out -- well, strike -- let me strike that.

10:45:57

Did you not read the statements that the deputies made about how the search was done? Did you not read that? Did you not read those statements?

A. Seems like I did, but I can't remember them. I don't -- I -- I wouldn't -- I can't remember. You know, I can look at it now and see, but I don't remember. That's been years ago.

Q. Yeah. Isn't it true that they all said that the way they made the entry was that without knocking, they went out and used a crowbar and a battering ram to break into the door? Is that not what they said?

10:46:29

A. I don't know that to be -- I don't know.

Q. You read the -- you read their statements, but you don't know whether that's what they said?

A. I don't -- I don't recall that. I don't know.

Q. You don't recall that that's what they said about how they entered?

10:46:42

MS. LEE: I'm going to object. Asked and --

A. I don't know --

MS. LEE: -- answered. You're badgering --

A. -- Mr. --

MS. LEE: -- the witness, Mr. Waide.

A. -- Mr. Waide.

MS. LEE: Let's move on.

A. I don't know that.

BY MR. WAIDE:

Q. You don't know that. How do you think they entered?

A. Well, I mean, I -- you know, I don't know -- I don't know how they entered. I wasn't around there. I don't know. I wasn't at the -- I -- I didn't see the entry.

Q. Had you instructed them on how they were to enter?

A. No, sir.

Q. Had you ever given them any instructions on when a no-knock warrant was proper or when it would be improper?

A. No, sir.

Q. Had you ever -- did you go out and look at the trailer after -- after Mr. Keeton was dead? Did you see the trailer?

A. Yes, sir.

Q. Did you see all the holes in the side of it and in the door?

A. There were some holes, yes, sir.

Q. Could -- did you surmise from that that they had been shooting through the trailer and through the door?

A. I can't answer that. All I can tell you is the door did have some gun -- gun bullet holes in it, yes, sir.

Q. Did you ask any of the deputies whether or not they had shot through the trailer and the door?

10:47:44 A. No, sir, I did not.

Q. Was it obvious to you that they had?

A. I don't know that.

Q. Had you ever instructed your deputies that once a danger -- you've earlier testified that they told you he had a gun, right?

A. The deputies did.

Q. Yeah. They told you that.

A. Matter of fact, they shot one of deputies.

10:48:00 Q. Well, actually, what you saw from the shooting of the deputy, you saw the picture, didn't you, of the deputy that you claim was shot?

A. I -- I talked to him that night. I didn't see a picture. Is there a picture?

Q. The -- well, we'll show you a picture. The only thing he had was some small area on his -- on his lower part of his leg in two places where it looked like something had hit the bottom of his leg?

A. I think in his neck too.

Q. He didn't have any evidence of any wounds in his neck, did he, Sheriff?

A. Well, he was complaining about it. I just assumed that he did.

10:48:33

Q. He complained about an injury to his neck, and you --

A. Yeah, I --

Q. -- assumed he did?

A. His leg and his -- and his neck, I thought he said. He was rubbing his neck. He --

Q. Yeah. He -- he jumped off the side of the porch, didn't he?

A. Yeah, when Mr. Keeton started shooting at him.

10:48:44

Q. You don't have any personal knowledge of that, do you, sir?

A. No, sir.

Q. In fact, you're aware of the MBI

report that all Mr. Keeton had was a pellet gun, right?

A. Yes, sir.

Q. And the pellet gun only had one pellet missing.

A. I don't --

Q. Correct?

A. I don't know that.

Q. But my -- my question was -- well, I

10:49:11 tell you what. I'll show you the -- I'll show you the picture of the deputy you're talking about.

A. Which would -- that would be --

Q. That's Deputy Mitchell?

A. Sam Mitchell?

Q. Yeah. You've never seen any medical records that indicate he'd been shot, have you?

A. No, sir.

MR. WAIDE: All right. I move the

10:50:19 introduction as Exhibit P-34.

- - - - -

(Exhibit P-34 moved into evidence.)

BY MR. WAIDE:

Q. Would you pick up that exhibit book

right there and turn over to P-34.

MR. WAIDE: Do you need a copy of that? Do you have that on your computer?

MS. LEE: I do. I do.

A. There's not a P-34 in here.

BY MR. WAIDE:

Q. Let me help you there if I can.

A. There's a P-35, but I don't see a 34.

Q. Let me see.

10:51:04

A. See right there? 35, 36 --

Q. Let me look. It may be -- I may have to give you my copy.

A. I don't see that.

Q. Okay. Well, this a copy, and they maybe didn't put it in there or something.

A. There's not one in there.

Q. No, it's sure not. You're exactly right. Let me give you my --

MS. LEE: Is this it?

10:51:25

MR. WAIDE: Yeah. That's it.

BY MR. WAIDE:

Q. Let me give you my copy. You're right, it's not in that copy.

I'm showing you what I'm asking the court to receive as Exhibit P-34, and I'll

represent that that purports to be a picture of Deputy Sam Mitchell's leg. See that?

A. This here?

Q. Yes, sir.

A. That's a pretty deep hole, isn't it?

Q. Okay. You -- you've referred as deep holes. How many holes do you see there?

A. I see a hole here. It looks like it's shot there and there. Is that the -- I don't know how many pictures that is. Is that all the -- is this the same picture as that?

Q. I can't answer any questions, Sheriff. I just asked you to look at the pictures.

Had you seen those pictures before?

A. No, sir.

Q. You're not an expert in saying where -- what the -- are you saying where those -- do you have any knowledge about where those indentions in his skin came from?

A. No, sir.

MS. LEE: Well, you just represented to him that those are --

THE WITNESS: Bullet --

MS. LEE: -- pictures of Sam Mitchell's leg --

MR. WAIDE: Right. I --

MR. LEE: -- so I think he can answer the question about whether he has an opinion about whether those are the shots that came from Mr. Keeton's gun that night.

MR. WAIDE: Well, excuse me.

BY MR. WAIDE:

Q. You weren't there that night, correct?

MS. LEE: Object to the form. He was present at the premises.

10:52:45

A. Where?

BY MR. WAIDE:

Q. Did --

A. Are you talking about at the -- at this house?

Q. Yes, sir.

A. Yes, sir. I was outside, out there in the car.

Q. How far away were you?

10:52:57

A. Well, where -- well, they went into the -- under the carport, went to that door on the back like that. And I was, I don't know, 75, a hundred feet, maybe.

Q. Or 75 or a hundred yards, maybe, right?

A. I didn't measure it. I'm going to say probably 75 feet, 80 feet.

Q. Well, regardless, you did not see any deputy get shot, did you, Sheriff?

A. No, sir.

Q. Did you see any medical records indicating any deputy had been shot?

A. No, sir.

Q. You did see indentions in the side of the trailer, approximately -- over 40 indentions in the side of the trailer?

10:53:29

A. Yes, sir.

Q. Which -- is it your opinion that those came from gunshots?

A. Yes, sir. It looked like it, yes, sir.

Q. In your opinion, would those cause shrapnel to come off the trailer, metal shrapnel to come off?

10:53:47

MS. LEE: I'm going to object to the form. The witness has -- if the witness --

A. I wouldn't know that.

MS. LEE: -- understands, he can answer.

BY MR. WAIDE:

         Q. You -- you don't know whether those would cause shrapnel to come off the --

A. I -- I wouldn't --

Q. -- tin house trailer?

A. I wouldn't think so.

Q. Why not?

A. I just wouldn't. After all my life of hunting and fishing, I just --

Q. Okay. Have you -- have you ever been shooting into a metal trailer?

10:54:03

A. No, I -- I haven't shot in a metal trailer, no, sir.

Q. It appears from those pictures that it was in the back of his leg, correct?

A. Well, I don't -- you need -- well, it looks like it's right on the inside of his -- right there on his -- above his ankle.

Q. In any event, you saw him -- after Mr. Keeton was dead and after the MBI left, he came back out to the scene, did he not?

10:54:33

A. No, sir.

Q. Sam Mitchell did not?

A. I don't know about that. This was -- while we was waiting for MBI to get there, he was complaining of where he was hurt. And we --

we took him to the -- I didn't take him, but some of the deputies took him to the -- or he went -- he -- I think the -- some of the deputies took him to the hospital, to the ER.

Q. Okay. I want to ask this -- I know this is repetitive, Sheriff, but I want to ask it one more time.

A. Yes, sir.

Q. Other than information that you said you heard about Mr. Keeton being a drug dealer, can you give us any other reason why there would have been a no-knock search as opposed to just knocking on the door and letting Mr. Keeton come?

MS. LEE: Objection. Asked and answered, as Plaintiff's counsel had already admitted, but --

MR. WAIDE: I'm not sure that he's ever answered.

BY MR. WAIDE:

Q. Can you give us any other reason?

A. All right. That was -- state the question again?

Q. Other than the fact that you'd heard on the street or Coxey, Sloan, or Parker had

told you that Mr. Keeton was a drug dealer, is there any other reason why there was a no-knock search, to your knowledge?

A. I -- I'm not aware of that. I'm not aware. I don't know that. I -- no, sir. I would say no.

Q. Gotcha.

At any time had you, as the sheriff of Monroe County, ever instructed your deputies that they could not do a no-knock search just because the person they're searching is a drug dealer? Had you ever instructed them to that effect?

A. I'm not aware of it. No, sir.

Q. You had not ever told them that, correct?

A. Well, basic -- basically, coming from -- you know, a situation you get into, you -- the judge actually determines whether it's a no-knock warrant or not. And I don't know what the judge determined at any of the -- at any search warrant, not only that one but any of them.

Q. All right. So -- so let's forget about the judge for a minute and ask about you

personally. Have you ever -- had you ever instructed the deputies, your deputies working under you, specifically that you cannot go out and do a no-knock search on somebody's house just because he's a drug dealer? Had you ever told them that?

A. I hadn't told them that.

Q. Had you ever instructed your deputies that once a danger -- let's assume there's a pistol pulled on the deputies. Had you ever instructed the deputies that once a danger ceases, you must stop the use of deadly force; you must stop shooting? Had you ever told them that?

A. Well, through their training through their academy -- all those were certified police officers that were around there at that time, and which they were seasoned officers. I'm talking about years and years of experience. I guess through their experience and going through the academy, being certified police officers, I guess through their training, that would -- how they would react. I know, you know -- I guess.

Q. Okay.

A. I mean, that's -- that's the only way

I can give you a fair answer, honest answer.

Q. What -- what -- are -- did you say that there are approximately 10 indentures into the door, into the outside of the door?

MS. LEE: Object to the form. The witness did not testify to any specific number of --

A. I -- I'm not aware -- there were some holes there. I don't know how many there were there.

10:58:20

BY MR. WAIDE:

Q. Holes in the door.

A. Yes, sir. There were some holes.

Q. What would be the necessity of continuing to shoot into the house after the door was closed?

A. I wasn't around there. I couldn't tell you. I don't know.

Q. Are you aware of any possible basis, any possible reason why deputies should continue to shoot into the house after the door is closed?

10:58:35

A. I -- I don't know that they did. I don't know.

Q. I know you don't know that they did.

But assuming those bullets indicate they did, do you -- do you know of reason why they should not?

A. No, sir, I don't -- I'm not aware of anything.

Q. You don't -- once the door is closed, and Mr. Keeton closed the door and somehow managed to get back into the trailer, you're not aware of any reason they should continue to shoot into the trailer --

10:59:02

A. I don't know --

MS. LEE: Object to the hypothetical. Object to the --

A. I don't --

MS. LEE: -- witness not being on the scene --

A. I can't answer that --

MS. LEE: -- and not knowing.

A. -- because I don't know if the door was shut or not. I don't know.

10:59:10

BY MR. WAIDE:

Q. I understand. But assume -- let's assume for the sake of argument that the evidence establishes that it was shut. Do you know of any reason they should continue to shoot

into the trailer after that?

MS. LEE: Object to the assumption. Object to the hypothetical. Those are my objections.

A. Do I -- I can't -- I can't answer the question --

BY MR. WAIDE:

Q. All right, sir.

A. -- and give you an honest answer.

10:59:29 Q. All right, sir.

MR. WAIDE: How long have we been going?

THE VIDEOGRAPHER: Hour 1.

MR. WAIDE: Do you need to take a break, Sheriff?

THE WITNESS: No, I'm -- I'm -- I -- let's just go ahead and try to finish.

MR. WAIDE: Well, we can stop and get some water. I've got another area I'm

10:59:48 fixing to go into, if you want to. Why don't we do that?

THE WITNESS: No, I'm -- I'm fine. Just -- just -- let's go. Let's just keep going if we can.

MR. WAIDE: All right.

- - - - -

(Exhibits D-13, D-14, and D-15 moved into evidence.)

BY MR. WAIDE:

Q. I want to show you Exhibit -- these should be in there -- Exhibits 13, 14, and 15, the -- the documents concerning the forfeiture of the property.

11:00:15 All right. Exhibit 13 is a Petition for Forfeiture. Exhibit 14 is an Agreed Order for the return of the property. I'm sorry. Exhibit 14 is the Answer to the Petition for Forfeiture. And Exhibit 15 is the Agreed Order for the return of the property.

Could you look at those exhibits and verify what I just said there, Sheriff? 13, 14 and 15.

A. Apparently, yes, sir. That looks right.

11:01:03

Q. All right. Sheriff, did -- did you order the seizure of vehicles, wreckers, mechanical equipment, and various items of Mr. Keeton's personal property? Did you tell your deputies to seize that property?

A. Well, basically, when you do a search warrant, if you don't know if anybody's going to be there, you have to kindly guard -- I mean, that was basically to keep anybody else from coming in there and disturbing it and taking it.

According to our attorney, our County Attorney -- I had mentioned and talked to him. He said, Go ahead and seize it, and then that way we can always return it, because basically

11:01:48 it just protects Mr. Keeton's property.

Q. All right. What attorney told you to seize it?

A. No -- no attorney told me to seize it, but I read the law. I mean, I.... I mean --

Q. On this -- did it -- did some attorney tell you to seize Mr. Keeton's property, Mr. Keeton's property specifically?

A. Not that particular night, no, sir.

Q. Is it your practice that every time

11:02:09 you do a drug raid you seize property of the -- of the --

A. Not -- not every time, no, sir.

Q. How do you decide whether you're going to seize it or not?

A. Well, this is the first time anybody

was hurt or killed, you know, and -- and we didn't want anybody to come in and take the property.

Q. So are you saying the reason you seized the property was to keep anybody from taking it?

A. Yes, sir.

Q. Who -- who -- did --

A. And also, I don't know if you know it or not, but there was some stolen merchandise in the back out there.

Q. Do you have any personal knowledge of that, sir?

A. Other than they run the serial numbers, and it was stolen from someone in Alabama.

MR. WAIDE: All right. I move to strike that. That's all hearsay.

BY MR. WAIDE:

Q. You -- do you --

A. Well, this other -- this other is hearsay too --

Q. Do you have a --

A. -- basically.

Q. Do you have a document showing that?

A. No, sir.

Q. Do you have any sort of document showing that?

A. No, sir, I do not.

Q. All right. Let's go back to --

MS. LEE: Well, you asked him -- you asked the witness what his personal knowledge was of the -- the nature of the items, and he's told you he knows they were stolen. You asked him.

11:03:01

BY MR. WAIDE:

Q. All right. Do you know this from any way that -- have you seen a document saying it was stolen?

A. No, sir.

Q. Who told you it was stolen?

A. Some of the deputies. I can't recall --

Q. What deputy?

11:03:10

A. I can't recall that. I don't know.

Q. All right. Did you -- tell us again: Did you order your deputies to take possession of, seize, and carry off a large amount of cars, wreckers, and mechanical equipment, welders and that type of thing from --

A. Well, you would assume, for his protection, that we can seize the property. We can always give it back, but to keep anybody from coming in and stealing it. And then therefore -- I mean, we give back a lot of stuff, you know, from drug dealers that -- basically that we got off folks, you know.

Q. Did you ask any of the family for permission to take his property?

11:03:48

A. There wasn't anybody there.

Q. Well, they were -- they were there within a day or two, weren't they? Some of them were there that same day.

A. I'm not aware of that either. I don't know.

Q. Well, you know you talked to his -- his sister.

A. Yes, sir, I did talk to his sister.

Q. All right. There's a list of -- who

11:04:04

-- who did you tell to pick up the property? What individual did you tell to seize it?

A. I didn't -- I don't know that I told anybody to -- to seize it.

Q. Well, you didn't personally go out and load it up, did you?

A. No, sir. They called some wreckers and got it. I -- I --

Q. Called some wreckers?

A. Uh-huh.

Q. Was that your --

A. I didn't -- they didn't seize much, though, I don't think.

Q. Well, we'll get a list of it in just a minute.

11:04:26 Did -- did -- did you -- are you saying you did not tell any of your deputies to seize it?

A. I'm not sure I -- I don't know if I did or -- or the chief deputy did. I don't know.

Q. It was -- did you -- were you aware that they were seizing it?

A. I was there all night. I guess. Yes, sir, I guess.

11:04:42 Q. How long did it take for y'all to take it all into your possession?

A. Not long.

Q. Y'all had -- what -- what did you use to seize it with?

A. Called a wrecker service.

Q. Had a wrecker service come? What wrecker service was that?

A. I don't recall.

Q. And where did they take it to?

A. To the Monroe County sheriff's office.

Q. Is this the same day that Mr. Keeton was killed or the next day that y'all did that?

A. It was that night.

Q. Well, y'all -- the raid was done about 11:05:07 1:00 o'clock in the morning, wasn't it?

A. Somewhere in that neighborhood.

Q. So do you mean it was done the next night, then?

A. No, that same -- up in that morning.

Q. Before the sun came up, y'all had seized it all?

A. Yes, sir. There wasn't much to seize.

Q. Well, let's look at the list here. We've got the exhibits in evidence.

11:05:26 Here's the Petition. I'd refer you to the Petition.

A. I'm sure Narcotics may have done that. I don't know.

Q. Well, isn't it true, or do you understand, Sheriff, that once you seize

property you are required to file a formal court document called a Petition for Forfeiture to get the court's permission for you to keep the property?

A. Oh, yeah. Everything goes in front of the judge.

Q. Right. A petition --

A. Goes in front of a Circuit Judge.

Q. Right. The Petition for Forfeiture is where you ask a Circuit Judge for permission to keep the property, correct?

11:05:54

A. Well, you just try to explain to the judge what's going on, and the judge makes that decision.

Q. What is a Petition For Forfeiture?

A. To let him know what we had.

Q. Isn't a Petition For Forfeiture where you ask the judge for permission to keep the property? "Forfeit" means the sheriff's department is going to keep the property, right?

11:06:17

A. If it's those kind of circumstances. You -- we -- you -- there's different circumstances on every case. I don't know exactly --

Q. The only way you could keep the

property, though, is if you proved it was purchased with drug money, correct?

A. Basically.

Q. And you didn't have any evidence any of that property was purchased with drug money, did you?

A. No, sir.

Q. Did not.

A. I didn't, no, sir.

11:06:39 Q. And your claim today is that you were -- the real reason you were keeping it is because you'd killed Mr. Keeton and you didn't want anybody to steal the property?

MS. LEE: Object to the form --

A. First of all, I --

MS. LEE: -- of the question. Move to strike the --

A. First of all, I --

MS. LEE: -- reference to killing.

11:06:51 A. First of all, I didn't kill Mr. Keeton. Mr. Keeton made a bad decision by coming to the door --

MS. LEE: Let him finish, Jim.

A. -- and shooting at the deputies, and they shot back. And he --

BY MR. WAIDE:

Q. Well --

A. If you -- if you'd have -- you know.

Q. Who --

MS. LEE: Let him finish his answer, please.

A. Mr. Waide, I don't understand what you're trying to establish here about the property. What's that got to do with the -- this, the other stuff? I don't understand that.

BY MR. WAIDE:

Q. We've also filed a suit against the county, Mr. Cantrell, because y'all seized a bunch of his personal property in addition to killing Mr. Keeton.

MS. LEE: Object to the form and the -- the --

BY MR. WAIDE:

Q. My -- my question was --

MS. LEE: -- characterization of the killing.

BY MR. WAIDE:

Q. What do you call what you did to -- what the -- what do you call what the sheriff's department of Monroe County did to Mr. Keeton?

You don't call it a killing. What do you call it?

A. Well, Mr. -- Mr. Keeton came to the door, a known drug dealer in our county; and he started shooting at the deputies.

MS. LEE: Let him finish, Mr. Waide.

A. And the deputies returned fire. That's all I can tell.

BY MR. WAIDE:

11:07:52 Q. That's what -- that's what y'all --

A. And I wasn't around there. I don't know exactly what happened.

Q. All right. Is a Petition For Forfeiture a request --

A. Yes, sir.

Q. -- that the Circuit Judge allow you to keep the property?

A. He makes that decision.

Q. Yes, sir. And Monroe County, through 11:08:06 its attorney -- let's see who the attorney is -- Samuel Griffin, filed a request that y'all keep Mr. Keeton's property, correct? A Petition for Forfeiture.

A. He did -- he did do -- he did do -- I think he did, yes, sir.

Q. It doesn't say anything about you had kept it for -- because Mr. Keeton had been killed and you wanted to keep it for safekeeping. There's nothing like that in the Petition, is there?

A. No, sir.

Q. The -- the claim being made is that it was used for drug activity, correct?

A. In my opinion I -- I think it was.

11:08:38 Q. But you have no evidence of that, correct?

A. No, sir, I do not.

Q. Okay.

A. Those people that don't work and have -- you know, he didn't even --

Q. Well --

MS. LEE: Let him finish --

A. He --

MS. LEE: -- Mr. Waide.

11:08:46 A. Mr. Waide, he -- he didn't even have a job. That man didn't even work.

BY MR. WAIDE:

Q. I thought you said you didn't know Mr. Keeton.

A. Well, I mean, after the fact, and you

find out from different people, I -- you know, they said he didn't even --

MS. LEE: Let him finish.

A. -- work.

BY MR. WAIDE:

Q. Did he not have a huge -- didn't you observe a -- the one thing that y'all didn't take was a large amount of his mechanic's tools that was located in the shed out there?

11:09:09 A. There was a lot of tools.

Q. He was working on those -- and he had numerous vehicles out there, didn't he?

A. He did have -- he had four or five.

Q. And you just said Mr. Weaver does a lot of trading, correct?

A. Yes, sir.

Q. And didn't Mr. Keeton also do a lot of trading?

A. I just assumed that he did. I don't

11:09:24 know.

Q. And didn't -- didn't his girlfriend have a steady factory job?

A. His girlfriend that -- you're talking about Wanda?

Q. Yeah.

A. Ms. Wanda? Matter of fact, she told me before we got there that night that they had just done meth about 15 or 20 minutes before we got there. And he -- she told me that she knew that we were coming up there because they had video of -- of the cars coming down the driveway.

Q. All right. I --

A. And she said that he's going -- he's -- he -- she told me -- and I didn't question her. She was shook up. She just started telling everything. She said -- she told me that Mr. Keeton was going to take care of this. He was going to run the law off. That's exactly what she said.

Q. Okay. So what she said was that he's going to take -- you understand it's now a pellet pistol he had, correct?

A. I do now, yes, sir.

Q. And you understand -- you earlier testified it was approximately six deputies, correct?

A. Yes, sir.

Q. And what were they armed with?

A. They had their handguns, and then they

had their rifles.

Q. They had a -- what size rifle did they have?

A. Just .223 ammunition --

Q. It's an AR-15, right?

A. AR-15s, I would say, yes, sir.

Q. And .40-caliber pistol, right?

A. Yes, sir.

Q. That's a high-powered pistol, correct?

11:10:38 A. Yes, sir.

Q. Nearly -- nearly as big as a military pistol. Nearly as big as a -- a .45-caliber military pistol.

A. Pretty good size, yes, sir.

Q. And what you're saying is that she said, We knew these heavily armed deputies were at the house, and Mr. Keeton was going to take his pellet pistol and run them off. Am I correct?

11:10:57 A. No. No. She -- he said that I'm going to run them off. I'm going to tell you what I think. I think he was high on drugs, and he come out to -- to scare the deputies with that gun, and he shot at those deputies.

Q. Well --

A. There's no doubt in my mind.

Q. Well --

A. Now, I wasn't around there. Hold on just a minute.

MR. WAIDE: Why don't we take a break. Let's just take a break. Let's just go off the record a minute.

THE WITNESS: You're -- I can't even answer the question.

11:11:18 MR. WAIDE: Let's just take a break.

THE VIDEOGRAPHER: All right. 11:09, off record.

(Brief recess.)

THE VIDEOGRAPHER: We're back on record at 11:15.

BY MR. WAIDE:

Q. Sheriff Cantrell, you had never been around Ricky Keeton when he was doing any drugs, have you?

11:16:55 A. No, sir.

Q. So you don't have any personal knowledge of how methamphetamine would affect Mr. Keeton, do you?

A. No, sir.

MR. WAIDE: With that I move to strike

his testimony about his opinion about what the methamphetamine was doing to Mr. Keeton. He's not competent to testify to that.

MS. LEE: And I assume we'll -- we would --

MR. WAIDE: Yeah. The court will have to rule on that.

MS. LEE: The court will figure it out.

11:17:20

BY MR. WAIDE:

Q. Sheriff, we were talking about what property you took or what property the sheriff's department seized.

A. Yes, sir.

Q. And there's a list of it here, and it looks like a substantial number of older vehicles, correct? That's one item of property?

A. Yes, sir, it looks like it. Yes, sir.

11:17:40

Q. And it -- and you also took -- there's an item called a Cub Cadet. What is a Cub Cadet?

A. That's probably a lawn mower, wasn't it?

Q. I don't know. I'm asking because I

don't know.

A. I would think maybe a lawn mower. I don't know.

Q. Well, there's a second one here that says "mower" here, a Hurra- -- I can't read that name. Some other kind of mower, it looks like.

It looks like two welders.

A. Okay.

Q. What do you do with welders?

11:18:21 A. Well, I mean, if the court give them to sheriff's department, then at some point we probably would have had an auction or a sale.

Q. No, I know, but you earlier said Mr. Keeton wasn't working. Isn't working what you do with welders?

A. Well, I don't -- I don't -- I -- I can't answer it. I can't give you an honest answer about that. I don't know.

Q. And then it says you took an AH wood

11:18:45 trailer. There was apparently a wood trailer out there?

A. I don't --

Q. Correct?

A. If it's on there, I'm sure we probably did.

Q. Well, how did y'all decide what to take and -- isn't it -- isn't it -- well, first of all, isn't it true that he had a large number of mechanic's tools in his shed out there?

A. Somebody mentioned that.

Q. Why didn't you take the tools?

A. Just didn't.

Q. Just didn't have time to fool with it?

A. Just didn't take any tools.

11:19:11 Q. That would have been the easiest item to steal, wouldn't it? The tools could have just -- much easier than a vehicle.

A. Thieves will steal anything.

Q. I see. So you're still saying the reason you took it was to protect it from thieves, correct?

A. Basically.

Q. Did you -- okay.

And then you -- there's -- admit -- it

11:19:33 also mentions that you took a camera, cell phone, and a computer, essentially, back here. Now, what --

A. It's a video camera --

Q. Yeah.

A. -- that he was videoing his drive --

most drug dealers have video of their driveways and their property.

Q. Isn't it true, sir, that Wanda Stegall called you and complained about a theft at her -- several years ago, a theft at her house and tried to get a complaint about the sheriff's department help, and you talked with her about her installing cameras out there several years ago? Isn't that true?

11:20:05 A. I don't recall that.

Q. Well, where was the camera that you -- or how many cameras did you see out there?

A. I only saw one.

Q. Where was it pointed? What was it taking a picture of?

A. Towards the driveway.

Q. Towards the driveway?

A. Uh-huh. Around the back of the house and driveway.

11:20:22 Q. Do you know whether or not -- apart from what you claim Wanda told you, do you know whether or not at night you could see out there on the camera? Could you see that area at night --

A. Yes.

Q. -- as opposed to daytime?

A. Well, you could see people walking back and forth. Yeah, I think you could see pretty good.

Q. Didn't you see a number of pictures that were taken with a camera out there? Have you ever seen those pictures?

A. Haven't ever seen them.

Q. Isn't it true that it shows you can't see anything out there at night with that camera, only during the daytime?

11:20:48

MS. LEE: Object. The witness has just said he's never --

A. I --

MS. LEE: -- saw the pictures.

A. I haven't seen them. I don't -- I couldn't answer that.

BY MR. WAIDE:

Q. All right. Have you told us the -- all the basis you had for seizing the property? Is there any other reason for seizing the property other than what you've told us?

11:21:00

A. No, sir.

Q. And then the judge -- the judge ultimately orders that the property be returned

-- strike that.

There was an agreed order that the property be returned back to the Keeton family?

A. Yes, sir.

Q. Except for the -- except for the computer and the cell phone and the cameras, correct?

A. I believe that's right, yes, sir.

Q. And do you contend that any judge gave you the authority to take that stuff? Did any judge give you the authority to take it?

A. No, sir. Not an authority, no, sir.

Q. Did any judge enter any order allowing you to take it?

A. No, sir.

Q. Now, according to this document, and I'll refer you to the exhibit, it looks like this Petition For Forfeiture was filed on November 4, 2015 -- would that sound about right to you -- according to Exhibit D-13?

A. I guess, yes, sir. That's what it says, yes, sir.

Q. So about a month after you'd taken the property, the petition was filed?

MS. LEE: I'm sorry. What is the

date, Jim?

MR. WAIDE: November 24th, 2015.

MS. LEE: Okay. Thank you.

A. I'm not aware. I'm not sure. I -- if that's what it says, I guess it was. I don't know.

BY MR. WAIDE:

Q. Okay. And then there was -- did the County Attorney -- you're not supposed to tell

11:23:04 me what you told him, but did the County Attorney consult with you about whether to enter that agreed order to return the property? Did he talk to you about it?

A. No, sir.

Q. All right. I'm looking at Exhibit P-15, and the agreed order reflects it was an agreement to return all the property on May 4th, 2000 -- well, strike that. That couldn't be right because it's got....

11:23:50 Yeah. I'm sorry. It is right. May 4th, 2016. That's what the order reflects.

A. I guess.

Q. But you just took the property, and then the County Attorney apparently agreed to return it but without ever consulting with you

about it?

A. That's true. I wasn't consulted, no, sir. I guess -- I guess you -- I don't know who the lawyer was.

Q. Right.

A. But I guess you and her talked, I guess, if you were her lawyer at that time, those people.

11:24:18

- - - - -

(Exhibit Number P-29 moved into evidence.)

BY MR. WAIDE:

Q. All right. Sheriff, I want to refer you to Exhibit P-29, and it's -- it's in your copy. If not, I'll -- I'll hand you a copy.

Take a look at Exhibit P-29. Tell me what that is.

A. This is a --

MS. LEE: I'm going to object to the

11:25:26

witness testifying about this. This particular exhibit, I believe we -- we have --

A. Is that an --

MS. LEE: -- an objection because it's a newspaper article.

A. I -- yeah. That -- they wrote that. I -- I don't know who wrote that.

BY MR. WAIDE:

Q. That's -- there's -- Exhibit P-29 is a series of newspaper articles, is it not?

A. Well, let's see. I only see one news article.

Q. Maybe -- some of them may be TV excerpts. Just look through them there.

11:25:59 A. There's -- WTVA had a thing there, and then this looks like a news article here -- I mean, a paper -- a *Dispatch* it says. The *Dispatch*. And then over here it's talking about -- I think -- looked like WTVA said -- had a news thing -- release on it. Yeah. Uh-huh. I see that, yes, sir.

Q. Aren't you quoted in all of these articles?

A. Well --

11:26:33 Q. Turn -- turn to the first page.

A. Gosh, I couldn't answer that with an honest answer. I guess, I don't --

Q. You can't --

A. I don't know.

Q. You can't read and see your name in

there?

A. Yeah, I can read, Mr. Waide.

Q. And -- and it --

A. But, now, you know newspapers write news stories like they want to write them. I don't -- I -- I -- I don't -- I don't know how they -- you know, I'm -- I'm sure I said some of those things. I don't know exactly. You know, that was a scenario. We -- you know, you don't just go down and say, Will you write so-and-so and so-and-so? I guess they made up their own mind of what to write.

MS. LEE: I'm going to have an ongoing objection about the use of the newspaper articles, as they are hearsay.

BY MR. WAIDE:

Q. Well, look at Exhibit P-29.

A. Yes, sir.

Q. First page.

A. Yes, sir. Yes, sir.

Q. Next to the last paragraph is quoting you, is what it says that you told them. It says that you told them, When we got there, the SWAT team went down to the house.

A. Wait a minute. Hold on a second.

Hold on. When we got there the SWAT team --

Q. Next to the last paragraph.

A. I see that, yes, sir.

Q. When they got to the backdoor, he opened the door and started shooting and wounded one of my deputies.

A. Uh-huh.

Q. The deputy shot back. They were seasoned deputies who was on the SWAT team, and they had no choice but to stand back. Is --

11:27:58

A. Shoot back.

Q. Is that the substance of what you told the reporter or told your media person at the sheriff's office to tell the reporter?

A. I just assume, yes.

Q. You believe that's what you would have told them?

A. I think so, yes, sir.

Q. You -- you did not tell them in that article or any of the other articles that all Mr. Keeton had was a pellet pistol. You never told them that, did you?

11:28:16

A. No, sir.

Q. You also did not --

A. It didn't make -- it didn't make any

difference. He had a weapon and he came to the door shooting at the deputies.

Q. Well, were you aware at the time, sir, at the time you gave this report, that the MBI had already looked at his pellet pistol and saw that there was only one pellet was missing out of the pistol?

A. I did not know that, sir.

Q. You know that now, don't you?

11:28:44 A. No, sir. I don't -- I haven't seen the weapon. I mean, I -- I don't know that. I saw it that night, but I --

Q. You know, from reading the officers' statements, all of the officers' statements -- you know from reading all of the officers' statement that they used both a battering ram and a pry bar to try to break into the home as the initial contact with Mr. Keeton. You know that, don't you, sir?

11:29:03 A. Yes, sir.

Q. Did you ever tell the newspaper that?

A. No, sir.

Q. In this -- in these newspapers you made statements to the effect that they were seasoned deputies. They were only -- let's see.

The exact -- according to the newspaper, the exact statement you made, They were seasoned deputies who were on the SWAT team, and they had no choice but to shoot back.

Is that what you told them?

A. I -- if -- I don't know what they -- I don't know how they came up with that, but I -- I don't know. I -- to give you an honest answer, I don't know. I can't -- I can't answer that. I don't know.

11:29:39

Q. So far as what's in these articles, at no point did you ever tell them that this was a no-knock search warrant. At no point did you ever tell them that, did you?

A. Mr. Waide, you don't talk search warrants with the news media.

Q. You didn't think it would be pertinent to tell them that your deputies were using a pry bar and a battering ram to try to break into Mr. Keeton's house? You didn't think that was pertinent?

11:30:01

MS. LEE: I'm going to object to the form. The -- the newspaper article is hearsay, and we don't know what the sheriff told the newspaper article -- newspaper

reporter because newspaper reporters put whatever they want in -- in the article. They can pick and choose their --

A. They just twist things.

MS. LEE: -- comments or whatever -- whatever they choose to do.

BY MR. WAIDE:

Q. Okay. Did you tell them that y'all executed a no-knock search out there?

11:30:21 A. No, sir.

Q. Did you tell them that -- that the deputies used a -- a -- a ram, a heavy ram to try --

A. No, sir.

Q. -- to break into the door?

A. No, sir.

Q. Did you tell them that they used a pry bar to try to break into the door?

A. No, sir.

11:30:35 Q. Did you -- did you tell them that Ms. -- that Ricky's live-in girlfriend, Ms. Stegall, had already admitted to you they knew they were coming?

A. To the newspaper?

Q. Yes, sir.

A. No, sir. No, sir.

Q. Isn't it true, Sheriff, that by saying that these were seasoned deputies and they had no choice but to shoot back, that you were approving what they did that night?

A. I don't think they had a choice.

Q. So you did approve what they did that night?

A. I didn't approve to them; but in my mind, yes, I think that they did what their training, that -- you know, they go through training, and they're certified police officers; and if you're being shot at, I don't think you're having a choice but to shoot back.

Q. Well, let's go back to the no-knock search. You had earlier testified you had not given them any training on when a no-knock search could be done. Am I correct?

A. I -- I -- I don't understand your question.

Q. Had you ever given the deputies any training under the circumstances under which they could use a no-knock warrant?

A. First of all, the no-knock warrant comes from a judge, as we've already found that

out. No, sir, we -- we didn't sit down. I mean, a logical person that was a certified police officer would know that, I would just assume, through their training. I mean --

Q. But -- and the training would be they could use it anytime there was a drug case, correct?

MS. LEE: Object to the form. That was not his testimony.

11:32:06 A. I'm -- I'm not sure about that. I don't know for sure. I can't answer and give you an honest answer.

BY MR. WAIDE:

Q. Have you ever trained them that they had to have something more than just the fact it was a drug warrant in order to see -- in order to do a no-knock search?

A. Now -- say that again.

Q. Have you ever told your deputies that

11:32:25 you got to have something -- in addition to the fact that a person is a drug dealer, you got to have some indication that he's dangerous or something else to justify a no-knock search? Had you ever trained them to --

A. Well --

Q. -- that effect?

A. -- you know, drug dealers, most of them have guns; and, you know, it's a dangerous situation. So, you know, they put their lives on the line anytime you're doing anything with drugs and drug dealers. People get killed every day, if you'll look at the TV, how police officers are killed in the line of duty. And I -- I -- I just assumed that they -- that they knew what to do.

11:33:02

Q. You just assumed your deputies knew what to do?

A. Well, I mean, they've been on there for -- been sheriff's deputies for years and years.

Q. In all that time you've never told them one time the circumstances under which -- the legal --

A. They -- they knew --

11:33:14

Q. -- the legal circumstances.

A. They knew the circumstances, yes, sir.

Q. If he was a drug dealer, that was enough, as far as you assumed, right?

A. Well, we had probable cause because we'd just made a drug buy off him with

Mr. Parker, you said. I didn't know his name, but I knew there was somebody. I assume it was Mr. Parker. I don't know that for a fact.

Q. You don't know whether Mr. Parker is reliable or not, do you?

A. No, sir, I do not. I do not.

Q. So would you -- would you agree with me that you never reprimanded any of the deputies about what they did that night?

11:33:47 A. No, sir, I did not.

Q. You did not change your policies on no-knock warrants after the killing of Mr. Keeton? You didn't change that at all?

A. No, sir. No, sir.

Q. Do you have a gun in your house here?

A. Probably a hundred.

Q. You have a hundred guns in your house?

A. Yes, sir.

Q. If somebody was breaking into your

11:34:07 house during the early morning hours, would you go to the door with a gun?

MS. LEE: I'm going to object to the hypothetical, object to that question.

A. Wouldn't you?

BY MR. WAIDE:

Q. Are you asking me if I would?
A. Yeah, I would.
Q. Right.
A. I -- right over there in the corner, if you'll notice, there's a gun in my house.
Q. Right.
A. Right there by my door, just --
Q. Do you remember one day -- you remember the Parvin case when I defended David Parvin? You --
A. I do.
Q. You remember us having a talk about the use of guns out there one day?
A. Yes, sir.
Q. Do you remember telling me that everybody ought to have a gun, including me, that I needed to get me one?
A. Yes, sir. You need a gun.
Q. That everybody ought to have one at his house, correct? Do you agree with that?
A. Well, the day and times that we live in, I think that you need to protect your home, which you have a right to. You know, the castle law, by law, gives you the right to protect your home.

Q. And if somebody's breaking into it, to confront them with a gun, right?

A. If somebody's breaking in my house, I'm going to confront them. I'm not going to let them come in and shoot me.

Q. With a gun.

A. Anything.

Q. And -- but you -- you'd confront them yourself with a gun if somebody was breaking into your house?

11:35:03

A. Wouldn't you?

Q. Yeah, my question is would you.

A. Yes, sir, I guess I would. Yeah. Yeah. Wouldn't you? I guess any normal person would do that, I would think.

Q. How long would you say you'd known Mr. Keeton was a drug dealer?

A. Several years.

Q. Several years?

11:35:24

A. That was -- that was the talk on the street, hearsay stuff. Now, I -- now, I mean --

Q. So it's just a coincident that y'all happened to go do this no-knock search just a few days before the election? That's just a coincident?

MS. LEE: Object to the form. Object to the characterization --

A. You don't never know --

MS. LEE: -- of the no-knock.

A. It certainly wasn't from no political standpoint, no, sir.

MS. LEE: I'm going to move to strike that question.

A. I don't know if that's where you're trying to say --

11:35:47

MS. LEE: There's been no foundation laid.

A. -- but that's -- no, sir. Would not.

BY MR. WAIDE:

Q. All right. Sheriff, you were -- you were defeated the last time you ran for office?

A. Yes, sir, I was.

Q. And there was some -- and then you resigned early?

11:36:34

A. Yes, sir, I did. About three and a half months early, yes, sir.

Q. And did you resign amidst charges that you had been improperly using -- charges by the State Auditor against you?

MS. LEE: I'm going to strike the --

A. No, sir.

MS. LEE: I'm going to move to strike the question.

A. I don't -- there -- there's --

MS. LEE: I'm going to object to the relevancy of the question. Improper character evidence.

A. Well --

MS. LEE: No foundation.

11:36:54 A. -- you know, Mr. Waide, I -- I guess, now, if you're going to go down this road, I'm going to answer it like this.

BY MR. WAIDE:

Q. Okay.

A. In 2000 -- and you're trying to make me look like a bad person. In 2008 you represented me for about three years --

Q. Right.

A. -- in a case.

11:37:10 Q. Right.

A. And I wasn't a bad person then because you got $15,000 to represent me. And then, after I ran for sheriff, you made me campaign donations. So I must not be a bad person.

Q. Sheriff, I'm actually -- actually --

these questions actually go to -- to questions of your -- your word about why the no-knock search was carried out and those type things of credibility, and I'm not asking these to embarrass you.

But since you brought it up, actually what was going on in -- when I represented --

A. I --

Q. -- you was --

11:37:39 A. I --

Q. Let's go into that since you --

A. That's --

Q. -- brought it up.

A. That -- no, you brought it up.

Q. No, sir.

A. You went down that road.

Q. No, sir. You brought it up by telling me that I represented you.

A. You did. Yes, sir.

11:37:47 Q. Yes, sir. And the reason I was representing you is the law enforcement in Monroe County, a number of deputies -- this is what you brought up. A number of deputies had gone to the polls and, according to you, were intimidating the voters, correct? According to

us in the lawsuit. That's what I represented you about.

A. That's what you proved.

Q. That's what we proved. So law enforcement was -- that's what our lawsuit was about?

A. Yes, sir. You -- you proved that in court.

Q. Yes, sir.

11:38:12 A. I mean, you did by your documents.

Q. Yes, sir.

A. Yes, sir. And did a good job.

Q. Okay.

Well, Sheriff, is it true that after I had represented you, you made statements to various people that it didn't matter what you did in Monroe County, Mississippi, because you had Jim Waide in your pocket? Did you say that?

A. No, sir.

11:38:30 Q. Did you say -- is it true what we earlier said, that --

A. Mr. Waide --

Q. -- the State -- the State Auditor was investigating you for acts of dishonesty? Is that what --

MS. LEE: No. Object to -- I'm going to object to this --

A. Dishonesty?

MS. LEE: -- line of questioning. Improper --

A. I -- I -- I object to --

MS. LEE: Hold on, Mr. Cantrell. This is --

A. No, sir, I didn't say --

11:38:46 MS. LEE: -- improper 607 character witness --

A. I'm not --

MS. LEE: -- (indiscernible).

A. -- dishonest.

BY MR. WAIDE:

Q. What -- what was the auditor investigating you for?

A. The auditor --

MS. LEE: Same objection.

11:38:53 THE WITNESS: Do I need to answer?

MS. LEE: You can answer.

A. Okay. I can answer it.

One of my deputies -- we were going to go out and -- that afternoon and campaign, and he had some signs with those little wire things

that you stick in there, and he was putting something together, we was going to go out in some neighborhoods and knock on some doors. And some of those inmates that work at the Work Center come out there and helped him a little bit.

And I -- I told them when I got there, Get on away from here; don't touch any of my political stuff. And they used that against me.

11:39:21 BY MR. WAIDE:

Q. Who did? The State Auditor?

A. Yes.

Q. So is that the reason you resigned?

A. No, sir. The reason I resigned is because of today. I had been going through issues with my physical issues. I couldn't go any further. My -- I was just --

Q. Okay.

A. I was washed out. My health had done

11:39:43 gotten to me.

Q. All right.

A. I just -- I couldn't do any -- I couldn't go any further.

Q. Sheriff, during the campaign, when you -- you earlier indicated about -- well, I'm

sorry also to have to get into this, but I must ask you this.

During the campaign, Sheriff, another issue was -- in that campaign was your statements, which was played on the news media, of your threatening your employees that you were going to take a 2-by-4 to any of them that were not loyal to you in the election.

A. That is not true.

11:40:08 MS. LEE: Object to the form.

BY MR. WAIDE:

Q. Well --

MS. LEE: Move to strike the question.

A. That's not true.

BY MR. WAIDE:

Q. All right. So weren't there audios played of you telling them that?

A. Let me run this by you.

Q. Yes, sir. All right, sir.

11:40:16 A. After I was elected for my first time, I made a statement or two at the sheriff's office to some of those people that I didn't like what they did in the election. They wasn't for me. But I never threatened anybody.

Q. Sir, wasn't there an audio tape played

where you threatened them with a 2-by-4 and you told them --

A. What they did --

MS. LEE: I'm -- hold on a second.

A. What --

MS. LEE: I'm going to move to --

A. What -- what --

MS. LEE: -- strike this entire line of questioning. This is improper. It's 11:40:44 irrelevant to the issues in this case, and the --

A. I totally agree.

MS. LEE: -- entire line of questioning.

A. I agree to that.

MS. LEE: It needs to be stricken.

A. That's -- that doesn't have anything to do with this case, and you know that, Mr. Waide.

11:40:51 BY MR. WAIDE:

Q. Sir, you earlier talked about what a Christian you were, correct?

A. I am a Christian. Yes, sir.

Q. All right, sir. Well, did you --

A. Now, are you?

Q. I think that -- what I think, Sheriff, is that -- that God will judge all of us, just like He'll judge you and He'll judge me; and it's not for you to say you are or I am either. I think it's judged by your acts is what I think.

A. Yeah.

Q. And I want to know whether -- did -- did you or did you not --

11:41:12 A. I know Jesus Christ died for my sins on the cross.

Q. Yes, sir. Did you or did you not tell the employees that you'd be taking a 2-by-4 to any of them that you found out was disloyal to you?

MS. LEE: Same objection.

A. No, sir, I did not say that.

MS. LEE: Relevancy and prejudice.

BY MR. WAIDE:

11:41:25 Q. Wasn't that an audio tape played --

A. That was --

Q. -- on the internet about it?

A. They may -- I don't know what was played on the internet. All that stuff is nothing but a gossip column, and they cut --

they can splice any kind of wording they want to and put in there for -- for what they want it to sound like.

MS. LEE: I'm going to move to strike the entire line of questioning as irrelevant, improper character, and under 403.

MR. WAIDE: Give me just a second. I got some notes I need to look at.

11:41:47 MS. LEE: (Whispering) You okay, Sheriff?

THE WITNESS: Yeah. I'm going to be all right.

MR. WAIDE: I think I'm finished. Give me just a minute.

I want to tender into evidence Exhibit P-16 --

- - - - -

11:44:02 (Exhibit P-16 moved into evidence.)

BY MR. WAIDE:

Q. -- and ask if you can identify what that is, Sheriff. See if it's in your copy there.

MS. LEE: We've objected to this

exhibit for hearsay and relevance --

MR. WAIDE: Yeah.

MS. LEE: -- under (indiscernible).

BY MR. WAIDE:

Q. What is Exhibit P-16?

MS. LEE: Same objection.

BY MR. WAIDE:

Q. I think that's both -- it's two pages of it.

11:45:20 A. Okay. What --

Q. Do you remember -- do you know what that is? You've already been asked about it. Do you remember what that is?

MS. LEE: Same objection. Hearsay evidence.

A. Well, what do you -- what do you -- I don't understand what you're trying to say.

BY MR. WAIDE:

Q. Yeah. I'm asking you to identify that

11:45:36 check with your name on it and ultimately endorsed by Wanda and put into Ricky Keeton's bank account. Do you -- do you know the circumstances of that, how that came about?

MS. LEE: Same objection.

A. I'm sure that was for that trailer.

BY MR. WAIDE:

Q. For the trailer?

A. I guess. That's the only --

Q. Earlier you said it was for the lawn mower. But maybe -- could it have been either one?

A. Oh, now, it could have been that lawn mower I bought from her -- her live-in boyfriend.

11:46:00

Q. Right. Could have been for --

A. Yeah. I bought a lawn mower from him.

Q. From Ricky's --

A. Yeah.

Q. -- sisters?

A. Yeah. I went down to North Mississippi Federal Credit Union and took out some of my money that I had in the credit union. I believe that's it, yeah. I think. I'm 99% sure it is, yeah. Yeah, I'm sure it is.

11:46:20

Q. All right. This case has gone on now for five years, basically. More than five years.

A. About eight.

Q. Well, okay. I won't quabble with you about that. (Inaudible).

A. Well, I think. I mean --

Q. Regardless --

A. -- 2015, and this is --

Q. Yeah. In --

A. -- 2000 --

Q. In all --

A. -- 22, seven years.

Q. In all this time you have never learned of any violent act that Ricky Keeton had ever done. Am I correct?

11:46:40

A. I haven't tried to find out anything, any violent act that he did.

Q. And you had not tried to find out before the search warrant either, correct?

A. Only thing I ever heard about Ricky Keeton was that he was a convicted felon for having a hundred pounds of marijuana that he was selling --

MS. LEE: Hold on. Let him finish.

11:47:03

A. -- and that he was charged with and convicted with. And I understand -- I understand that he -- you know, that he was a -- must have been a -- anybody that has a hundred pounds of marijuana wouldn't have that for just their own use. It would be to have to sell.

BY MR. WAIDE:

Q. All right. Sir, we have the records of what he was convicted of. He was actually convicted of selling marijuana, and -- and it's much less than a hundred pounds. You've seen those records?

A. I have not.

Q. Let's see.

A. We was told a hundred pounds.

11:47:29 Q. I'm sorry. What?

A. We were told a hundred pounds.

Q. Did Ricky tell you that?

A. No, sir.

Q. Sir, isn't it -- were -- were you involved in getting Ricky's charges reduced so that he got a suspended sentence?

A. No, sir.

Q. How did he get a suspended sentence with --

11:47:46 A. I don't know. That was not even in our county.

Q. It was Itawamba County.

A. It was Itawamba County. I didn't --

Q. So how did -- how did -- how was anybody talking to you about it?

A. That just hearsay on the street. I mean, everybody knew it.

Q. Well, you talked to Ricky about it, didn't you, sir?

A. I have never talked to Ricky Keeton about that. I --

Q. So who -- who told you, then, it was a --

MS. LEE: Let him finish, Mr. Waide, please.

11:48:04

BY MR. WAIDE:

Q. Who told you that it was a hundred pounds?

A. I can't remember. I -- I don't recall.

MR. WAIDE: Give me just a minute. Let me see if I can find it.

All right. I -- at this time I don't have -- apparently don't have it with me, but we have a -- this as an exhibit, I believe, the records of the conviction of Ricky Keeton in Itawamba County. And I'm going to tender that into evidence, but I don't have it with me, apparently.

11:49:12

BY MR. WAIDE:

Q. My question that led up to all of this was at any time, either before or in the several years after this case was filed, you have never located, found, or been made aware of any act of violence that Ricky Keeton had ever -- has ever committed.

A. No, sir. Don't know of any. But I wasn't trying to find out any.

Q. And you weren't trying to find -- you

11:49:50 weren't trying to answer that question before the search warrant was executed either, were you?

A. Never came up.

Q. Never concerned about whether or not he was violent, correct?

MS. LEE: Object to the form. The sheriff has already testified he wasn't --

A. I just assume that --

MS. LEE: -- involved in --

11:50:02 A. -- all drug dealers are -- are -- are dangerous.

BY MR. WAIDE:

Q. I see. Well, that would include Terry Parker, your informant, then, correct?

MS. LEE: Object to the form. Mr.

Parker is not -- it's not in evidence that Mr. Parker is a --

A. I --

MS. LEE: -- drug dealer like Mr. Keeton.

A. I think he's more of a drug user.

BY MR. WAIDE:

Q. I see. Well, what is he convicted of? He was convicted of manufacturing, wasn't he? Mr. Parker?

11:50:21

A. I think so. I think he was at one point, yeah. I think he was growing some marijuana.

Q. And we know he was continuing to use drugs at least as of the time Mr. Keeton was killed. According to him he was.

A. I assume that he was.

Q. So you'd assume he was violent also.

A. I can't answer that. I don't know that he was violent.

11:50:36

Q. I thought you said all drug dealers were violent.

A. Well, if they're selling drugs, they usually have guns, and they're -- they'll kill you. They're dangerous. They're dangerous --

Q. Well, it -- it looked like Mr. Keeton had a low standard of living out there, didn't he? Lived in a trailer worth -- you know what he paid for that trailer, Sheriff?

A. No, sir. I don't have any idea.

Q. But it's very inexpensive. Would you agree with that?

A. I -- I -- I never thought about it. I -- I guess. I don't know. I don't know what he paid for it. Have no idea.

11:51:05

Q. Well, Sheriff, do you agree with me that there are worlds of factory workers that work in factories right here and use crystal meth all the time? That's pretty common in this area?

MS. LEE: Object to -- I -- I didn't understand the --

A. I --

MS. LEE: Can you --

11:51:21

A. I don't --

MS. LEE: Hold on one second. I don't understand the --

A. I don't know.

BY MR. WAIDE:

Q. You don't know?

A. I don't know that. I don't know what they use at work. I'm -- work. I don't know.

Q. You don't know?

Is it common in this area for people to make crystal meth at home?

MS. LEE: Object to the form of the question.

A. I --

MS. LEE: What is the --

11:51:51 BY MR. WAIDE:

Q. That's what Mr. --

MS. LEE: -- definition of "common"?

BY MR. WAIDE:

Q. -- Parker was doing -- that's what Mr. Parker was doing.

A. I couldn't answer that. I mean, they -- there's some that I -- I assume that do, yeah.

Q. Do you believe that being a drug 11:52:05 dealer ought to be a capital offense? It ought to be an offense you'd be killed for, Sheriff?

A. I can't answer that. I don't -- I wouldn't think so, no, sir.

MR. WAIDE: Okay. That's all I have.

EXAMINATION

BY MS. LEE:

Q. All right. Sheriff, I've just got a few questions since this is your trial deposition.

It's true, isn't it, that the bust that you-all made that night at -- at Keeton's trailer was the largest crystal meth bust in the history of Monroe County, isn't it?

11:52:37 A. Well --

MR. WAIDE: Object to leading.

A. It was the biggest one that's ever been made, yes.

BY MS. LEE:

Q. I'll -- I'll --

A. During my tender [sic].

Q. How would you characterize the bust that you made at the Keeton residence in terms of volume of crystal meth seized?

11:52:50 A. There was an ammo can -- you know what an ammo can is. And it was over half full.

Q. And did it have a street value that you were aware of?

A. We were -- of course, I don't know exactly because I don't know what they're

selling for, what they get it for. But it was thousands of dollars.

Q. Have you ever had a bust bigger than the one in Monroe County that you're aware of at the Keeton residence that night?

A. No, ma'am.

Q. How did the crystal meth appear to you? Was it -- was it packaged in any way?

A. Yes, ma'am. It was packaged to sell.

11:53:20 MR. WAIDE: Object because it's not showing he has any personal knowledge.

BY MS. LEE:

Q. All right. Sheriff, did you witness the -- the drugs in the ammo can at the Keeton residence after you began the seizure of the property?

A. After -- after the -- the seizure? Yes. When they brought it to the sheriff's department. Yes.

11:53:35 Q. Okay. And what did the -- what did the drugs look like to you in terms of their appearance?

MR. WAIDE: Object to relevance.

A. I don't understand your question.

BY MS. LEE:

Q. Okay. Were the -- were the drugs loosely packaged or were they --

A. I would just say --

Q. -- individually packaged?

A. No, individual package, most of it was.

Q. Okay. When you spoke to Wanda Stegall on the night of the Keeton incident -- you spoke to her, correct?

11:54:01 A. Yes -- yes, ma'am. She just was talking, saying --

Q. Okay. Was she upset about the situation, understandably?

A. Yes, ma'am.

Q. And how soon after Mr. Keeton's death did Ms. -- Ms. Stegall approach you to speak to you at the trailer?

A. She was sitting out under the carport, and I went over there and I give her a -- seem

11:54:22 like I give her a handkerchief or something. She was crying, and I gave it to her. And then she just started telling all what -- that they had been doing drugs that night and -- about 20 -- 15 or 20 minutes before we got there.

Q. Okay.

A. Something like that.

Q. And, Sheriff, you have had experience with crystal meth users in the past, correct?

A. Yes, ma'am.

Q. And is it your experience that -- how -- what is -- what is the experience normally that a crystal meth user -- after using, what is their behavior like?

MR. WAIDE: Object to relevance.

11:54:54 Beyond his calling. He's not --

A. Well --

MR. WAIDE: -- designated as an expert.

A. I'm not an expert or anything. But what I've seen out of it, people that we've arrested, they'd stay up for days.

BY MS. LEE:

Q. Okay. How many times have you dealt with crystal meth users who have been up for

11:55:08 days?

A. Numerous.

Q. Okay. And how long were you sheriff?

A. Eight -- eight years. Almost eight years. I lacked a couple of months of it being eight years.

Q. Okay.

A. And I was county justice court judge for 24 years.

Q. Have you ever known any crystal meth user to go to bed following the use of crystal meth?

A. No, ma'am.

Q. Okay. Did Mr. Keeton have -- have dogs on the property?

11:55:34 A. Yes, ma'am. He had some vicious dogs.

Q. Okay. Were you -- were your office -- do you know if your officer were aware of the dogs prior to the -- the execution of the no-knock?

A. I do not know that.

Q. Okay. You'd agree with me, wouldn't you, Sheriff, that someone can actually -- on either side of a trailer door can shoot through the door, correct?

11:55:57 A. Yes, ma'am.

Q. Okay. And your officers would have received training on no-knock warrants even if you didn't personally give them that training, correct?

MR. WAIDE: Object. Beyond his

personal knowledge.

A. I would assume they got that at -- at the academy.

BY MS. LEE:

Q. Okay. All right. Thank you.

MS. LEE: That's all I have. Thank you.

FURTHER EXAMINATION

11:56:23 BY MR. WAIDE:

Q. Were you aware that Ms. Stegall, Wanda Stegall, was interviewed on three different occasions by Kenneth Bailey, the highway patrol investigator?

A. I knew that night he was talking to her.

Q. Have you -- have you looked at those interview notes?

A. No, sir.

11:56:43 Q. Are you aware of why she would share all this information -- are you aware that none of this information you're saying about what she told you about they knew they were coming or whatever -- did she ever say that to Mr. Bailey?

A. I don't know.

Q. You know -- you inter- -- did you -- did you say you were or were not friends with Wanda?

A. Well, when I was growing up in Amory, you -- you know, we -- just kids, you see each other, you know, out, around and maybe at a football game or a baseball game or something like that.

Q. So y'all -- so you did consider her

11:57:12 friends.

A. I consider everybody I -- yeah, I guess she was my friend.

Q. So she was just your friend. And was she really telling you, It wasn't your fault because we knew they were coming? Is that what she was telling you?

A. No, sir. That wasn't it at all.

Q. I see.

A. No, sir. She -- she -- she was --

11:57:28 very adamantly knew that the deputies were coming around their property, and she told -- he told Wanda that he was going to run these deputies off.

Q. I see. So she came out and just told you that he said --

A. Yes, sir.

Q. -- Well, I'm going to run those deputies off.

A. Uh-huh.

Q. I'm going to run them off with my pellet pistol.

A. I -- I don't know. I guess. I don't know that. I don't know.

Q. And you say you've observed a lot of meth people?

11:57:59

A. A bunch.

Q. And you -- and -- and you -- have you been around them after they took meth and then you left, or did you -- did you stay there with them to know they didn't go to bed?

A. I -- I -- I don't know if they went to beds or not. I -- Mr. -- Mr. -- I know they was fully clothed.

Q. He had his pants and no shirt on, didn't he?

11:58:21

A. He had a shirt on. Yes, sir.

Q. Well, we got the pictures, so we can see that.

A. I think. I'm -- I'm -- I'm sure he did. He had his pants on, I know for sure.

Q. All right. Are you saying that you have been around meth dealers and observed them using meth; and then you've noticed they didn't go to bed, they stayed up after that?

A. I don't know about -- I know what -- the people that we would arrest, you know, might -- like, out driving in -- on the road and everything, they were high on meth, and maybe find meth in their car and they'd stay up -- 11:58:58 when you arrest them, they're liable to stay up three or four days in jail before you laid down.

Q. Some of that depends on how much you use and what your reaction to it is and --

A. That's true.

Q. -- how long it's been --

A. I'm sure --

Q. -- since you --

A. I'm sure of that, yes, sir.

Q. But you had never heard in your whole 11:59:11 life of anything violent Mr. Keeton had ever done. Even though you heard all this stuff, that he -- did you hear he was a meth dealer or used meth? Which did you hear? Or did you hear both?

A. We heard that he was selling meth.

Q. And it -- and you'd known it for years, you say.

A. Not for years.

Q. How long?

A. Well, I was only sheriff for -- I'd say I'd known it for four or five years.

Q. Four or five years.

A. Something like that. Three or four, five, something.

11:59:32 Q. And in the four or five years, you had never heard that it caused him to be violent in any way.

A. I -- I -- I don't know of anything.

Q. And you never had heard it caused him to be irrational in any way.

A. I don't know about that, no, sir.

Q. You agree with me that a person would have to be absolutely crazy or irrational to take a pellet pistol and go out and aim it or,

11:59:52 according to you, shoot it at six heavily armed deputies. He would have to be absolutely crazy to do anything like that, wouldn't he?

A. Most people that are high on meth make bad decisions. He made a decision.

Q. So that's what you're saying happened.

You're --

A. Yes, sir.

Q. -- saying that he was high on meth, so he decided to take his pellet pistol and go out there and scare off six armed deputies?

A. For -- that's what --

Q. That's what you're saying happened?

A. That's what it looks like.

Q. And you're saying that even though you weren't there.

12:00:15

A. I was around -- I was there. I was on the other side of the house.

Q. Well, even though you weren't there when the shooting occurred.

A. I was out in the -- out in my pickup on the other side of the house.

Q. So you are justifying what these deputies did on that ground, that you assume that he was just high on meth and he went out and confronted six armed deputies with his pellet pistol.

12:00:29

A. That's what it looks like.

Q. That's your defense in the case, correct?

A. That's what it looks like.

Q. That's your defense?

A. That's what it looks like.

Q. So it -- so according to you, then, it was perfectly okay to use that no-knock warrant that night?

A. I don't know what the judge said about the no-knock warrant.

Q. You're saying the entire responsibility for the no-knock warrant is on

12:00:49 the judge --

A. Yes, sir.

Q. -- not on you. Am I correct?

A. That's correct.

Q. So you blame the judge, correct?

A. I'm not blaming anybody.

Q. But it's --

A. I do not know what that judge did. Being a judge for 24 years, I don't know what Mr. Fowlkes decided to --

12:01:01 Q. So --

A. -- do about that.

Q. So you believe the judge told y'all to issue a no-knock warrant, and for that reason you couldn't just go knock on the door and give Mr. Keeton a chance to come to the door. You

couldn't do it because a judge had issued a no-knock warrant?

A. I don't know that for a fact. I don't know.

Q. And the -- and the reason that -- you could just -- for example, with Mr. Parker, do you understand Mr. Parker -- do you understand now Mr. Parker was a friend of Keeton's, had been over there, be it months or years, seeing Mr. Keeton? Do you understand that?

12:01:26

A. I didn't know that.

Q. Have you even read the file in this case?

MS. LEE: I'm going to object to the entire line of questioning. First of all, this --

A. Yeah, but I don't --

MS. LEE: -- these are matters that were not gotten into on my cross-examination or examination of this witness --

12:01:38

A. I mean --

MS. LEE: -- and they're improper -- hold on Mr. Cantrell -- and they're improper redirect, Jim. This is -- we've

gone way beyond the scope of my examination.

BY MR. WAIDE:

Q. Okay. The scope of her examination was she said -- she got you to express your opinion that he was high on drugs, and that's the reason he went to the door with a gun, right? Is that -- is that your opinion?

A. I don't know. I don't why he did what he did. I don't know.

12:01:59

Q. And you --

MS. LEE: And that was not what his opinion was. I asked him about what people did when they were high on crystal meth or whether they went --

A. That's --

MS. LEE: -- to bed or not, and his testimony was that his experience was you don't go to bed after smoking crystal meth, as Mr. Keeton and Wanda did that evening.

12:02:16

A. You stay up for days. Some of them stay up for days. I don't know how that affected him. I don't know.

BY MR. WAIDE:

Q. You -- and then when you say you don't

know, you have no evidence -- you have no evidence that the reason Mr. Keeton went to the door with --

A. I'm sure --

Q. -- his pellet gun was --

A. I'm sure MBI that did the investigation, I'm sure they did -- took blood and -- and --

Q. So they know how much meth he had.

12:02:47 A. That's right. In his body. I would assume that.

Q. And so far as the amount of the drugs, you're not the person that found the drugs?

A. No, sir. M --

Q. That was either Keeton -- that was --

A. MBI found them.

Q. Sir -- are you sure about that, sir?

A. I think so, yes, sir. I think so.

Q. Isn't it your deputies that found the

12:03:03 amount of the drugs, your deputies Coxey and -- either Coxey and Sloan?

A. I'm not sure. I thought it was MBI, but I -- they could have. I don't -- I don't know. I couldn't answer that. I wasn't there when they found it.

Q. So you personally don't know how much drugs were there.

A. I know what the ammo can had in it.

Q. No --

A. About -- about this -- about that --

Q. The ammo can -- who showed you --

MS. LEE: Let him finish his answer --

MR. WAIDE: Okay.

MS. LEE: -- please, Jim.

12:03:21 A. It was about that deep in drugs, that long. An ammo can is about this wide. It's about a foot long or longer, and it was about half full.

BY MR. WAIDE:

Q. Who showed you the ammo can?

A. They brought it to the sheriff's office.

Q. Who did?

A. The narcotics people.

12:03:37 Q. Sloan and Coxey?

A. Yeah. I don't know if MBI let them have the drugs. I don't know. I have no idea.

Q. You don't know whether it's Coxey and Sloan that brought it there.

A. I -- no -- I would just assume they

did. I don't know that.

Q. So is it your defense to the killing of Mr. Keeton that because he had so many drugs there, we think that would be a defense to killing him?

MS. LEE: Object to the form of the question. That's not what the testimony has been.

A. Mr. Waide --

12:04:01 BY MR. WAIDE:

Q. What -- what does that have to --

A. -- I can't --

Q. -- do with the case?

A. -- answer. I can't answer that. I don't know why he did what he did. I don't know why he went to the door with a gun and shot at the deputies. I don't know that.

Q. And you also don't know why the judge would have issued a no-knock warrant?

12:04:14 A. No, sir. I don't know why the judge did whatever he did.

Q. And -- but you're saying -- and as I understand --

A. You need to --

Q. -- you said --

A. What you need to do is ask the judge those questions, and he can answer that, because I don't know.

Q. But it's not -- it's not -- it's not law enforcement's fault that the judge did -- issued the no-knock warrant, right?

A. I can't -- I wouldn't assume that it would be the law enforcement's responsibility.

Q. You don't think, sir, that if a judge

12:04:35 illegally issues a no-knock warrant, you don't think you have the authority, as a -- as a --

MS. LEE: Object --

A. I don't know how --

MS. LEE: Objection. There's been no finding that the -- the no-knock warrant was illegal. I object to the characterization of that in the question.

A. I don't know what the judge --

BY MR. WAIDE:

12:04:49 Q. Did you ever read the warrant?

A. I looked over the warrant, yes, sir.

Q. It doesn't say that the judge issued it. It said the officers requested it, didn't it, sir?

A. I don't recall, to be honest.

Q. So can you really say the judge issued a no-knock warrant, then?

A. I'm sure he did.

Q. Well, that's -- why do you say that?

A. I guess he did. I don't know what the judge did. I don't know if he said it was no-knock or -- or what, or whatever. I don't know. I can't answer what the judge did. You need to ask the judge those questions.

12:05:17 Q. And I want to refer you to page 6 --

MS. LEE: I'm going to object to this entire line of questioning because I did not get into the no-knock warrant at all in my -- in my examination of Mr. Cantrell.

BY MR. WAIDE:

Q. I'm going to show you Exhibit 6 and ask you to read what -- this is the warrant.

MR. WAIDE: I moved to receive the warrant into evidence.

12:05:47

\- - - - -

(Exhibit P-6 moved into evidence.)

MS. LEE: Same objection. This -- this has not been -- I did not ask any questions about the warrant to

Mr. Cantrell.

MR. WAIDE: Okay.

MS. LEE: All this should be stricken.

BY MR. WAIDE:

Q. All right. I'm reading from Exhibit P-6. It says --

THE WITNESS: All right. What do -- what do I do?

MS. LEE: You can answer the question. My objection will be ruled on --

12:06:00

THE WITNESS: Okay.

MS. LEE: -- by the judge --

THE WITNESS: Okay.

MS. LEE: -- at the time of trial.

BY MR. WAIDE:

Q. The above affiant respectfully requests a no-knock search due to officer safety and the possession of further -- and the protection of further evidence. It's signed Robert Fowlkes.

12:06:12

It says the affiant requested. Had you ever looked at that before just now?

A. I never noticed that, no, sir.

Q. All right, sir.

MR. WAIDE: All right. I'll give

Counsel an opportunity to redirect based on matters I brought out -- to recross, I mean, based on the matters that I brought out that she says wasn't brought up properly.

FURTHER EXAMINATION

BY MS. LEE:

Q. How would you characterize the -- what the deputies faced when they came to the door and Mr. Keeton was standing there with a gun? How would you characterize that?

A. I imagine that was a bad, bad feeling. I would have to think that it was. I would think that they were in fear of losing their lives.

Q. In an ambush?

A. Ambush. I think --

Q. From Mr. Keeton to them, correct?

A. Correct.

Q. Not from the officers to Mr. Keeton?

A. Correct.

Q. Because Ms. Stegall told you, didn't she, that these -- that they knew these officers were coming, correct?

A. She --

MR. WAIDE: Speculating.

A. She told me that.

BY MS. LEE:

Q. What did Ms. Keeton -- I mean Ms. Stegall specifically tell you about their knowledge, she and Mr. Keeton, about those officers arriving on the Keeton premises?

A. She said the law was out there. They were talking. He says, I'm going to run them off.

Q. Okay. And when you came inside the trailer that night, what did you observe in terms of cameras and what Mr. Keeton could see when those officers were arriving?

A. He had a video of his property coming down the road. You could see the whole video of it. He could too from where -- if he was laying in bed. I don't know if he was laying in the bed or not. I don't know. I know you could look up there and see it.

Q. So this wasn't a situation, as Mr. Waide asked earlier, about someone breaking in your house, was it?

A. No.

MR. WAIDE: Leading. Object to leading.

A. No. It wasn't.

BY MS. LEE:

Q. How would you characterize this?

A. Ask that question again.

Q. How would you characterize this? It was -- this wasn't a break-in, wasn't it -- was it, Sheriff Cantrell?

12:08:15 A. No, ma'am, it wasn't a break-in. No, ma'am. No.

Q. It was an ambush.

MR. WAIDE: Object to leading.

BY MS. LEE:

Q. By Mr. Keeton upon these officers.

A. Mr. Keeton made a decision, which it was a bad decision, to come to that door with a gun --

Q. Uh-huh.

12:08:30 A. -- and firing it. So that's all I can tell you. That's -- and -- and I wasn't around there to see that. That's what the deputies said.

Q. What did Sam Mitchell tell you specifically about Mr. Keeton and the firing of

the weapon?

A. He just said, He -- he shot me. He said, I -- he said up around his neck and then somewhere on his leg. And I see that on the leg. I didn't see nothing about his neck. I said, Well, we -- we need to get you to the ER and -- and get the doctor to check that out.

Q. Now, Mr. Waide asked you questions about --

12:09:01 A. If it had been a -- thank goodness it wasn't a real gun because if it had, he would be dead today, and probably with some of the other deputies.

MR. WAIDE: Object to leading. Move to strike. Not responsive to the question.

MS. LEE: I asked -- I asked what -- what Mr. Mitchell had told him about being shot. I don't think that was a leading question, but --

12:09:22 MR. WAIDE: It's hearsay also, then.

BY MS. LEE:

Q. You were asked about -- you were asked about any violent acts that you are aware of that Mr. Keeton took. How would you characterize coming to the door with a gun and

shooting at deputies? Would that be a violent act?

A. Yes, ma'am, it would.

Q. Thank you.

MS. LEE: I have nothing further.

MR. WAIDE: That's all. That's all I have.

MS. LEE: Okay.

THE VIDEOGRAPHER: We're off record, 12:06.

12:09:44

(Deposition concluded at 12:09 p.m.)

C E R T I F I C A T E

STATE OF MISSISSIPPI )

COUNTY OF MONROE )

RE: ORAL DEPOSITION OF CECIL CANTRELL

I, Gena Mattison Glenn, CSR 1568, a Notary Public within and for the aforesaid county and state, duly commissioned and acting, hereby certify that the foregoing proceedings were taken before me at the time and place set forth above; that the statements were written by me in machine shorthand; that the statements were thereafter transcribed by me, or under my direct supervision, by means of computer-aided transcription, constituting a true and correct transcription of the proceedings; and that the witness was by me duly sworn to testify to the truth and nothing but the truth in this cause.

I further certify that I am not a relative or employee of any of the parties, or of counsel, nor am I financially or otherwise interested in the outcome of this action.

Witness my hand and seal on this 27th day of January, 2022.

______________________

My Commission Expires: July 19, 2023

CSR 1568
Notary Public