1

1    THE CIRCUIT COURT OF MONROE COUNTY, MISSISSIPPI

2    STATE OF MISSISSIPPI

3    VERSUS                    CAUSE NO.:  CR16-045

4    STEPHANIE HERRING               DEFENDANT

5

6

7            TRANSCRIPT OF HEARING

8    TRANSCRIPT OF THE HEARING HAD IN THE

9    ABOVE-STYLED AND NUMBERED CAUSE, BEFORE THE

10   HONORABLE PAUL FUNDERBURK, CIRCUIT JUDGE,

11   FIRST JUDICIAL DISTRICT OF MISSISSIPPI, AT THE

12   LEE COUNTY COURTHOUSE, ON THE 29TH DAY OF

13   SEPTEMBER, 2021.

14

15   APPEARANCES:

16   Present and Representing the State of Mississippi:

17       JOHN WEDDLE, ESQUIRE
         PAUL GAULT, ESQUIRE
18       Post Office Box 7237
         Tupelo, Mississippi  38802
19
     Present and Representing the Defendant:
20
         JIM WAIDE, ESQUIRE
21       Post Office Box 1357
         Tupelo, Mississippi  38802
22
     Also Present:  Justin C. Moody, Staff Attorney
23

24

25



INDEX

PAGE

B.J. Harmon
   Direct                      5
   Cross — Mr. Gault      19

Roger Woods
   Direct                    23

Rodney Starling
   Direct                    29
   Cross — Mr. Gault      77

Kenny Bailey
   Direct                    81

Vernon Hathcock
   Direct                  103
   Cross — Mr. Weddle    111

Curtis Knight
   Direct                  115
   Cross — Mr. Weddle    137
   Redirect                144

Certificate of Court Reporter     155

EXHIBITS

| | ID | EVD |
|---|---|---|
| Exhibit 1<br>(Statement of Laura McDaniel) | | 13 |
| Exhibit 2<br>(Pleadings in the Roger Wood case) | | 27 |
| Exhibit 3<br>(First Interview of Barik Williams) | 35 | |
| Exhibit 4<br>(Second Interview of Barik Williams) | 35 | |
| Exhibit 5<br>(MS Dept of Public Safety Report) | 67 | 83 |
| Exhibit 6<br>(Lie Detector test of Ms. Herring) | 87 | |
| Exhibit 7<br>(FBI report) | 118 | |
| Exhibit 8<br>(Statement of Curtis Knight) | | 120 |

1          THE COURT:  The matter on the docket

2     this afternoon is State of Mississippi versus

3     Stephanie Herring.  It's Monroe County Cause

4     number CR16-045.

5          I think, in addition to motion hearings,

6     I believe there's a pretrial conference on

7     this matter.  And I would like to meet with

8     the attorneys in chambers before we get

9     started on the motions.  We'll do that at

10    this time.

11         (OFF THE RECORD.)

12               - - -

13         THE COURT:  All right.  I understand

14    from conversations in chambers that the Rule

15    will be invoked during this hearing, with the

16    exception it will not apply to Agent Quaka.

17    Both the State and the defense agree that FBI

18    Agent Quaka may remain in the courtroom

19    during the course of these hearings.  All

20    other witnesses for the State and the defense

21    shall be excluded.

22         MR. WAIDE:  Your Honor, if the Court

23    please, we're going to call B.J. Harmon as

24    our first witness, if he can remain in the

25    courtroom.

```
 1              THE COURT:  All right.  You said an
 2         officer?
 3              MR. WAIDE:  No, sir, he's not an
 4         officer.
 5              THE COURT:  All right.  Mr. B.J. Harmon
 6         then.
 7                        B.J. HARMON,
 8    having been called as a witness, and having been
 9    first duly sworn by the Court, testified as
10    follows, to-wit:
11              MR. WAIDE:  May I proceed, Your Honor?
12              THE COURT:  You may.
13                        - - -
14                   DIRECT EXAMINATION
15    BY MR. WAIDE:
16         Q    What is your name please, sir.
17         A    Billy Harmon.
18         Q    If you would, Mr. Harmon, I'm hard of
19        hearing, could I ask you to please speak up a
20        little bit.
21         A    Billy Harmon.
22         Q    Billy Harmon.  You sometimes go by B.J.?
23         A    Yeah.
24         Q    Where do you live, Mr. Harmon?
25         A    In Itawamba.  In Nettleton.
```

```
 1        Q     Give us a street address, if you would.
 2        A     2300 Van Buren Road.
 3        Q     2300 —
 4              THE COURT:  I'm sitting here next to you
 5        and I can't hear you.
 6              THE WITNESS:  2300 Van Buren Road,
 7        Nettleton, Mississippi.
 8              THE COURT:  Pull the microphone around
 9        where it can get up to you and repeat your
10        answer.
11              THE WITNESS:  2300 Van Buren Road,
12        Nettleton, Mississippi.
13   BY MR. WAIDE:
14        Q     Where do you work?
15        A     Seale & Trenching and Boring out of
16        Ecru.
17        Q     What do you do there?
18        A     We have a contract for Maxx South, put
19        up cable, fiber.
20        Q     I want to take you back to August of
21        2015.  The specific date is August 20th.  I want
22        to ask you about a robbery that occurred while
23        you were present.
24              Do you recall that occasion?
25        A     Yes, sir.
```

```
 1        Q     Who were you with when the robbery
 2   occurred?
 3        A     Laura McDaniel.
 4        Q     Laura McDaniel?
 5        A     Yes, sir.
 6        Q     And what was your relationship with
 7   Laura McDaniel?
 8        A     Kind of on and off girlfriend.
 9        Q     Had you spent the night — were you
10   spending the night with her on the night that
11   the robbery occurred?
12        A     Yes, sir.
13        Q     When the robbery occurred, could you
14   identify by voice or could she identify any of
15   the robbers?
16        A     I could identify one, just the way he —
17   tall and lanky, just the way he looked.
18        Q     And what — who was that?  What robber
19   could you identify?
20        A     B.J. Williams.
21             THE COURT:  Who?
22             THE WITNESS:  Bart Williams.  B.J.
23        Williams.
24             THE COURT:  Mark —
25   BY MR. WAIDE:
```

```
 1        Q    B.J. Williams?
 2             THE COURT:  Mark Williams, B.J.
 3        Williams, which one?
 4             THE WITNESS:  It's Bart or B.J.
 5             THE COURT:  Bart.
 6             THE WITNESS:  I don't know his real
 7        name.
 8   BY MR. WAIDE:
 9        Q    All right.  Did Ms. McDaniel have a lot
10     of money there when the robbery occurred?
11        A    Yes, sir.
12        Q    How much money did she have there?
13        A    In the bag it was 230,000, 235,000.
14        Q    Do you know of your personal knowledge
15     where that money came from?
16        A    Yeah.  Her daddy just died and he left
17     it to her in a pay — in a pay-on-death account.
18        Q    Did she have some other money there,
19     other than that money in the bag?
20        A    I think it was anywhere from 1,300 to 25
21     maybe, something like that.
22        Q    And --
23        A    But there is papers for that, where it
24     come from, her daddy's cattle business he had.
25             MR. GAULT:  Your Honor, I will object
```

```
 1        based on relevance.  This is my understanding
 2        an equal protection hearing and this seems to
 3        be a lay fact witness.
 4             MR. WAIDE:  Your Honor, I didn't
 5        understand what he said.  But I — this is
 6        going to be shown to be relevant as to the
 7        theft of money by law enforcement and that's
 8        what I'm getting to.
 9             THE COURT:  All right.  The objection is
10        overruled.
11   BY MR. WAIDE:
12        Q    All right.  Mr. McDaniel {sic}, how many
13   robbers came in that night?
14        A    Two.
15        Q    And it was B.J. Williams and another
16   male or female?
17        A    Male.
18        Q    After the robbery occurred, did police
19   officers come to the place where you and Ms.
20   McDaniel were living?
21        A    Yes, sir.
22        Q    What officers can you identify came
23   there?
24        A    Now, Sloan is the only one that really
25   said anything.  Eric Sloan.
```

1    Q    Eric Sloan?

2    A    (Nods affirmatively.)

3    Q    Do you remember there were other

4    officers there as well?

5    A    I remember Cantrell ended up being

6    there, Cecil, and some bigger guy.  And — I

7    don't — yeah, Starling, Rodney Starling.

8    Q    Rodney Starling?

9    A    Yeah.

10   Q    Okay.  The — well, you mentioned two

11   bits of money, a very large sum of money and

12   then a smaller sum.

13         Where was the smaller sum of money

14   located?

15   A    It was on the dresser right there by the

16   door, the bedroom door, against the wall.

17   Q    You say it was on the dresser?

18   A    Yeah.  It was laying in an envelope on

19   the dresser.

20   Q    All right.  What money did the robbers

21   take?

22   A    The 230,000 that was in the bag that was

23   hid under the little cot on the other side of

24   the room.

25   Q    All right.  After the robbery did any

1  officers approach you or talk to you after the

2  robbery?

3      A   No, not — not — not the first time

4  they came, no.

5      Q   Well, tell me about the first time.

6  What happened the first time they came?

7      A   Laura pretty much told them what

8  happened.  And I kept trying to tell them that

9  they left the axe and all the — whatever they

10  brought in with them laying on the bed.  But

11  they didn't pick none of that up and look at it.

12  They — then I — I told them that Stephanie

13  knew B.J. and might know where he was at and so

14  that's why they went to her house.

15      Q   Okay.  After that did they come back?

16      A   Yeah.

17      Q   My question is, did you speak or have

18  some come conversation with one of the officers

19  when they came back?

20      A   Yeah.  Eric Sloan asked for — knocked

21  on the door and asked for me specifically.

22      Q   Asked for you?

23      A   Yes, sir.

24      Q   All right.  Was there a search — the

25  smaller sum of money that you referred to

```
 1    earlier that you said was on a dresser, was that
 2    money still there at the time the officers came
 3    back?
 4        A    It was before they went in the house and
 5    started searching, yes.  But Sloan — Sloan, and
 6    I don't know the other officer, they was the
 7    only two of them that went in first.
 8        Q    All right.  I didn't understand you.
 9             What did you say about what officer went
10    in the house?
11        A    Sloan, and I don't know who the other
12    officer was, but they were the only two that
13    went in the first time.  They brought us outside
14    in handcuffs and we didn't —
15        Q    All right.  Did it come a point when you
16    noticed that the money was missing?
17             The smaller sum of money.  I'm not
18    talking about the large sum.
19        A    No.  We — not until we got out of jail
20    because they — they didn't let us back in the
21    house.
22        Q    When you got out of jail?
23        A    Yes, sir.
24        Q    When was that?  How long were you in
25    jail?
```

1    A    Six days, seven days.

2    Q    Do you know whether it was reported that

3    night that the money had been taken?

4    A    I don't know.  You'd have to ask Laura

5    on that one.  And —

6    Q    All right.

7    A    — like I said, I don't know.

8        MR. WAIDE:  Your Honor, I'd like to have

9    marked for identification as an exhibit

10   the — this statement received in discovery

11   by — it's a statement purportedly of Laura

12   McDaniel and it's part of the State's

13   discovery, if I could mark this for

14   identification.

15       THE COURT:  Any objection?

16       MR. GAULT:  No, Your Honor.

17       THE COURT:  All right.  Let it be

18   received and marked.

19       MR. WAIDE:  This will be exhibit —

20   defense Exhibit 1.

21            — — —

22   (EXHIBIT 1 MARKED AND RECEIVED INTO EVIDENCE.)

23            — — —

24       MR. WAIDE:  May I approach the witness,

25   Your Honor?

```
 1              THE COURT:  You may.
 2    BY MR. WAIDE:
 3       Q    I want to turn you over to what appears
 4    to be a statement by Laura McFarley {sic} on
 5    page — looking on page 4.  Bottom of page 3.
 6    It looks like the bottom of page 3 is ineligible
 7    on my copy.  I don't know whether counsel's copy
 8    shows it.  But — so I refer you to the top of
 9    page 4.
10              And can you see what she's written at
11    the top of page 4, can you read that?
12              MR. GAULT:  Your Honor, I object.  If
13         he's asking this witness to read another
14         person's statement, it's hearsay.
15              MR. WAIDE:  Your Honor, I'm doing this
16         just to corroborate or show there was a
17         reason to believe that there was money stolen
18         that night.  It doesn't prove it for a fact,
19         but it just shows there's reason to believe
20         an officer took the money there that night
21         and it's — that's the purpose of it.
22              It's — it's not — we couldn't try the
23         criminal case, introduce this, but to show
24         there was reasonable grounds to believe an
25         officer was stealing that night.
```

```
 1              THE COURT:  All right.  The objection is
 2       overruled.
 3  BY MR. WAIDE:
 4       Q    All right.  Can you read the statement
 5    where it says bills and —
 6       A    Bills and the remaining.
 7       Q    Is that $2,500?
 8       A    Twenty-five — yeah, 25 or 2,100 of that
 9  was taken from —
10       Q    Speak — speak up so Judge Funderburk
11  can hear you now.  Speak into the mic.
12       A    Was taken —
13       Q    Is that out?
14       A    Yeah.  Out and — out of my wallet by
15  police that night of the robbery.
16       Q    Okay.  Now, what — you talked to me
17  yesterday, correct?
18       A    Yes, sir.
19       Q    And I talked to you by phone earlier?
20       A    Yes, sir.
21       Q    All right.  And do you remember telling
22  me about money being taken that night by the
23  police?
24       A    That was the only people that could have
25  got it cause they didn't let nobody else in the
```

1    house.

2        Q    All right.  Do you remember my asking

3    you about which officer took the money?

4        A    Sloan.

5        Q    What — on what basis do you say it was

6    Sloan if there were two officers that went into

7    the house?

8        A    Sloan was the only one — well, the

9    first — first one and really the only one who

10   went in the bedroom before they come back and,

11   you know, they done the search with the dogs and

12   whatever they brought after they carried us to

13   jail.

14       Q    All right.  I thought I understood you

15   to say that they took y'all outside while they

16   —

17       A    Yeah, we was outside.  Nobody was in —

18   they didn't let nobody in the house.

19       Q    Do you remember telling me, or did you

20   not tell me that you asked — or you complained

21   to one of the other officers, not Sloan but

22   another officer, about the money being stolen

23   that night?

24       A    Laura was.

25       Q    Laura was complaining?

```
 1          A      Yeah, cause she didn't -- she didn't see
 2     the envelope on the dresser.
 3          Q      Who were -- do you know who she was
 4     complaining to?
 5          A      I don't know any of them officer's name
 6     but Sloan and Starling.
 7          Q      All right.  Was it Sloan she was
 8     complaining to or was it somebody else?
 9          A      Sloan wasn't -- he was -- he wasn't even
10     talking to us, he was in the house the whole
11     time.
12          Q      Okay.  What complaint could you hear her
13     making to the officer?
14          A      I really wasn't paying any -- Cecil
15     Cantrell was drilling me the whole time, I
16     couldn't hear anything else.
17          Q      Okay.  Was drilling you about what?
18          A      Telling me that I was going to get raped
19     in prison and I was going to be -- you know, be
20     somebody's, for lack of a better word, bitch.
21          Q      Okay.
22          A      He was just -- you know.
23          Q      Okay.  Well, let me -- I'm not trying to
24     embarrass you and this is not really an issue,
25     but just to fill out the whole story here.
```

```
 1            You were arrested for possession of some
 2     type of drugs that night yourself, weren't you?
 3        A     Two or more precursors with intent and
 4     possession.  Which nothing was on me but it was
 5     in the house.
 6        Q     And you were arrested that night?
 7        A     Yes, sir.
 8        Q     All right.  What happened to that
 9     charge?
10        A     We went to court, I think, three times
11     and the judge said — or the DA said that Sloan
12     was fired cause he was a dishonest cop and they
13     had to drop his cases.
14        Q     How do you know that?  Who told you
15     that?
16        A     Laura's lawyer.
17        Q     Who — what lawyer was that?
18        A     I think it was Brian — I can't remember
19     his last name.
20        Q     Do you know — do you know where that —
21     the smaller amount of money, not the huge amount
22     of money that was in the bag, but the smaller
23     amount of money that was left on the dresser, do
24     you know where Laura got that money, where it
25     came from?
```

1      A    Yes, sir.

2      Q    Where was that?

3      A    Just, like I said, her daddy's cattle

4   business he had.  He had some bulls or

5   something, he sold the semen to other people and

6   they got --- he sold the cattle and it was from

7   that.  But those people are somewhere, I'm sure

8   you can find them.

9          MR. WAIDE:  May I have just a moment,

10   Your Honor?

11          THE COURT:  You may.

12          MR. WAIDE:  That's all I have, Your

13   Honor.

14          THE COURT:  All right.  Any questions by

15   the State?

16          MR. GAULT:  Briefly, Your Honor.

17                   - - -

18             CROSS-EXAMINATION

19   BY MR. GAULT:

20      Q    Mr. Harmon, my name is Paul Gault with

21   the DA's office.  I just have a few questions

22   for you.

23          The statement you've referenced of Ms.

24   McDaniel indicated that the money was in her

25   wallet?

1    A    Wallet.

2    Q    But you remember —

3    A    She never had a wallet.

4    Q    You remember an envelope on the dresser?

5    A    Yeah.  Cause she didn't have a wallet.

6    Q    Okay.

7    A    She had a bunch of bags but she didn't

8    have a wallet.

9    Q    I understand.

10        Did you — you didn't actually see

11   anybody take the money, correct?

12   A    No.  But I know it was on there when

13   we — when they escorted us out and Sloan went

14   in.

15   Q    Additionally, were you both in jail for

16   approximately a week?

17   A    And there's one more thing.  The —

18   after — when — the third day in jail when

19   Mr. — what was his name — the other officer —

20   when he brought me in for questioning or

21   whatever, he — he was on the phone with Sloan

22   after he got shot or whatever and Sloan said —

23   told him on the phone that he laid the money

24   back on the dresser.

25   Q    Okay.  And y'all were each in jail for

1  about six days after the robbery?

2      A    She was in there about two weeks.  I was

3  in there for about eight days.  Six, seven,

4  eight days.

5      Q    So there was a time period where nobody

6  was occupying the house?

7      A    Yeah.  Yes.

8      Q    Finally, there were drugs in the house?

9      A    There was filters.  No drugs.

10     Q    Do you have any prior convictions?

11     A    No, sir.  Nothing.

12         MR. GAULT:  Your Honor, the State has no

13     further questions.

14         THE COURT:  I didn't hear his answer.

15         THE WITNESS:  No, sir, I don't.

16         THE COURT:  All right.  What time of

17     night or day did this robbery take place?

18         THE WITNESS:  I think it was around —

19     it had to be midnight maybe, 1:30.  Between

20     midnight and 1:30, maybe.

21         THE COURT:  All right.  Mr. Waide, any

22     redirect?

23         MR. WAIDE:  No, Your Honor.

24         May Mr. Harmon be finally excused?

25         THE COURT:  Any objection by the State?

```
 1              MR. GAULT:  No, Your Honor.
 2              THE COURT:  All right.  Mr. Harmon,
 3         you're finally excused.  You may leave or
 4         stay here and listen, whatever you want to
 5         do.
 6              THE WITNESS:  All right.
 7              MR. WAIDE:  Your Honor, I have another
 8         short witness before we call Mr. Starling.
 9         Roger Woods.
10              THE COURT:  All right.
11              MR. WAIDE:  If I can get him.
12              THE COURT:  You may.
13              (PAUSE.)
14                        - - -
15              THE COURT:  Mr. Woods, if you'd come up,
16         please.  Raise your right hand.
17                      ROGER WOODS,
18    having been called as a witness, and having been
19    first duly sworn by the Court, testified as
20    follows, to-wit:
21              THE COURT:  Come around here and sit in
22         this witness chair, please, sir.
23              You may proceed.
24                        - - -
25                  DIRECT EXAMINATION
```

```
1    BY MR. WAIDE:
2         Q    What is your name, please, sir.
3         A    Roger Wayne Woods.
4         Q    Where do you work, Mr. Woods?
5         A    North Mississippi Medical Center.
6         Q    What do you do at North Mississippi
7    Medical Center?
8         A    I'm a Floor Tech II, Environmental
9    Services.
10        Q    All right, sir.  How long — how long
11   have you worked at the medical center?
12        A    Seven years.
13        Q    Have you had some dealings in the past
14   with a deputy sheriff named Eric Sloan?
15        A    Yes, sir, I have.
16        Q    Has that been a number of years ago?
17        A    Yes, sir.
18        Q    What capacity did he have at that time?
19        A    He was a sheriff of Monroe County, a
20   deputy sheriff of Monroe County.
21        Q    And would you tell Judge Funderburk
22   whether or not he had occasion to approach you
23   when you were stopped by the side of the road
24   with a — some mechanical problem with your
25   vehicle.
```

1    A    Yes, Your Honor, he did.  Yes, sir.

2    Q    All right.  Tell — tell Judge

3 Funderburk about that.  Tell him what —

4         Well, first of all, did you have a —

5 did you have a substantial sum of cash with you

6 at that — at that time?

7    A    Yes, sir.  That particular evening, it

8 was a Sunday evening, I was coming from

9 Hamilton, Mississippi, coming down Highway 45.

10 After I passed that highway bridge, my vehicle

11 was running hot and I pulled over to the side of

12 the road to block — to further block traffic.

13 And I called 911 cause my fan belt had broken.

14         Two officers came to the scene that

15 night.

16         There was a couple of passengers in the

17 vehicle from Hamilton, Mississippi, my roommate,

18 my son, Frederick Bronson, were passengers in

19 the vehicle.

20         Eric — Deputy Eric Sloan and another

21 deputy sheriff came to the scene and I explained

22 what had happened to the vehicle.

23         He said, well, *home boy, I need you to*

24 *get out the car, every one of you get out the*

25 *vehicle.*

1    Which we did.

2    He got — come to the back of the

3 vehicle, he said, *do y'all have drugs in that*

4 *vehicle?*

5    I said, *no, sir. I do not sell drugs.*

6 *I work every day.*

7    *Can I search the vehicle?*

8    I said, *yes, sir.*

9    He searched the vehicle. He said, *can I*

10 *search the trunk?*

11    I said, *yes, sir.*

12    He said, *homeboy, what is this right*

13 *here?*

14    I said, *sir, this is a personal safe I*

15 *travel with when I'm going out of town.*

16    He said, *can I look in it?*

17    I said, *yes, sir. It's open.*

18    He searched the safe.

19    I had a bank envelope with $1,226 in

20 cash in that safe in an envelope.

21    He said, *Homeboy, this is drug money.*

22 *I'm confiscating this cash money until you can*

23 *prove where it came from.*

24    I said, *well, sir, that money came from*

25 *a insurance premium check from my last employer*

1    *of overpayments of premiums, insurance premiums.*

2            *I'm confiscating this cash.*

3            He took the cash.

4            I went to jail that night.  I never got

5    no emergency service from the tow truck or no

6    one.  And my other roommates had got

7    transportation back to Lee County, Mississippi.

8    And I went to jail in Monroe County.

9        Q    Did you — did you ever get charged with

10   any crime?

11       A    No, sir.

12       Q    Did anybody — did you ever get any

13   papers about forfeiting the money or anything

14   from anybody?

15       A    No, sir.

16       Q    Did you file your own civil suit because

17   of Mr. Sloan taking the money?

18       A    Yes, sir.  I contacted Jimmy Shelton law

19   firm and Brandon Leslie was representing me on

20   that matter.

21       Q    And did you end up with a lawyer —

22   although the Shelton law firm started out

23   representing you, did you end up with a lawyer

24   named Shane McLaughlin?  Do you remember that?

25       A    Yes, sir.  They were working together to

```
 1    retain the money back.
 2         Q    All right.  And do you remember whether
 3    you — ultimately whether that case was
 4    ultimately settled?
 5         A    They agreed to return the cash money and
 6    drop the case.  I got $1,226 back from the city
 7    of Monroe County in the form of a check.
 8         Q    The money that Sloan had taken from you?
 9         A    Yes, sir.
10         Q    All right.
11              MR. WAIDE:  Your Honor, I'd like to move
12         to introduce the pleadings in the case Mr.
13         Woods filed as an exhibit to his testimony.
14              THE COURT:  Any objection?
15              MR. GAULT:  Your Honor, may I review it
16         briefly?
17              (PAUSE.)
18                        - - -
19              MR. GAULT:  No objection.
20              THE COURT:  All right.  These pleadings
21         shall be marked as an exhibit to this
22         witness' testimony for the purpose of this
23         hearing.
24                        - - -
25    (EXHIBIT 2 MARKED AND RECEIVED INTO EVIDENCE.)
```

```
 1                          - - -
 2          MR. WAIDE:  That's all I have, Your
 3     Honor.
 4          THE COURT:  Mr. Gault?
 5          MR. GAULT:  No cross, Your Honor.
 6          THE COURT:  All right.  Mr. Woods, thank
 7     you for being here.  You may stay out in the
 8     audience or you may leave, whichever you want
 9     to do.
10          THE WITNESS:  Thank you, Your Honor.
11     I'll just sit out in the audience.
12          THE COURT:  All right.
13          THE WITNESS:  Thank you, sir.
14          MR. WAIDE:  I would call Rodney
15     Starling.
16          (PAUSE.)
17                          - - -
18          THE COURT:  All right.  Mr. Starling, if
19     you would raise your right hand.
20                    RODNEY STARLING,
21     having been called as a witness, and having been
22     first duly sworn by the Court, testified as
23     follows, to-wit:
24          THE COURT:  Have a seat in the witness
25     chair.
```