# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

**ROBBIE KEETON GEIGER, as Administratrix**
**of the Estate of Ricky Keith Keeton, Deceased;**
**DELISHA KEETON MOONEY; and**
**MEGAN ARCHER**                                                                        **PLAINTIFFS**

**VS.**                                                        **CAUSE NO. 1:16-CV-00095-DMB-DAS**

**MONROE COUNTY, MISSISSIPPI;**
**and ERIC SLOAN**                                                                     **DEFENDANTS**

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
## LEAVE TO FILE RENEWED MOTION FOR SUMMARY JUDGMENT
## AND MOTION FOR JUDGMENT ON THE PLEADINGS [252]

---

## I.  INTRODUCTION

On November 1, 2017, Defendants filed their Motion for Summary Judgment [97]. That motion was denied on June 18, 2018 [142]. Defendant Sloan appealed [148]. On August 8, 2019, the Fifth Circuit Court of Appeals affirmed. *Keeton Geiger v. Sloan*, 780 F. App'x 150, 154–55 (5th Cir. 2019).

The current motion is untimely, as it is filed long after the dispositive motion deadline, which was November 1, 2017. Docket Text Order of October 2, 2017. Thus, the motion should be denied for that reason alone. The motion is also untimely because the case has been on the verge of trial repeatedly. The time for the filing of any motions has passed.

In addition, these legal claims were fully litigated and decided in the first appeal. Thus, the motion is barred by the law of the case doctrine and the mandate rule.

There remain multiple issues of material fact in this matter.

00365111.WPD

For any of the above-mentioned reasons, this Court should deny Defendants' motion.

## II. **FACTS**

On October 7, 2015, a group of Monroe County Sheriff's deputies, under the personal supervision of former Monroe County Sheriff Cecil Cantrell, shot and killed Ricky Keeton. Deposition of Wanda Stegall Taken April 17, 2017, pp. 27-30, Exhibit "A"; Statement of Facts by Eric Sloan, Exhibit "B;" Certified Autopsy of Ricky Keith Keeton, Exhibit "C." At the time of the shooting, Monroe County deputies were making a no-knock entry into Keeton's house trailer. Deposition of Wanda Stegall Taken April 17, 2017, pp. 27-30, Exhibit "A"; Statement of Facts by Eric Sloan, Exhibit "B."

Keeton lived in a house trailer with Wanda Stegall, his girlfriend of approximately ten (10) years. Transcribed Statement of Wanda Stegall by Kenneth Bailey, p. 5, Exhibit "D." At the time of his death, Keeton was self-employed as a mechanic. Previously, Keeton had worked as a plant manager for a furniture factory. Deposition of Wanda Stegall Taken April 17, 2017, pp. 39-40, Exhibit "A."

Keeton's criminal record consisted of a twenty (20) year old felony possession of marijuana conviction, for which he received a suspended sentence. Ricky Keeton Indictment and Sentencing Order, Exhibit "E." Keeton was a nonviolent person. Affidavit of Chuck Chism, Exhibit "F"; Deposition of Wanda Stegall Taken April 17, 2017, p. 10, Exhibit "A"; Deposition of Terry Parker, p. 14, Exhibit "G"; Deposition of Cecil Cantrell Taken January 18, 2022, pp. 52-53, Exhibit "H." Keeton had never even been in fistfight, and was "closer than friends" to former Sheriff Cecil Cantrell. Affidavit of Robbie Keeton Geiger, Exhibit "I."

On October 27, 2015, Defendant Sloan and his subordinate, Deputy Sheriff Tony Coxey, observed Coxey's long-time confidential informant, Terry Parker, present at Keeton's house trailer. Defendant Sloan and Coxey then called other deputies and directed those deputies to stop Parker. Deposition of Eric Sloan, pp. 42, 59, Exhibit "J." Once stopped by deputies, Parker stated that the crystal methamphetamine, which the deputies found in his possession, came from Keeton. Deposition Eric Sloan, pp. 54-58, Exhibit J"; Deposition of Terry Parker, pp. 9, 13, 15-17, 19-20, Exhibit "G." Defendant Sloan then called for the SWAT team and the sheriff to meet him at the Government Complex to plan the no-knock search of the Keeton house trailer. Statement of Facts by Eric Sloan, Exhibit "B." Although Defendant Sloan had already decided to conduct a no-knock search, Defendant Sloan's subordinate, Coxey, went to Justice Court Judge Robert Earl Fowlkes to ask Fowlkes to sign a search warrant. Statement of Facts by Eric Sloan, Exhibit "B"; Deposition of Robert Fowlkes, p. 8, Exhibit "K." Defendant Sloan and his subordinate, Coxey, decided to conduct the no-knock search. Deposition of Eric Sloan, p. 66, Exhibit "J."

Defendant Sloan claimed that Parker had reported that a Mexican drug cartel member had delivered drugs to Keeton's house trailer, and that a Mexican male would be coming back the following day (the same day deputies killed Keeton) to pick up the cash proceeds of $20,000.00. Statement of Facts by Eric Sloan, Exhibit "B"; Deposition of Eric Sloan, pp. 39-40, 46, 54-48, Exhibit "J"; Deposition of Cecil Cantrell Taken February 15, 2017, pp. 6, 8, Exhibit "L." At the pre-raid briefing of the other deputies, however, Defendant Sloan did not tell the other deputies about the $20,000.00. Deposition of Cecil Cantrell Taken February 15, 2017, pp. 7-8, Exhibit "L"; Deposition of John Bishop, p. 14, Exhibit "M"; Deposition of Curtis Knight, p. 26, Exhibit "N";

Deposition of Spencer Woods, p. 11, Exhibit "O"; Deposition of John Michael Lay, p. 7, Exhibit "P."

After Defendant Sloan had briefed the sheriff and the SWAT team about the upcoming raid, the deputies and the sheriff headed to Keeton's house trailer on Sizemore Road in Monroe County, Mississippi. Statement of Facts by John Bishop, Exhibit "Q"; Deposition of Spencer Woods, pp. 4-8, Exhibit "O." Sheriff Cantrell and Chief Deputy Knight followed the deputies, including members of the SWAT team, to Sizemore Road, but stopped before the deputies reached Keeton's house trailer. The sheriff and chief deputy stayed some distance from the Keeton house trailer, where Keeton was killed. Deposition of Cecil Cantrell Taken February 15, 2017, p. 31, Exhibit "L"; Deposition of Cecil Cantrell Taken January 18, 2022, p. 12, Exhibit "H." When Sheriff Cantrell was asked whether Keeton was dangerous, he responded "[w]e just assume any person that's dealing in drugs is dangerous," and this assumption is "why we went in with a no-knock warrant." Deposition of Cecil Cantrell Taken February 15, 2017, pp. 9-10, Exhibit "L." Regarding whether Keeton posed any danger, Coxey's affidavit supporting the warrant stated only:

> That within the past seventy-two (72) hours, a confidential source contacted me, Agent Tony Coxey, with the Monroe County Sheriff's Department and stated that at 60021 Sizemore Rd Amory, MS that Ricky Keeton possessed and he saw a crystal like substance that was stated by Mr. Keeton to *Methamphetamine* . . . .

Affidavit for Search Warrant and Search Warrant, Exhibit "R."

The affidavit for the warrant states no facts indicating why a no-knock warrant is needed. Deposition of Eric Sloan, pp. 54-55, Exhibit "J"; Affidavit for Search Warrant and Search Warrant, Exhibit "R." The warrant states that deputies *request* a no-knock warrant. Affidavit for Search Warrant and Search Warrant, Exhibit "R." The warrant, however, does not authorize a no-knock

entry. Affidavit for Search Warrant and Search Warrant, Exhibit "R." To the contrary, the warrant states that deputies should make "known to the person or persons occupying or controlling said place, if any, your purpose and authority for so doing. . . ." Affidavit for Search Warrant and Search Warrant, Exhibit "R." Instead, deputies waited no time before they began breaking down the Keeton door with a ram and, at the same time, yelling "Sheriff's Department." Deposition of Spencer Woods, pp. 8-9, Exhibit "O."

Defendant Sloan testified that all of his searches are no-knocks. Deposition of Eric Sloan, p. 97, Exhibit "J." Defendant Sloan explained that he had used this no-knock method of entry hundreds of times. Deposition of Eric Sloan, p. 97, Exhibit "J." Defendant Sloan has never knocked and announced his presence <u>before</u> making entry. Deposition of Eric Sloan, p. 50, Exhibit "J." Defendant Sloan described no-knocks as consisting of ramming the door in and yelling "sheriff's department" as soon as the ram hits the door. Deposition of Eric Sloan, p. 50, Exhibit "J."

Keeton's reputation for nonviolence was well established. Parker testified that he had known Keeton for approximately twenty (20) years and had never seen Keeton do anything violent. Deposition of Terry Parker, pp. 14, Exhibit "G." Keeton's daughter testified that she had never known her father to be in a fistfight. Affidavit of Robbie Keeton Geiger, Exhibit "I." A third-party witness testified that even the sheriff knew Keeton was nonviolent. Affidavit of Chuck Chism, Exhibit "F."

Justice Court Judge Robert Fowlkes testified Coxey gave him no specifics as to whether Keeton had ever performed any violent acts. Fowlkes had no independent knowledge that Keeton had ever behaved in a violent manner. Deposition of Robert Fowlkes, p. 9, Exhibit "K". Parker said he had never told anyone that guns were in Keeton's house trailer. Deposition of Terry Parker, p.

22, Exhibit "G." In fact, Parker testified that no one even asked him whether Keeton might have guns in the trailer. Deposition of Terry Parker, p. 22, Exhibit "G."

Robbie Keeton Geiger, one of Keeton's daughters, talked to Sheriff Cantrell about why the Sheriff's Department had killed her father. Affidavit of Robbie Keeton Geiger, Exhibit "I." Geiger testified that the sheriff told her ,in a taped conversation, that he and Keeton were "closer than friends. . . ." Affidavit of Robbie Keeton Geiger, Exhibit "I."

Judge Fowlkes was asked about the language in paragraph 7 of his search warrant, which says:

> Do not interpret this writ as limiting your authority to seize all contraband and things the possession of which in itself is unlawful which you find incident to your search, or as limiting your authority to make otherwise valid arrests at the place described above. **The above affiant respectfully requests a no-knock search due to officer safety and the protection of further evidence.**

Affidavit for Search Warrant and Search Warrant, Exhibit "R" (emphasis added).

Judge Fowlkes responded that this is the same language he sees on all the forms from the Monroe County Narcotics Department. Deposition of Robert Fowlkes, p. 5, Exhibit "K." The Judge has no notes to indicate Coxey told him anything other than the information contained in the affidavit. Deposition of Robert Fowlkes, p. 7, Exhibit "K."

Fowlkes agreed that people in Northeast Mississippi generally keep firearms in their homes. Deposition of Robert Fowlkes, pp. 18-19, Exhibit "K." Accordingly, it would be "inherently dangerous" for an intruder to crash into the door of a home in Mississippi. Deposition of Robert Fowlkes, p. 19, Exhibit "K."

After Fowlkes issued the October 27, 2015, warrant, he issued a second warrant on October 29, 2015, after Keeton was killed. Fowlkes does not know why he issued the second warrant.

Deposition of Robert Fowlkes, pp. 4-7, Exhibit "K." Both warrants have identical language requesting a no-knock warrant entry.

The deputies who approached Keeton's house trailer at approximately 1:00 a.m. were Defendant Eric Sloan, Tony Coxey, John Michael Lay, Sam Mitchell, John Bishop, David Mitchell, Spencer Woods, Hunter Knight, and Tim Coker. These deputies, but not the sheriff or the chief deputy, lined up and walked down the road toward Keeton's house trailer. Statement of Facts by John Bishop, Exhibit "Q." Defendant Sloan was to be the "point man," immediately behind the two (2) deputies assigned to break into the trailer, and would be the first person with his firearm out. Deposition of John Michael Lay, p. 10, Exhibit "P"; Deposition of Spencer Woods, pp. 8-9, Exhibit "O." There was no announcement before the battering ram hit the door. Deposition of Eric Sloan, pp. 45, 49-50, Exhibit "J;" Deposition of John Michael Lay, p. 10, Exhibit "P"; Deposition of Spencer Woods, pp. 8-9, Exhibit "O."

Defendant Sloan claims that he then saw Keeton appear in the doorway with a firearm. Defendant Sloan and other deputies then fired multiple rounds into the house trailer and killed Keeton. Statement of Facts by John Bishop, Exhibit "Q"; Statement of Facts by Eric Sloan, Exhibit "B"; Deposition of Eric Sloan, p. 76, Exhibit "J"; Certified Autopsy of Ricky Keith Keeton, Exhibit "C."

There were forty-nine (49) bullets fired through the side of the house trailer. Affidavit of Robbie Keeton Geiger, Exhibit "I."

Wanda Stegall, Keeton's girlfriend, was in the mobile home in bed with Keeton when the deputies started trying to break the door open.

Stegall's first deposition of April 17, 2017, says:

Q.      Okay.  During the night, were you awaked by anything?
A.      Ricky woke me up.
Q.      Okay. Why did he wake you?
A.      He said he thought he heard something.
Q.      Okay. What happened then?
A.      He went to the door. I think they rammed the door.

* * *

Q.      . . .  If I understand right, you said he – Mr. Keeton woke you up. Then you
        heard some banging on the door.
A.      Yeah.
Q.      Okay.
A.      Yes, sir.
Q.      Did you hear anyone announce their presence?
A.      No.
Q.      Okay.
A.      They just started, like, beating on the door.
Q.      Okay.
A.      And Ricky went to the door, and he opened it, and then he closed it back.

* * *

Q.      Okay. Did Mr. Keeton have anything in his hands when he went to the door?
A.      He had a pellet pistol.
Q.      Okay. Do you know if Mr. Keeton had any other firearms or weapons on the
        premises?
A.      No, sir.
Q.      As in you don't know or there weren't any?
A.      There wasn't – there wasn't anything.
Q.      There was no anything?
A.      No, sir.

* * *

Q.      But he did have it on him at the time that he –
A.      Yes, sir.
Q.      – opened the door. Okay. You said he opened the door and closed it. Okay.
A.      Yes, sir.
Q.      Okay.  During the time did you hear any type of announcement of presence?

A.      No.  When he closed – when he pulled the door to, that's when they started
        shooting.

Q. Okay. Do you know if he shot his pellet pistol before he closed the door?
A. I don't know.
Q. Okay. Did you see any of that – anything else happen after that?
A. No, sir.

Deposition of Wanda Stegall Taken April 17, 2017, pp. 27-30, Exhibit "A."

The above testimony is almost exactly the same as the testimony Stegall gave at her second deposition. Stegall had taken the Fifth Amendment regarding drugs use in her first deposition. Stegall had, however, told Mississippi Bureau of Investigation (M.B.I.) Investigator Kenneth Bailey about her own drug use, as well as Keeton's drug use, on the night Keeton was killed. *See* Transcribed Statement of Wanda Stegall by Kenneth Bailey, pp. 12-13, Exhibit "D." In her second deposition, Stegall gave the following testimony about how deputies killed Keeton:

Q. Okay. But you were -- you were asleep when the --
A. Yeah.
Q. -- police arrived.

Deposition of Wanda Stegall taken March 1, 2022, p. 30, Exhibit "S."

Q. Okay. Were they inside the trailer on October 27, 2015?
A. Yes.
Q. And in the early morning hours of October 28, 2015?
A. Yes.
Q. Okay. All right. So your testimony has been that you went to bed about 10:00 p.m., correct, on October 27, 2015?
A. Yes.
Q. And Mr. Keeton, did he come to bed with you at that time?
A. Yes.
Q. All right. Talk me through, then, the next thing you remember in terms of what occurred with the police, following you going to bed.
A. Onliest thing I remember was they were ramming the door and hollering. And Ricky got up and went to the door because he thought somebody was breaking in, and that's when they started shooting.
Q. Okay. All right. So you heard them ramming the door and hollering.
A. (Nods head up and down.)
Q. Yes?
A. Yeah.

Q.      And when they were hollering, were they hollering Monroe SO or –

A.      I don't know.

Q.      -- could you make it out?

A.      I couldn't tell what they was doing.

Q.      But they were hollering.

A.      They was hollering and ramming the door.

Q.      And these were the policemen hollering, not --

A.      I don't --

Q.      -- Mr. Keeton hollering.

A.      No, it wasn't Ricky.  No.

Q.      Okay. And Mr. Keeton heard the hollering and ramming, and he went to the door, correct?

        MR. WAIDE: Excuse me.  Excuse me.

A.      He -- I don't know if he --

        MR. WAIDE: Object.  She doesn't know what he heard.

A.      Yeah.  I don't --

        MR. WAIDE:  Just let her answer for herself what happened. Just --

A.      Yeah.

        MR. WAIDE: -- explain what happened.

A.      I don't know if he heard it.  I mean, I don't know what he heard.

BY MS. LEE:

Q.      Okay.  But you heard ramming and hollering.

A.      Something, yeah.

Q.      Yes.  Okay.  So Mr. Keeton then -- did you witness Mr. Keeton go to the door, picking up a pellet gun along the way?

A.      It was a pellet pistol.

Q.      Okay.  Pellet pistol.  And I've seen a picture of the pellet pistol, and it looks just like a handgun, doesn't it?

A.      Yeah, it does.

Q.      And so Mr. Keeton took the handgun, pellet pistol, to the front door, correct?

A.      Yes.

Q.      Now, did you have a visual of him at this time and where were you in terms of what you could see or not see?

A.      I was -- I was sitting up in the bed.

Q.      All right. Could you see Mr. Keeton?

A.      Yes.

Q.      And is the hollering and ramming continuing at this time?

A.      I don't -- I don't -- I don't remember. It was for a while, and then the guns started shooting.

Q.      Did you see the door swing open at any time?

A.      Ricky opened the door.

Q.      All right.  And he was standing there with his pellet pistol, correct?

A.    I don't know. I don't know where he -- where it was at. I don't know. I don't know -- well, he's left-handed, so the gun would be in his left hand. And he opens the door like this, so the pistol would be back here.

Q.    Uh-huh.

A.    And I -- I don't know how anybody could have seen it.

Q.    You don't know how anybody could have seen it?

A.    No.

Q.    But you don't know -- you don't actually know what they saw because --

A.    No.

Q.    -- you didn't --

A.    I don't.

Q.    -- have a visual?

A.    No.

Q.    All right. After the door swings open, what next?

A.    Ricky closed the door.

Q.    All right. And then what next?

A.    They started shooting.

Q.    All right. Is it your testimony that Mr. Keeton did not fire a shot from the pellet pistol?

A.    If he did I didn't hear it.

Q.    Okay. It's possible, though, that he could have fired a shot from the pellet pistol.

A.    Well, no, because the pellet was found at his feet.

Q.    Well, let me ask this again.

A.    Okay.

Q.    Do you know one way or the other whether Mr. Keeton fired his pellet pistol at the officers?

A.    No.

Q.    All right. You just saw the door open and then the door close.

A.    Yes.

Q.    Correct? All right. Now, tell me what you saw or heard next.

A.    I just heard the gun shooting.

Q.    Okay. You don't know if it was Mr. Keeton's gun or the officer's gun, do you?

A.    It was not Ricky's gun.

Q.    How can you be sure?

A.    Because you can tell a pellet gun from a pistol.

Deposition of Wanda Stegall taken March 1, 2022, p. 32-37, Exhibit "S."

Q.    All right. When the shooting stopped, what did you do next?

A.    Nothing. I just stayed under the bed.

Q.    So you were under the bed?

A.    I was under the bed.

Q.     All right. Tell me at what point during this whole scenario you got under the bed?

A.     When the shooting started.

Q.     Okay. Did Mr. Keeton make any statements to you at any time from the time you heard the hollering and ramming of the door until it was all over?

A.     Yeah. When they shot him he said, Wanda, they got me.

Q.     Okay. Did he -- did he make any statements to you that -- about the police coming on the property?

A.     (Shakes head side to side.)

Q.     Is that a no?

A.     No.

Q.     He never said something to the effect of, I'm going to go show them?

A.     No.

Q.     Okay.

A.     He didn't know anybody was even out there.

Q.     All right. How do you know what he knew, Ms. --

A.     Well, I don't really know, but he didn't hear anything to start with, and the dogs didn't bark. If somebody's coming up, the dogs will always bark; but they never barked.

Q.     Okay. But you earlier testified that you heard hollering and ramming, correct?

A.     Yeah, when they -- yeah. I did.

Deposition of Wanda Stegall taken March 1, 2022, pp. 38-39, Exhibit "S."

On examination by Plaintiffs' counsel, Stegall again testified:

Q.     All right. So you've been asked about this several times, about what happened that night; so I know this is repetitive. But if you would, you said y'all went to bed. Did you go to sleep?

A.     Yes.

Q.     Did you go to sleep?

A.     Yes.

Q.     What do you -- do you remember how – how is it that you woke up? Do you remember Ricky saying anything to you or –

A.     He woke me up and he said -- he said, I heard something outside. And then that – that's when they started ramming the door.

Q.     At about the same time?

A.     Yeah. About the same time he said it and got up.

Deposition of Wanda Stegall taken March 1, 2022, pp. 49-50, Exhibit "S."

Later, in her second deposition, Stegall confirmed that at night, one could not see from the house trailer to the gate, which deputies had walked over to reach the house trailer. Stegall testified:

> Q. All right. Assuming there are no lights out there -- well, first of all, are there any streetlights or anything to light up that area?
> A. Maybe on the other street but nothing right there coming in the gate.
> Q. Let's talk about from the gate. From the gate up until the trailer. First of all, how far is that from the gate to the trailer?
> A. I don't know. I don't have a clue.
> Q. All right. From the gate up to the trailer, at night, can you see anything between the trailer and the gate at night?
> A. No.
> Q. If there's no lights?
> A. No.
> Q. Cannot?
> A. Cannot.

Deposition of Wanda Stegall taken March 1, 2022, p. 58, Exhibit "S."

After the shooting ended, deputies handcuffed Stegall and took her to jail. Deposition of Wanda Stegall taken April 17, 2017, p. 32, Exhibit "A." Stegall was charged with drug trafficking. Deposition of Wanda Stegall taken April 17, 2017, p. 34, Exhibit "A." After killing Keeton and arresting Stegall, deputies seized most of Keeton's personal property. Deposition of Eric Sloan, p. 99, Exhibit "J."

Chief Deputy Curtis Knight informed the M.B.I. of the shooting, and the M.B.I. launched an investigation. Deposition of Kenneth Bailey, p. 5, Exhibit "T." M.B.I. Captain Kenny Bailey was assigned to investigate. Deposition of Kenneth Bailey, p. 5, Exhibit "T." Bailey arrived at Keeton's house trailer at approximately 1:30 a.m. on October 28, 2015. Synopsis of Kenny Bailey, Exhibit "U." Bailey testified that the deputies who shot and killed Keeton refused to provide statements to

him until they had an opportunity to meet with their attorney, Tony Farese[1]. Deposition of Kenneth Bailey, pp. 7-8, Exhibit "T"; Deposition of Corey Burrow, p. 10, Exhibit "V." Bailey did, however, take several statements, including a statement of Wanda Stegall. Deposition of Kenneth Bailey, p. 23, Exhibit "T"; Written Statement of Wanda Stegall, Exhibit "W"; Transcribed Statement of Wanda Stegall to Kenneth Bailey, Exhibit "D." Even after meeting with Attorney Farese several days later, the deputies furnished only written statements. The deputies who shot into the house trailer were Defendant Sloan, and SWAT team members John Michael Lay, John Bishop, Spencer Woods, and Sam Mitchell. Synopsis of Kenneth Bailey, Exhibit "U."

After the deputies had killed Keeton, M.B.I. Agent Burrow collected the deputies' firearms, and the M.B.I. agent subsequently collected cameras, including subscriber identity module (SIM) cards, from the sheriff's department. These cards had been taken from the cameras on the scene. Deposition of Corey Burrow, pp. 8, 11, Exhibit "V."

Cantrell testified that if he had heard someone breaking into his home in the middle of the night, he also would have gone to the door with a firearm. *See* Deposition of Cecil Cantrell taken January 18, 2022, pp. 111-12, Exhibit "H."

### III.  STANDARD OF REVIEW

FEDERAL RULE OF CIVIL PROCEDURE 56(a) allows summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a).

---

[1]  Farese came to the scene at approximately 2:00 a.m. or 3:00 a.m. on the morning of the shooting. Deposition of Cecil Cantrell Taken February 15, 2017, pp. 34-35, Exhibit "L."

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. at 324. In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Although summary judgment is a useful device, it must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

According to *Hopson v. Quitman County Hosp. and Nursing Home, Inc.*, 119 F.3d 363, 366 (5th Cir. 1997):

> [S]ummary judgment will be affirmed only if we are "convinced, after an independent review of the record, that there is 'no genuine issue as to any material fact' and that the 'movant is entitled to judgment as a matter of law.'"

This Court is to consider the evidence in the light most favorable to the non-movant, draw inferences in his or her favor, and disregard all contrary evidence that the jury is not required to believe. *Reeves*, 530 U.S. at 150-51. "[L]itigants are entitled to have the jury draw those inferences and conclusions that are appropriate grist for juries." *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).

00365111.WPD                                      -15-

## IV.  ARGUMENT

### A.    THE PRESENT MOTION IS BARRED BY THE LAW OF THE CASE DOCTRINE AND THE MANDATE RULE.

In a 2018 opinion, the Fifth Circuit Court of Appeals upheld this Court's (Judge Sharion Aycock) denial of summary judgment. *Keeton Geiger v. Sloan*, 780 F. App'x 150 (5th Cir. 2019), affirming *Geiger v. Monroe Cty., Mississippi*, 2018 WL 3025951 (N.D. Miss. 2018).

With respect to the claim based on the no-knock entry, the Fifth Circuit held that "there are genuine disputes of material fact which bear on whether conducting a no-knock raid violated Keeton's rights." *Keeton Geiger*, 780 F. App'x at 153.  With respect to the excessive force claim, the Fifth Circuit held that "there are disputes of material fact that bear on whether the officers reasonably perceived a threat of imminent harm." *Keeton Geiger v. Sloan*, 780 F. App'x at 154.  The Fifth Circuit held that "[w]ith a disputed story, it's hard to assess whether—as a matter of law—Sloan reasonably thought that Keeton posed a threat of imminent harm." *Keeton Geiger*, 780 F. App'x at 154-55.

Over three (3) years after the Fifth Circuit decided that there are issues of material fact with respect to both the no-knock and excessive force claims, Defendants have filed another motion for summary judgment.   This eleventh hour motion contravenes basic principles.  "[T]he law of the case controls legal claims which were fully litigated and decided in the first appeal, even if parties seek to introduce new legal or factual evidence on remand." *Lindquist v. City of Pasadena, Tex*., 656 F. Supp. 2d 662, 677-78 (S.D. Tex. 2009), aff'd sub nom. *Lindquist v. City of Pasadena Texas*, 669 F.3d 225 (5th Cir. 2012), quoting *Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007).

*Cooper Tire & Rubber Co. v. Farese* is apt authority because in that case, the Fifth Circuit Court of Appeals reversed the grant of a motion for summary judgment, and then the district court countermanded the Fifth Circuit by once again granting summary judgment, using a different ground. According to the Fifth Circuit:

> The separation agreement's legality was fully briefed and argued before the prior panel. *Cooper Tire I*[2] held that the non-disparagement clause was legal under Mississippi law and remanded the case for trial. 423 F.3d at 456–57. Following remand, the district court again found that the separation agreement was illegal, this time under section 97–9–9 of the Mississippi Code. *Cooper Tire II,* 2007 WL 108281, at *2[3], 2007 U.S. Dist. LEXIS 1779, at *6–7. The district court relied on the fact that section 97–9–9 was not before the *Cooper Tire I* panel. *Id.* This finding misunderstands the scope of the law of the case doctrine and the substance of Mississippi law on this topic.
>
> Subject to a few narrow exceptions, the law of the case controls legal claims which were fully litigated and decided in the first appeal, even if parties seek to introduce new legal or factual evidence on remand. *See Felt,* 255 F.3d at 225[4].

*Cooper Tire & Rubber Co.*, 248 F. App'x at 558.

As in *Cooper Tire & Rubber Co. v. Farese,* Defendants in this case ask for summary judgment on a ground which the Fifth Circuit did not discuss when it ruled on the motion for summary judgment on the first appeal. *Cooper Tire & Rubber Co. v. Farese* held that granting of summary judgment after the Fifth Circuit has ruled otherwise is not appropriate, and that the district judge who made such a grant would be recused from the case and a new judge assigned. *Cooper Tire & Rubber Co.*, 248 F. App'x at 561.

---

[2]  *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446 (5th Cir. 2005).

[3]  *Cooper Tire & Rubber Co. v. Farese*, 2007 WL 108281 (N.D. Miss. 2007), rev'd and remanded, 248 F. App'x 555 (5th Cir. 2007).

[4]  *In re Felt*, 255 F.3d 220 (5th Cir. 2001).

In the present case, just as in *Cooper Tire & Rubber Co.*, the Fifth Circuit has already held that summary judgment is inappropriate on the claim of the unconstitutionality of the no-knock entry warrant claim and on the claim of excessive force. As in *Cooper Tire & Rubber Co.*, Defendants' adding a new legal theory not discussed in the Fifth Circuit opinion is of no significance. The law of the case applies "even if parties seek to introduce new legal or factual evidence on remand. *See Felt,* 255 F.3d at 225." *Cooper Tire & Rubber Co.*, 248 F. App'x at 558. Otherwise, every time a summary judgment motion is denied, the moving party could simply file another motion for summary judgment, adding additional grounds. This practice would contravene FED. R. CIV. P. 1, directing the Court to interpret the FEDERAL RULES OF CIVIL PROCEDURE so as to ensure a "speedy" resolution of disputes.

"The mandate rule requires a district court on remand to effect our mandate and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007).

The Eleventh Circuit Court of Appeals agrees. In *Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, & Helpers, Dist. Lodge No. 57*, 841 F.2d 1067, 1072, n. 5 (11th Cir. 1988), the Eleventh Circuit noted that there is "nothing in the record to indicate that the evidence produced at the hearing after remand was unavailable to the taxpayers during the first trial." Similarly, Defendants have pointed to no argument on remand that they could not have made when they filed their first motion for summary judgment.

Defendants raised their current argument – that Keeton's own "poor choices" were the cause of his death – in their first motion. Defendants' first brief on summary judgment states that "Keeton confronted the deputies by pointing a gun and firing at them," and "[d]ue to the tense, dangerous, uncertain and evolving events that unfolded, the Monroe County Sheriff's deputies were forced to

defend themselves from Keeton's violent and possibly drug-induced actions." Defendants'
Memorandum in Support of Summary Judgment, p. 32 [98]. Judge Aycock rejected this argument
four (4) years ago, and the Fifth Circuit affirmed. It would be error for this Court to overrule the
Fifth Circuit.

Wanda Stegall did not change her testimony in her second deposition. Stegall had taken the
Fifth Amendment concerning drug use at the time of her first deposition. However, Defendants
already knew that Stegall admitted that she and Keeton had used drugs before the raid because
Stegall told Investigator Bailey about the drug use when he interviewed her shortly after deputies
killed Keeton. Defendants had this information since discovery four (4) years ago. *See* Transcribed
Statement of Wanda Stegall Given to Kenneth Bailey, Exhibit "Y."

> **B.      AS WAS TRUE AT THE TIME OF THE FIRST DECISIONS BY THIS
> COURT AND BY THE FIFTH CIRCUIT COURT OF APPEALS,
> THERE ARE ISSUES OF MATERIAL FACT AS TO THE
> CONSTITUTIONALITY OF THE NO-KNOCK WARRANT AND
> ENTRY.**

The Fifth Circuit has recognized "that an officer must knock and announce his presence and
authority prior to entering a home." *Trent v. Wade*, 776 F.3d 368, 378 (5th Cir. 2015). The Supreme
Court has held that "[i]n order to justify a 'no-knock' entry, the police must have a reasonable
suspicion that knocking and announcing their presence, under the particular circumstances, would
be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for
example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).
*Richards* held that there is no "blanket exception" to the knock and announce rule for drug cases,
stating that "[w]e disagree with the court's conclusion that the Fourth Amendment permits a blanket
exception to the knock-and-announce requirement for this entire category (felony drugs cases) of

criminal activity." *Richards*, 520 U.S. at 388. Rather, the question is whether the "case establishes that the decision not to knock and announce was a reasonable one under the circumstances . . . ." *Richards*, 520 U.S. at 388.

One of the interests counseling against a no-knock entry is "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident." *Hudson v. Michigan,* 547 U.S. 586, 594 (2006).

The Fifth Circuit has reversed a district court which granted qualified immunity to a police officer who executed a no-knock entry under circumstances nearly identical to those in this case. In *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012), a confidential informant told Detective Arcuri that he had purchased methamphetamine from a man named "Randy." *Arcuri*, 674 F.3d at 459. Detective Arcuri procured a search warrant. *Arcuri*, 674 F.3d at 459. Arcuri and a team of seven (7) deputies made a no-knock entry by using a battering ram to knock in the front door. *Arcuri*, 674 F.3d at 459.

The officers in *Arcuri* claimed that the no-knock entry was justified based on the potential for evidence destruction and the danger to the officers in executing the search warrant. *Arcuri*, 674 F.3d at 459. The Fifth Circuit disagreed and reversed the district court's grant of summary judgment in favor of the officers. As to the potential for the destruction of drug evidence, the Fifth Circuit explained: "[W]hen police are afraid that announcing their presence and purpose will prompt the destruction of evidence, the appropriate constitutional inquiry is how long they must wait to enter after they have announced, not whether they should announce at all." *Arcuri*, 674 F.3d at 463.

Similarly, the Fifth Circuit rejected the officer's claim that knocking and announcing would have been dangerous. *Arcuri*, 674 F.3d at 464. Detective Arcuri, like Defendant Sloan in this case,

relied on only generalities about the dangerousness of drug dealers to justify the no-knock entry. *Arcuri*, 674 F.3d at 464. Arcuri had no particularized basis for safety concerns based on the occupants of the residence. *Arcuri*, 674 F.3d at 464. *Arcuri* held that these generalized concerns could not justify deviation from the Fourth Amendment knock-and-announce requirement.

In *Arcuri*, as in this case, the defendant treated no-knock entries as "the default mode of executing drug related search warrants." *Arcuri*, 674 F.3d at 464. The Fifth Circuit further held that *Richards* clearly established the plaintiff's rights to be free from such no-knock entries. *Arcuri*, 674 F.3d at 467. Accordingly, the Fifth Circuit reversed the district court's grant of summary judgment based on qualified immunity. *Arcuri*, 674 F.3d at 467. *See* also *United States v. Valdez*, 302 F.3d 320, 322 (5th Cir. 2002) (affirming district court's suppression of evidence based on unconstitutional no-knock entry).

Just as in *Arcuri*, Defendant Sloan and the other deputies made no-knock entry with no particularized evidence that a traditional knocking and announcing would be dangerous. Similar to *Arcuri*, there are no special concerns here about evidence destruction. Indeed, in this case, an officer disconnected the home's sewer pipe before the entry, which diminished the possibility of the destruction of any evidence.

Every search warrant ever requested by Defendant Sloan in Monroe County, Mississippi resulted in a no-knock search. Defendant Sloan testified he has conducted hundreds of searches, and all have been no-knock entries. Defendant Sloan treated no-knock searches as the rule, not the exception.

Defendant Sloan is sure to attempt to distinguish *Arcuri* by arguing that the warrant in *Arcuri* did not explicitly authorize a no-knock entry. The warrant in this case, however, also did not

authorize a no-knock entry. Rather, the warrant recites that the officer "respectfully requests a no-knock search due to officer safety and the protection of further evidence." Affidavit for Search Warrant and Search Warrant, Exhibit "R." A warrant's noting an officer's *request* for a no-knock entry is not a judicial authorization of a no-knock entry.

Even if Judge Fowlkes had authorized a no-knock warrant, this authorization would not afford immunity to Defendant Sloan. The Supreme Court has held that a Fourth Amendment violation by an officer is not excused merely because the judge improperly issues a warrant since "it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should." *Malley v. Briggs*, 475 U.S. 335, 345-46 (1986).

*Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998), is also similar. In *Gould*, Baltimore police officers requested and obtained a no-knock warrant to enter and search the home of a robbery suspect. *Gould*, 165 F.3d at 267. The officers had information that handguns used in a spree of robberies were present in the home and that other occupants of the home had violent criminal histories. *Gould*, 165 F.3d at 267. Based on this information, a state court judge permitted a no-knock entry. *Gould*, 165 F.3d at 267. When the officers made entry, the suspect believed intruders were invading his home. *Gould*, 165 F.3d at 267. The suspect retrieved a handgun and was promptly shot by an entering officer. *Gould*, 165 F.3d at 267. The suspect filed a civil action claiming that the officer's unconstitutional no-knock entry caused his injuries. *Gould*, 165 F.3d at 267. The district court denied a motion for summary judgment, and the defendant appealed.

The Fourth Circuit held that it was clearly established that the Fourth Amendment knock-and-announce principle applies unless exigent circumstances are present. *Gould*, 165 F.3d at 270. *Gould* concluded that the mere presence of weapons in the suspect's home, the seriousness of the

crime being investigated, and the criminal histories of other occupants of the home did not justify a no-knock entry.  *Gould*, 165 F.3d at 273-74.

*Gould* also held that the fact that the state court judge authorized a no-knock entry did not shield the officers from liability.  *Gould*, 165 F.3d at 272 (stating "although the state court judge clearly neglected his duties in sanctioning a no-knock warrant under these facts, his incompetence does not excuse the officers' default in bringing the no-knock request to the judge in the first place, as well as their execution of the warrant later that morning").  *Gould* affirmed the denial of summary judgment based on the no-knock entry.  *Gould*, 165 F.3d at 273.

In *Gould*, firearms used in robberies were known to be in the home, and some of the occupants had violent histories.  Here, Keeton was nonviolent, and was even a friend of the sheriff. Also, Parker testified that he had never been asked about whether firearms were present in the Keeton house trailer.  Because the no-knock entry was found to be unconstitutional in *Gould*, then the no-knock entry in this case is also unconstitutional.

### C.  THERE ARE ISSUES OF MATERIAL FACT AS TO WHETHER THE NO-KNOCK ENTRY CAUSED KEETON'S DEATH.

*Cty. of Los Angeles, Calif. v. Mendez*, ___ U.S. ___, 137 S.Ct. 1539, 1548 (2017), held: "Thus, there is no need to dress up every Fourth Amendment claim as an excessive force claim. For example, if the plaintiffs in this case cannot recover on their excessive force claim, that will not foreclose recovery for injuries proximately caused *by the warrantless entry*."

Whether Plaintiffs will be able to recover on the no-knock theory depends upon whether the no-knock entry was a proximate cause of Keeton's death.

Proper analysis of this proximate cause question required consideration of the "foreseeability or the scope of the risk created by the predicate conduct," and required

the court to conclude that there was "some direct relation between the injury asserted and the injurious conduct alleged." *Paroline v. United States*, 572 U.S. ——, ——, 134 S.Ct. 1710, 1719 . . . (2014). . . .

*Cty. of Los Angeles, Calif.*, 137 S. Ct. at 1548-49 (2017).

"Causation is a question of fact for the jury, and the jury has broad latitude to infer proximate cause from the evidence and circumstances surrounding an event." *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997). "Causation, like duty, involves questions of foreseeability. . . Unlike duty, causation is a question of fact." *Doe ex rel. Doe v. Wright Sec. Servs., Inc.*, 950 So. 2d 1076, 1085 (Miss. App. 2007) (citation omitted).

Cantrell admitted at his trial deposition, that coming to the door armed is the foreseeable result of believing an intruder is breaking into one's home. The following occurred at Cantrell's trial deposition:

> Q.    Do you have a gun in your house here?
> A.    Probably a hundred.
> Q.    You have a hundred guns in your house?
> A.    Yes, sir.
> Q.    If somebody was breaking into your house during the early morning hours, would you go to the door with a gun?
> MS. LEE: I'm going to object to the hypothetical, object to that question.
> A.    Wouldn't you?
> BY MR. WAIDE:
> Q.    Are you asking me if I would?
> A.    Yeah, I would.
> Q.    Right.
> A.    I -- right over there in the corner, if you'll notice, there's a gun in my house.
> Q.    Right.
> A.    Right there by my door, just –

Deposition of Cecil Cantrell taken January 18, 2022, pp. 111-12, Exhibit "H."

A jury may, therefore, reasonably infer that the cause of Keeton's death was his foreseeably going to the door with a pellet pistol believing that intruders were breaking into his house trailer.

While Cantrell's testimony demonstrates that it is foreseeable that one whose home will be broken into would come to the door armed, such a showing is not even required. A tortfeasor is liable for the effects of his or her illegal acts even if he or she did not foresee the exact harm that occurred. "[T]he particular harm to plaintiff need not be foreseeable." *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir. 1980). Foreseeability is required only in negligence cases; not intentional tort cases. *McCulloch*, 620 F.2d at 51, citing *State ex rel. Richardson v. Edgeworth*, 214 So.2d 579 (Miss. 1968).

Defendants argue that whether or not the no-knock search warrant was lawful is moot because, according to Defendants: "The deputies unequivocally stated that Keeton shot at them and Wanda now admits that she cannot be sure whether Keeton shot at officers or not." Defendants' Motion for Leave to File Renewed Motion for Summary Judgment and Motion for Judgment on the Pleadings [252], Exhibit B thereto [PageID #: 3187]. In fact, Stegall's testimony was that the deputies were doing all of the firing, and that she could tell the difference between a pistol shot and high-powered rifle shots. Deposition of Wanda Stegall taken March 1, 2022, pp. 36-37, Exhibit "S."

Furthermore, deputies' testimony – that Keeton was repeatedly firing the pellet pistol at the deputies – is contradicted by the testimony of Mississippi Bureau of Investigation Investigator Greg Nester, who testified that there was only one pellet missing from the ten (10) round chamber of the pellet pistol. *See* Deposition of Greg Nester, p. 15, Exhibit "X." According to Stegall, that pellet was found near Keeton's feet. Deposition of Wanda Stegall taken March 1, 2022, pp. 36-37, Exhibit "S."

Defendants cite *Rockwell v. Brown*, 664 F.3d 985, 992 (5th Cir. 2011), claiming that "the [plaintiffs'] argument that the breach of the door necessarily caused the shooting that followed is

nothing more than speculation." Defendants' Motion for Leave to File Renewed Motion for Summary Judgment and Motion for Judgment on the Pleadings [252], Exhibit B thereto [PageID #: 3200]. As relevant to the no-knock warrant causing Rockwell's death, *Rockwell* establishes nothing. *Rockwell* held only that the officers had the right to enter the home because of exigent circumstances, stating: "On the issue of exigent circumstances, however, we conclude that the law at the time of the entry did not clearly establish that the officers were unreasonable in believing that *the threat Scott posed to himself* constituted an exigent circumstance." *Rockwell*, 664 F.3d at 994 (emphasis in original). *Rockwell* held that since "Scott had been diagnosed as suicidal. . . .," *Rockwell*, 664 F.3d at 994-95, they could reasonably believe that it was necessary to enter the home without a warrant. *Rockwell*, 664 F.3d at 994-95. Here, it has not been established that entering without knocking was necessary at all.

> **D. A JURY MAY INFER THAT DEFENDANT SLOAN WAS NOT PERFORMING ANY "DISCRETIONARY FUNCTION," BUT INITIATED THE RAID IN ORDER TO STEAL. QUALIFIED IMMUNITY IS AVAILABLE FOR ONLY DISCRETIONARY FUNCTIONS. FURTHERMORE, STEALING IS NOT A REASON FOR ENTRY, AND VIOLATES THE FOURTH AMENDMENT.**

*Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), held that "government officials performing <u>discretionary</u> functions generally are shielded from liability for civil damages. . . ." (Emphasis added). This record contains powerful evidence from which a jury may infer that a purpose of this raid was not to carry out any discretionary function, but to steal. At the time of the raid on the Keeton house trailer, Defendant Sloan was under investigation by Monroe County Chief Deputy Curtis Knight and Mississippi Bureau of Investigations Investigator Kenneth Bailey for attempted stealing. Deposition of Curtis

Knight, pp. 17-20, Exhibit "N." Deposition of Cecil Cantrell Taken February 15, 2017, pp. 13-15, Exhibit "L"; Statement of Kenneth Bailey, Exhibit "Y."

At the time Defendant Sloan initiated the raid, Knight and Bailey were investigating Defendant Sloan based upon information about his stealing from Stephanie Herring, who had been working for Defendant Sloan as a confidential informant. Statement of Kenneth Bailey, Exhibit "Y"; Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 6, Exhibit "Z." The former sheriff, the chief deputy, and other deputies knew about this ongoing investigation of Defendant Sloan when the sheriff allowed Defendant Sloan to lead the no-knock raid. Deposition of Curtis Knight, pp. 17-19, Exhibit "N"; Deposition of Eric Sloan, p. 37, Exhibit "J." Herring described Defendant Sloan's attempting to steal to Chief Deputy Knight and M.B.I. Investigator Kenneth Bailey in September 2015. Statement of Kenneth Bailey, Exhibit "Y"; Deposition of Curtis Knight, pp. 17-20, Exhibit "N."

At deposition, Herring explained how she came to be an informant for Defendant Sloan. Herring testified that in August 2015, Defendant Sloan contacted her about a robbery. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, pp. 9-12, Exhibit "Z." Herring knew about the robbery because she was a short-time girlfriend of a suspect, B. J. Williams. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 12, Exhibit "Z." Defendant Sloan told Herring that in exchange for $10,000.00, which he wanted her to steal from Williams, Defendant Sloan would drop all potential charges against her related to the robbery. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, pp. 13-14, Exhibit "Z." Defendant Sloan told

Herring that he wanted $10,000.00 in order to take his children to Disney World. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 10, Exhibit "Z."

Herring testified that she was unsuccessful in getting the money from Williams because Williams claimed he had been robbed of the stolen money. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 12, Exhibit "Z." Williams, however, provided Herring with the name and address of another robber, Michael Patterson, who still had his share of the stolen money. Herring gave Patterson's physical location to Defendant Sloan, and told Defendant Sloan the remaining money was at Patterson's place. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, pp. 13-14, Exhibit "Z." Herring refused, however, to assist Defendant Sloan in attempting to steal the money from Patterson. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 13, Exhibit "Z."

The same day that Herring gave Defendant Sloan this information, local media reported that Defendant Sloan had been shot. Herring then called Defendant Sloan and asked him whether he was shot while trying to get the money from Patterson; Defendant Sloan responded that he would "plead the Fifth amendment,. . . ." Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 13, Exhibit "Z." Even knowing that the Monroe County Sheriff's Department was investigating Defendant Sloan for this theft at the time of the search, former Monroe County Sheriff Cantrell nevertheless allowed

Defendant Sloan to lead the no-knock search in this case. *See* Deposition of Curtis Knight, pp. 17-20, Exhibit "N."

Herring was only the latest example of persons who had witnessed theft and attempted theft by Defendant Sloan. Around the same time (a few weeks before the Keeton raid) as Defendant Sloan was orchestrating the theft plans described by Herring, he had stolen from a victim of a robbery. *See* Hearing Testimony of B.J. Harmon in *State v. Herring*, Monroe County Circuit Court No. CR16-045, pp. 15-16, Exhibit "AA." Years before, Defendant Sloan had also stolen from Roger Woods, who testified about Defendant Sloan's theft at the same state court hearing. *See* Hearing Testimony of Roger Woods in *State v. Herring*, Monroe County Circuit Court No. CR16-045, pp. 24-27, Exhibit "AA."

There is a legitimate issue in this case as to whether Defendant Sloan's purpose for the raid was to steal. A jury may reasonably find that Defendant Sloan did not tell the SWAT team or deputies about the $20,000.00 he claimed was in the trailer because he intended to steal the money without their ever knowing about the existence of funds. In fact, if Defendant Sloan is truthful that there was $20,000.00 in the trailer, his stealing it is a good explanation for why the $20,000.00 has never been found. At least, this is an inference that a reasonable jury may draw.

Stealing is not a discretionary law enforcement function. A law enforcement officer's using a no-knock entry in order to steal from a criminal suspect is just as egregious as "deliberate concealment of exculpatory evidence," which was held not subject to a qualified immunity defense in *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008).

Qualified immunity does not protect those who "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). One who uses his office and carries out a search in an effort to steal is "knowingly violat[ing] the law."

*Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 166 (5th Cir. 2007), held that "harassment is by definition objectively offensive and unreasonable, and qualified immunity protects only the 'objectively reasonable,'. . . ." If Defendant Sloan were using his office to steal, he engaged in conduct which is not objectively reasonably.

Stealing makes the search not "reasonable," and, thus, violates the Fourth Amendment. *Cty. of Los Angeles, Calif. v. Mendez*, ___ U.S. ___, 137 S. Ct. 1539, 1546 (2017), held:

> The Fourth Amendment prohibits "unreasonable searches and seizures." "[R]easonableness is always the touchstone of Fourth Amendment analysis," *Birchfield v. North Dakota,* 579 U.S. ——, ——, 136 S.Ct. 2160, 2186. . . (2016), and reasonableness is generally assessed by carefully weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694 . . . (1985). . . .

*Cty. of Los Angeles, Calif.*, 137 S. Ct. at 1546.

"[T]he nature and quality of the intrusion" was severe, a no-knock breaking into a home. The interest of the government in recovering a small amount of drugs is minimal. That interest is nonexistent if the jury believes that the purpose of the entry was Defendant Sloan's intent to steal the $20,000.00.

Whether Defendant Sloan carried out the no-knock to steal or to carry out a legitimate law enforcement function involves the drawing of inferences by a jury. "[T]he drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). "There will seldom be 'eyewitness' testimony as to the

[individual's] mental processes. . . The law often obliges finders of fact to inquire into a person's state of mind." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (citations omitted). As put in *Hunt v. Cromartie*, 526 U.S. 541, 542 (1999), "it was error to resolve the disputed fact of intent at the summary judgment stage."

A jury need not accept as true Defendant Sloan's claims that his purpose was legitimate law enforcement. "[T]he mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401, 408 (1899). A jury is required to accept as true only that testimony which "comes from disinterested witnesses." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 943 (5th Cir. 2015).

A jury, drawing inferences in the non-movant's favor, may reasonably conclude that if Defendant Sloan's purposes were legitimate law enforcement, he would have told the SWAT team about the $20,000.00, or at least noted the funds in the search warrant affidavit. Similarly, legitimate law enforcement purposes would be served by awaiting the arrival of the alleged Mexican drug cartel leader who Defendant Sloan claimed was supposed to pick up the $20,000.00 that same day. If legitimate law enforcement had been the objective, a jury may infer the deputies would have waited until the arrival of the Mexican drug cartel member so that deputies could arrest that person and also recover the $20,000.00 for forfeiture to Defendant County. Coxey so testified. Deposition of Tony Coxey, pp. 18-19, Exhibit "BB." Defendant Sloan has never admitted that this was the purpose, but "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

**E.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT THERE WERE GENUINE ISSUES OF MATERIAL FACT AS TO THE CLAIM OF EXCESSIVE FORCE.**

Besides alleging that the unconstitutional no-knock entry proximately caused Keeton's death, Plaintiffs also allege that Defendant Sloan and other deputies used unreasonable force in shooting and killing Keeton. These "two claims should not be confused." *Cty. of Los Angeles, Calif. v. Mendez*, ___ U.S. ___, 137 S.Ct. 1539, 1548 (2017).

To succeed on an excessive force claim, "the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016), citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000. "The use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero v. City of Grapevine, Texas*, 888 F.3d 170, 176 (5th Cir. 2018) citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009).

A similar case, *Graham v. Connor*, 490 U.S. 386 (1989), set the standard to be utilized in claims of unreasonable force. The Supreme Court held that the due process standard of determining whether officers acted "maliciously and sadistically for the very purpose of causing harm," *Graham*, 490 U.S. 386, is "incompatible with a proper Fourth Amendment analysis." *Graham*, 490 U.S. at 387. Rather, the Fourth Amendment requires a determination of whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 387.

The issue of whether Keeton posed an "immediate threat to the officer[s]" is a disputed issue of material fact.

There were still other reasons why a jury might choose to believe the testimony of a single witness over the testimony of numerous deputies to the contrary. Former Sheriff Cantrell's original version of events does not comply with what we now know to be the facts. In a statement to the news media, former Sheriff Cantrell stated, "When they got to the back door, he opened the door and started shooting, wounded one of my deputies." *See* Article Entitled *Smithville man killed during drug raid*, Exhibit "CC." The deputies shot back. Those were seasoned deputies who were on that SWAT team, and they had no choice but to shoot back." Cantrell said the wounded deputy was "expected to make a full recovery,. . . ." *See* Article Entitled *Smithville man killed during drug raid*, Exhibit "CC." Thus, in the false version of events Cantrell gave the media, the sheriff did not even acknowledge that there was any no-knock entry, and falsely claimed that Keeton had wounded a deputy.

Cantrell, in the last line of the press release, even magnifies the deputies' version of events by alluding to a previous shooting of Defendant Sloan, a fifteen (15) year veteran, whom he claims was shot on Highway 45 after pulling over a motorcycle. *See* Article Entitled *Smithville man killed during drug raid*, Exhibit "DD." According to non-movant's evidence, however, Defendant Sloan was, in fact, shot when he was trying to steal the proceeds of a robbery. Deposition of Stephanie Herring, in the case styled, *Cynthia Verdise Fuller v. Eric Sloan, et al.,* U.S.D.C., No. 1:16-cv-00014-GHD-DAS, p. 14, Exhibit "Z."

In order to grant summary judgment, this Court must disregard Stegall's testimony, and accept, instead, the testimony in favor of the deputies at the scene. A jury could certainly discount

the deputies' testimony, since their claim that Keeton was firing at them is inconsistent with the fact that his pellet pistol held only ten (10) rounds, there was only one missing from the chamber, and that round was found at Keeton's feet, not anywhere near the deputies.

In *Tolan v. Cotton*,___ U.S.___, 134 S.Ct. 1861 (2014), the appeals court has held "'an objectively-reasonable officer in Sergeant Cotton's position could have ... believed' that Tolan 'presented an 'immediate threat to the safety of the officers.'" *Tolan*, 134 S.Ct. at 1865. The Supreme Court reversed, however, stating "[b]y failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party, *Anderson,* 477 U.S., at 249, 106 S.Ct. 2505.[5]" *Tolan*, 134 S.Ct. at 1866.

If the jury believes Herring's testimony, that Keeton had already closed the door when the shooting began, the jurors are entitled to conclude that the force used was "clearly excessive to the need" and objectively unreasonable.

Finally, a jury is entitled to infer that the deputies' obscuring the camera that would have depicted the shooting is evidence of a cover up of the manner in which the killing actually occurred. It is familiar law that a jury is entitled to draw an inference that a party who intentionally destroys important evidence "did so because the contents of those documents were unfavorable to that party." *Russell v. Univ. of Texas of Permian Basin*, 234 F. App'x 195, 207 (5th Cir. 2007).

## V.   CONCLUSION

Defendants' Motion for Summary Judgment[252] should be denied.

---

[5]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

RESPECTFULLY SUBMITTED, this the 13th day of April, 2022.

ROBBIE KEETON GEIGER, DELISHA KEETON MOONEY, and MEGAN ARCHER, Plaintiffs

By:    */s/ Jim Waide*
Jim Waide, MS Bar No. 6857
waide@waidelaw.com
Rachel Pierce Waide, MS Bar No. 100420
rpierce@waidelaw.com
WAIDE & ASSOCIATES, P.A.
332 North Spring Street
Tupelo, MS 38804-3955
Post Office Box 1357
Tupelo, MS 38802-1357
(662) 842-7324 / Telephone
(662) 842-8056 / Facsimile

R. Shane McLaughlin, MS Bar No. 101185
rsm@mclaughlinlawfirm.com
McLAUGHLIN LAW FIRM
347 North Spring Street
Tupelo, MS 38804-3943
Post Office Box 200
Tupelo, MS 38802-0200
(662) 840-5042 / Telephone
(662) 840-5043 / Facsimile

ATTORNEYS FOR PLAINTIFFS

00365111.WPD                                    -35-

## <u>CERTIFICATE OF SERVICE</u>

This will certify that undersigned counsel for Plaintiffs has this day filed the above and foregoing with the Clerk of the Court, utilizing the federal court electronic case data filing system (CM/ECF), which sent notification of such filing to the following:

**Arnold U. Luciano, Esquire**
**Jacks Griffith Luciano, P.A.**
aluciano@jlpalaw.com
vsmith@jlpalaw.com
mhankins@jlpalaw.com
lvanvulpen@jlpalaw.com

**Bethany A. Tarpley, Esquire**
**Jacks Griffith Luciano, P.A.**
btarpley@jlpalaw.com
dlivingston@jlpalaw.com
vsmith@jlpalaw.com
ballday@jlpalaw.com

**Daniel J. Griffith, Esquire**
**Jacks Griffith Luciano, P.A.**
dgriffith@jlpalaw.com
vsmith@jlpalaw.com
lvanvulpen@jlpalaw.com
aluciano@jlpalaw.com

**Jamie Ferguson Lee, Esquire**
**Jacks Griffith Luciano, P.A.**
jamie@jlpalaw.com
mlott@jlpalaw.com
vsmith@jlpalaw.com

DATED, this the 13th day of April, 2022.

/s/ Jim Waide
Jim Waide

00365111.WPD                    -36-